**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| **SHORT'S BURGER & SHINE, LLC**, AN IOWA LIMITED LIABILITY COMPANY AND **KEVIN PEREZ**, AN INDIVIDUAL | Case No. 3:24-cv-00059-RGE-SBJ |
| **Plaintiffs**, | |
| v. | **FIRST** |
| **MIDWESTONE BANK**, AN IOWA STATE BANK, BOTH INDIVIDUALLY AND AS TRUSTEE OF THE **HAYWOOD B. BELLE FAMILY TRUST**; **DENNIS MITCHELL**, AN INDIVIDUAL AND TRUST OFFICER OF MIDWESTONE BANK; **GREG TURNER**, AN INDIVIDUAL AND FORMER OFFICER OF MIDWESTONE BANK, **THAIS WINKLEBLACK**, AN INDIVIDUAL AND OFFICER OF MIDWESTONE BANK; | **AMENDED** **COMPLAINT** |

**CITY OF IOWA CITY, IOWA**; **GEOFF FRUIN**, INDIVIDUALLY AND AS CITY MANAGER; **ERIC GOERS**, INDIVIDUALLY AND AS CITY ATTORNEY; **SUSAN DULEK**, INDIVIDUALLY AND AS ASSISTANT CITY ATTORNEY; **ELIZABETH CRAIG**; INDIVIDUALLY AND AS ASSISTANT CITY ATTORNEY; **JESSICA BRISTOW**, INDIVIDUALLY AND AS CITY HISTORIC PRESERVATION PLANNER, **KEVIN BOYD**, INDIVIDUALLY AND AS FORMER CHAIR OF THE IOWA CITY HISTORIC PRESERVATION COMMITTEE;

**IOWA CITY DOWNTOWN SELF-SUPPORTED MUNICIPAL IMPROVEMENT DISTRICT** (AKA IOWA CITY DOWNTOWN DISTRICT, IOWA CITY DOWNTOWN ASSOCIATION & DOWNTOWN ASSOCIATION OF IOWA CITY) AN IOWA NONPROFIT CORPORATION**; GREATER IOWA CITY, INC.**, AN IOWA CORPORATION, **NANCY BIRD**, AN INDIVIDUAL;

**CRAFT CONCEPTS, L.L.C,** AN IOWA

LIMITED LIABILITY COMPANY; **IC BURG, LLC** (DBA GOLD CAP HOSPITALITY) AN IOWA LIMITED LIABILITY COMPANY; **MIDWEST PROPERTY MANAGEMENT IC, LLC** (AKA KMB PROPERTY MANAGEMENT & KMB PROPERTY MANAGEMENT – IOWA CITY), AN IOWA LIMITED LIABILITY COMPANY; **MH LEGACY, LLC,** AN IOWA LIMITED LIABILITY COMPANY; **NS HOLDINGS, LLC** (FORMERLY MIDWEST S.N. INVESTORS, LLC), AN IOWA LIMITED LIABILITY COMPANY; **NATHANIEL KAEDING**, AN INDIVIDUAL AND MEMBER OF THE BOARD OF DIRECTORS OF MIDWESTONE BANK; **MATTHEW SWIFT**, AN INDIVIDUAL; **CORY KENT**, AN INDIVIDUAL; **BENJAMIN SMART**, AN INDIVIDUAL  **JOHN MASKE**, AN INDIVIDUAL, **STEPHANIE BREITBACH**, AN INDIVIDUAL; **DOUG GOETTSCH**, AN INDIVIDUAL; **BRIAN FLYNN**, AN INDIVIDUAL; **LANE ERIK SHEWMAKER**, AN INDIVIDUAL

**120 EAST WASHINGTON L.L.P**, AN IOWA LIMITED LIABILITY PARTNERSHIP; **MATTHEW HAYEK**, AN INDIVIDUAL, MEMBER OF THE BOARD OF DIRECTORS OF MIDWESTONE, FORMER IOWA CITY COUNCIL MEMBER, AND FORMER IOWA CITY MAYOR; **JOSEPH MORELAND**, AN INDIVIDUAL; **LAURA BERGUS**, AN INDIVIDUAL AND CITY COUNCIL MEMBER;  **HAYEK, MORELAND, SMITH & BERGUS, L.L.P.**, AN IOWA LIMITED LIABILITY PARTNERSHIP;

**SIOBHAN BRILEY**, AN INDIVIDUAL; **PUGH HAGAN PRAHM PLC**, AN IOWA PROFESSIONAL LIMITED LIABILITY COMPANY;

**SARAH WALLACE** (AKA SARAH WALLACE BELLE), AN INDIVIDUAL
      **Defendants**.

# Table of Contents

**INTRODUCTION**......................................................................................................... 6

**THE PARTIES**............................................................................................................... 7

**JURISDICTION & VENUE** ......................................................................................... 10

**DEFINITIONS** ............................................................................................................. 11

**FACTUAL ALLEGATIONS** ........................................................................................ 12

  **Perez Background** ..................................................................................................... 12

  **Short's History & the Lease** ...................................................................................... 12

  **Short's Disputes with Landlord** ............................................................................... 14

  **Eviction Attempts and Related Litigation**.................................................................. 19

  **Kaeding & Craft Defendants** .................................................................................... 24

  **The Break-In/Trespass By MWO & Craft Defendants** .............................................. 27

  **Short's Sidewalk Café & Patio** ................................................................................. 29

  **Racial Discrimination Complaints** ............................................................................ 33

    Discrimination in 2022 .............................................................................................. 33

    Discrimination Continues throughout 2023 ................................................................ 35

    Iowa Civil Rights Commission Complaint #1 ............................................................. 37

    Retaliation for Filing ICRC Complaint #1 .................................................................. 38

    Amendment to ICRC Complaint #1 – Addition of Retaliation Claim............................ 38

    Further Retaliation and Aiding and Abetting by the City – Short's Patio ...................... 40

    ICRC Complaint #2 – Retaliation & Aiding and Abetting............................................ 43

    Iowa Civil Rights Act Litigation................................................................................. 47

  **Iowa City's Misuse of Historic Preservation** ............................................................ 48

    History of the Building ............................................................................................... 48

    Iowa City – Certified Local Government .................................................................... 49

    Historic Property Survey............................................................................................ 50

    The City's Inconsistent Description of the Building in Representations to the State
      and DOI............................................................................................................... 50

    Historic Preservation Plan.......................................................................................... 51

    Requests for City Assistance ..................................................................................... 52

    Slezak Building.......................................................................................................... 53

    Failure to Enforce Ordinances Against the Building Owners ....................................... 55

  **Exclusion from Iowa City Ad Hoc Truth and Reconciliation Commission**.................... 56

  **Iowa City Downtown District**.................................................................................... 56

**Interlocking Relationships of the Enterprise** ...................................................... 58

**CLAIM 1:**      **VIOLATION OF TITLE VI OF THE UNITED STATES CIVIL RIGHTS ACT** (Short's & Perez v. MWO) ........................................................... 63

**CLAIM 2:**      **VIOLATION OF TITLE VI OF THE UNITED STATES CIVIL RIGHTS ACT** (Short's & Perez v. the City) ...................................................... 66

**CLAIM 3:**      **VIOLATION OF TITLE VI OF THE UNITED STATES CIVIL RIGHTS ACT** (Short's & Perez v. the Craft Defendants) ................................... 69

**CLAIM 4:**      **VIOLATION OF 42 U.S.C. § 1981** (Short's & Perez v. All Defendants) ......... 70

**CLAIM 5:**      **VIOLATION OF 42 U.S.C. § 1982** (Short's & Perez v. MWO Defendants, Wallace, and City Defendants) ................................................................ 73

**CLAIM 6:**      **VIOLATION OF 42 U.S.C. § 1983** (Short's & Perez v. City Defendants Other than Boyd, MWO Defendants PHP Defendants, & Craft Defendants) ............... 76

**CLAIM 7:**      **CONSPIRACY TO VIOLATE 42 U.S.C. § 1983** (Short's & Perez v. All Defendants Other than Boyd) ................................................................ 80

**CLAIM 8:**      **VIOLATION OF 42 U.S.C. §§ 1985(2) & (3) & 1986** (Short's & Perez v. All Defendants Other than Boyd) ....................................................... 83

**CLAIM 9:**      **VIOLATION OF IOWA COMPETITION LAW – IOWA CODE CHAPTER 553** (Short's & Perez v. All Defendants) ....................................... 86

**CLAIM 10:**    **CIVIL RICO – 18 U.S.C. §1961 et seq.** (Short's & Perez v. All Defendants Other than the City) ................................................................ 94

     **A. STATUTORY PROVISIONS** ............................................................... 94

     **B. CULPABLE PERSONS** ....................................................................... 95

     **C. ENTERPRISES** ................................................................................... 95

     **D. INTERSTATE COMMERCE** ............................................................. 96

     **E. RACKETEERING ACTIVITY – PREDICATE ACTS** ....................... 97

       1.    Iowa Code § 711.4 Extortion ................................................................. 97

       2.    Iowa Code § 722.1 Bribery .................................................................. 100

       3.    Iowa Code § 714.1 (1) – Theft/Robbery ............................................. 102

       4.    Iowa Code § 714 – Fraudulent Practices ............................................. 103

       5.    Iowa Code § 716.7 – Criminal Trespass .............................................. 104

       6.    Iowa Code § 720.2 Perjury & § 720.3 Suborning Perjury ..................... 105

       7.    Iowa Code § 720.4 Witness Tampering ............................................... 108

       8.    Iowa Code § 808B.2 Unlawful acts — Interception of Communications. ............... 108

       9.    18 USC 201(b) & (c) Bribery ............................................................... 109

     10.    18 U.S.C. § 1344 – Bank Fraud ........................................................... 110

     11.    18 U.S.C. § 1512 – Witness Tampering ............................................... 111

12.   18 U.S.C. §§ 891-894 – Extortionate Extension of Credit ...................................... 112

13.   18 U.S.C. § 1951 – Interference with Commerce by Threats ................................. 113

14.   18 U.S.C. § 1956 – Laundering ............................................................................. 115

15.   18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity ................................................................................... 116

16.   18 U.S.C. § 2511 Electronic Communications Privacy Act .................................... 116

17.   18 U.S.C. § 1341 Mail Fraud ................................................................................. 117

18.   18 U.S.C. § 1343 Wire Fraud ................................................................................. 118

**F.  RICO § 1962(a)** ........................................................................................................ 120

**G.  RICO § 1962(b)** ....................................................................................................... 121

**H.  RICO § 1962(c)** ....................................................................................................... 122

**I.  RICO § 1962(d)** ........................................................................................................ 123

**CLAIM 11:   UNLAWFUL INTERCEPTION OF ELECTRONIC COMMUNICATIONS IOWA CODE CH. 808B** (Short's & Perez v. Craft Defendants) .................... 125

**CLAIM 12:   ELECTRONIC COMMUNICATIONS PRIVACY ACT 18 U.S.C. § 2520** (Short's & Perez v. Craft Defendants) ................................................................. 127

**CLAIM 13:   NEGLIGENT SUPERVISION** (Short's & Perez v. MWO) .......................... 128

**CLAIM 14:   DEFAMATION** (Short's & Perez v. MWO Defendants, Kaeding, Swift, Bird and Wallace) ................................................................................................ 130

**CONCLUSION** ....................................................................................................................... 138

**REMEDIES AND REQUEST FOR RELIEF** ..................................................................... 139

## <u>Exhibits</u>

**A.** Downtown and "Block" Map & Boundaries

**B.** Iowa City Historic District Map and Boundaries

**C.** Iowa River Landing Map and Boundaries

**D.** Iowa City Certified Local Government Agreement

**E.** State Historic Preservation Office Letter dated May 6, 2024

**INTRODUCTION**

1.      The Defendants, individually and as co-conspirators as part of an enterprise, have acted

to deprive Plaintiffs of their civil rights and have damaged Plaintiffs in furtherance of the common

goal to unlawfully dominate the downtown Iowa City real estate and restaurant markets to the

exclusion of Plaintiffs in violation of (i) Title VI of the United States Civil Rights Act (42 U.S.C.

§2000d et seq)("Title VI"), (ii) 42 U.S.C. §§ 1981, 1982, 1983, 1985 & 1986, (iii) the United States

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.)("RICO") (iv) the

Iowa Competition Law (Iowa Code Chapter 553), and (v) Iowa and federal electronic

communications laws.

2.      The "enterprises" (defined below), with each consisting of some or all of the defendants

as its members, have used unlawful and fraudulent means to attempt to:

   **a.**   Remove Plaintiff Perez and his business, Plaintiff Short's, from downtown Iowa

         City because of Perez's Hispanic race;

   **b.**   Fraudulently seize real estate interests (both leasehold and fee title) of the Building

         housing Short's operations;

   **c.**   Replace Plaintiffs business operations in the building with a new tenant/business

         owned by the Craft Defendants (white-owned) or affiliates and confederates of the

         group of Defendants choosing;

   **d.**   Unlawfully conspire and attempt to interfere with the markets for commercial retail

         leasing, commercial real estate valuations and restaurant/bar businesses in the Iowa

         City Downtown market;

3.      The City's and its personnel (whether acting individually or on behalf of the City) are

participating in the furtherance of these goals for the benefit of the "enterprises" and their goals of

removing Perez and Short's (Hispanics) from participating in the Iowa City downtown economy and in interfering in markets to direct properties into the hands of City and enterprise blessed businesses to the exclusion of competitors.

4.    All statements of claims herein are plead in the alternative. Fed. R. Civ. P. 8(d)(2)

## THE PARTIES

5.    Plaintiff Short's Burger & Shine, LLC ("Short's") is an Iowa limited liability company with its principle place of business in Iowa City, Iowa. Short's is authorized and in good standing to conduct business in the State of Iowa.

6.    Plaintiff Kevin Perez is an individual residing in Johnson County, Iowa.

7.    The "**MWO Defendants**" are the following:

    a.   MidWestOne Bank ("MWO"), an Iowa state bank with its principle place of business in Iowa City, Iowa.

    b.   MWO as trustee of the Haywood B. Belle Family Trust ("Trust"), an Iowa trust formed pursuant to Iowa Code Chapter 633A.

    c.   Dennis Mitchell ("Mitchell"), an individual and officer employed by MWO who resides in Johnson County, Iowa.

    d.   Greg Turner ("Turner"), an individual and former officer of MWO who resides in Johnson County, Iowa.

    e.   Thais Winkleblack ("Winkleblack"), an individual and officer employed by MWO who resides in Johnson County, Iowa.

    f.   Kaeding, defined below

    g.   Hayek, defined below.

**8.**     The "**City Defendants**" are the following:

    **a.**   The City of Iowa City, Iowa ("City").

    **b.**   Geoff Fruin ("Fruin") as an individual residing in Johnson County, Iowa and as City Manager of Iowa City.

    **c.**   Eric Goers ("Goers") as an individual residing in Johnson County, Iowa and as City Attorney of Iowa City.

    **d.**   Susan Dulek ("Dulek") as an individual residing in Johnson County, Iowa and as Assistant City Attorney of Iowa City.

    **e.**   Elizabeth Craig ("Craig") as an individual residing in Johnson County, Iowa and as Assistant City Attorney of Iowa City.

    **f.**   Jessica Bristow ("Bristow") as an individual residing in Johnson County, Iowa and as City Historic Preservation Planner,

    **g.**   Bergus, defined below.

    **h.**   Boyd, defined below.

    **i.**   Hayek, defined below.

**9.**     The "**Craft Defendants**" are the following

    **a.**   Craft Concepts, LLC ("Craft Concepts"), an Iowa limited liability company doing business in Johnson County, Iowa.

    **b.**   IC Burg, LLC, doing business as Gold Cap Hospitality ("Gold Cap"), an Iowa limited liability company doing business in Johnson County, Iowa.

    **c.**   Midwest Property Management IC, LLC ("Midwest Property"), also known or formerly known as KMB Property Management and KMB Property Management- Iowa City), an Iowa limited liability company doing business in Johnson County, Iowa.

**d.**  MH Legacy, LLC ("MH Legacy"), an Iowa limited liability company doing business in Johnson County, Iowa.

**e.**  NS Holdings, LLC ("NS Holdings"), formerly Midwest S.N. Investors, LLC, an Iowa limited liability company doing business in Johnson County, Iowa.

**f.**  Nathaniel Kaeding ("Kaeding"), an individual residing in Johnson County, Iowa and as a member of the boards of directors of MWO and MidWestOne Financial Group ("MFG"), an Iowa corporation doing business in Johnson County, Iowa.

**g.**  Matthew Swift ("Swift"), an individual residing in Johnson County.

**h.**  Cory Kent ("Kent"), an individual residing in Johnson County.

**i.**  Benjamin Smart ("Smart"), an individual residing in Johnson County.

**j.**  John Maske ("Maske"), an individual residing in Johnson County.

**k.**  Stephanie Breitbach ("Breitbach"), an individual residing in Johnson County.

**l.**  Doug Goettsch ("Goettsch"), an individual residing in Johnson County.

**m.**  Brian Flynn ("Flynn"), an individual residing in Johnson County.

**n.**  Lane Erik Shewmaker ("Shewmaker"), an individual residing in Johnson County.

**10.**  The "**ICDD Defendants**" are the following:

**a.**  Iowa City Downtown Self-Supported Municipal Improvement District (also known as or formerly known as Iowa City Downtown District & Iowa City Downtown Association) ("ICDD"), an Iowa nonprofit corporation, doing business in Johnson County, Iowa.

**b.**  Greater Iowa City, Inc. ("GIC"), an Iowa nonprofit corporation doing business in Johnson County, Iowa.

**c.**  Nancy Bird, an individual residing in Johnson County, Iowa and as former officer

of ICDD and current officer of GIC.

    **d.**   Kaeding.

**11.**   The "**East Washington Defendants**" are the following:

    **a.**   120 East Washington L.L.P. ("120 East"), an Iowa limited liability partnership doing business in Johnson County, Iowa.

    **b.**   Matthew Hayek ("Hayek"), an individual residing in Johnson County, Iowa, and as a member of the Board of Directors of MWO and MFG, as a former member of the Iowa City City Council and former mayor of Iowa City.

    **c.**   Joseph Moreland ("Moreland"), an individual residing in Johnson County, Iowa.

    **d.**   Laura Bergus ("Bergus") an individual residing in Johnson County, Iowa and as a member of the Iowa City City Council.

    **e.**   Hayek, Moreland, Smith & Bergus, LLP ("HMSB"), an Iowa limited liability partnership doing business in Johnson County, Iowa.

**12.**   The "**PHP Defendants**" are the following:

    **a.**   Siobhan Briley ("Briley"), an individual residing in Johnson County, Iowa

    **b.**   Pugh Hagan Prahm PLC ("PHP"), an Iowa professional limited liability company doing business in Johnson County Iowa.

**13.**   Sarah Wallace (aka Sarah Wallace Belle) ("Wallace") an individual residing in Johnson County Iowa and sole beneficiary of the Trust.

## JURISDICTION & VENUE

**14.**   This Court has subject matter jurisdiction over Plaintiffs' claims under Title VI, 42 U.S.C. §§ 1981, 1982, 1983, 1985 & 1986, RICO, 18 U.S.C. §1961 et seq., and Electronic Communications Privacy Act, 18 U.S.C. § 2520 (Claims 1 to 8 and 10 & 11) under 28 U.S.C. §

1331 because these claims arise under federal law. This Court also has jurisdiction over the civil RICO claim (Claim 10) pursuant to 18 U.S.C. § 1964(a), (c) and § 1965(a).

**15.** Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiffs' claims under the Iowa Competition Law (Iowa Code Chapter 553) (Claim 9), under the Iowa Interception of Communications statute (Iowa Code Chapter 808B) (Claim 11), at common law for Negligent Supervision (Claim 13) and for Defamation (Claim 14) .

**16.** The Court is authorized to issue declaratory and injunctive relief under 28 U.S.C §§ 2201-2202.

**17.** Venue is proper under 18 U.S.C. § 1965 (RICO venue), 28 U.S.C. §1391(b)(1) (all defendants are residents of Iowa and more than one defendant resides in the Southern District of Iowa) and 28 U.S.C. §1391(b)(2) (a substantial portion of the events or omissions giving rise to the claims occurred in the Southern District of Iowa).

## **DEFINITIONS**

**18.** As used herein, the following terms have the meaning set forth below:

**a.** "Block" means the city block in Iowa City, Iowa bounded by Iowa Avenue to the north, Dubuque Street to the east, Washington Street to the south, and Clinton Street to the west delineated by blue borders in Exhibit A attached hereto and incorporate herein.

**b.** "Defendants" means the group comprised of the MWO Defendants, City Defendants, Craft Defendants, ICDD Defendants, East Washington Defendants, PHP Defendants, and Wallace.

**c.** "Iowa City Downtown" means the area within Iowa City, Iowa delineated by red borders and pink shading in Exhibit B attached hereto and incorporated herein.

**d.** "IRL Market" means the Iowa River Landing Area ("IRL Area") depicted in

Exhibit C.

## FACTUAL ALLEGATIONS

### Perez Background

**19.**   Perez's grandfather was born in Mexico and was a teenager when he immigrated to the United States in the 1910s.

**20.**   Perez is a 57-year old man, Hispanic in race and his surname is Hispanic in origin.

**21.**   Perez attended West Des Moines Valley High School and graduated in 1985 and attended and graduated from the University of Iowa.

**22.**   Perez has owned and operated retail businesses and restaurants in and around downtown Iowa City since 1992.

### Short's History & the Lease

**23.**   Short's was formed as a limited liability company in 2008. The initial members, each owning 1/3rd interests in the entity were Plaintiff Perez, Defendant Kaeding, and Daniel Ouverson ("Ouverson"). Short's was formed to operate a restaurant/bar in downtown Iowa City.

**24.**   Ouverson and Kaeding are both Caucasion.

**25.**   From 2008 to 2011 Short's operated at 18 S. Clinton Street, Iowa City, Iowa 52240 ("Premises") pursuant to a sublease from an entity owned by Ouverson.

**26.**   The Premises is part of a building (the "Building") comprised of (i) 18 S. Clinton being the ground level and basement of the northern half of the Building, (ii) 20 S. Clinton being the ground level and basement of the southern half of the Building and (iii) 18 ½ S. Clinton being the second and third floors of the entire Building.

**27.**   The Premises (18 S. Clinton) is located in a prime location directly across the street from the University of Iowa Pentacrest in the middle of the block between East Washington and Iowa

Avenue. This block experiences student, faculty, university employee and Iowa City resident foot-traffic and is a block from the Iowa City Pedestrian Mall.

28.    In 2011 the sublease expired and Short's entered the "Lease – Business Property" ("Lease") directly with H.D. Short and Sons, an Iowa General Partnership ("Landlord"), for rental of the Premises, for an initial term of three (3) years (May 1, 2011 to April 30, 2014) with the option to renew for seven (7) additional terms of three (3) years. Perez, Ouverson and Kaeding each also individually signed the Lease as "Tenants" effectively making Perez, Ouverson and Kaeding individual guarantors responsible for the obligations under the Lease.

29.    In 2012, Perez and Ouverson acquired Kaeding's equity interest in Short's. Perez and Ouverson have been 50/50 owners of Short's ever since.

30.    In 2012, Short's entered a Consulting Agreement with Kaeding and paid consulting fees to Kaeding.

31.    On or about February 2, 2017, Short's and Kaeding agreed to a mutual termination of Kaeding's consulting agreement.

32.    A year later, in 2018, Kaeding became a director of MWO.

33.    The Landlord from 2008 to 2016 was H.D. Short & Sons. During this time, Haywood B. Belle was the sole owner of H.D. Short & Sons.

34.    Upon the passing of Haywood Belle in 2016, Defendant MWO served as executor of Mr. Belle's estate. In December 2016, ownership of the Building was transferred from the estate to Defendant Haywood B. Belle Family Trust ("Trust") with MWO serving as trustee.

35.    Short's as tenant was never notified in writing or verbally that the Trust, with MWO as trustee, had become owner of the Building and landlord under the Lease. Until commencement of FED #1 in 2022, Short's believed that since Mr. Belle's passing in 2016 MWO had been serving

as property manager for the Building owned by Mr. Belle's estate or Defendant Wallace. At no time did the Trust/MWO notify Short's that the Trust had become owner of the Building.

36.    Short's renewed the Lease for the 2014-2017, 2017-2020, and 2020-2023 three-year lease terms.

37.    In August 2021, the Trust/MWO agreed to release Kaeding from his personal obligations under the Lease.

38.    The Trust/MWO did not agree to release Ouverson and Perez at the same time from their obligations under the Lease.

## Short's Disputes with Landlord

39.    From 2008 to 2016, while Haywood Belle was alive, anytime Short's had repair or maintenance issues at the Premises, Mr. Belle responded promptly to make repairs.

40.    Ownership of the Building transferred to the Trust in December 2016.

41.    At that time, MWO became property manager and trustee of the Trust.

42.    From 2018 through April 2022, Short's repeatedly notified the Trust/MWO regarding needed repairs including sewer malfunctions, water collecting in the basement through severely cracked sub-surface basement walls and roof leaks, and open leaks through the ceiling of the restaurant which interfered with customer dining.

43.    The Trust/MWO was slow to react to Short's requests for repairs during this period, if the Trust/MWO reacted at all to these requests.

44.    From 2011 through April 2022, Ouverson (Caucasian) was responsible for the day-to-day "front-of-the-house" operations at Short's and Perez (Hispanic) was responsible for the "back-of-the-house" operations.

45.    Defendants Mote, Mitchell and Wallace have testified that during the time MWO has

been managing the Building from 2016 to April 2022 that they had minimal or no contact with Perez regarding Short's.

**46.** Defendants MWO, Mote, Mitchell and Wallace have testified that during this 2016 to 2022 period they did not know Perez was an owner of Short's.

**47.** In early April 2022, Perez (Hispanic) and Ouverson (Caucasian) decided to change their management responsibilities and Perez became responsible for managing the front-of-the-house.

**48.** As a result of this change in managerial responsibility, Perez became Short's primary manager responsible for interactions with the landlord.

**49.** Immediately after the change of responsibility from Ouverson (Caucasian) to Perez (Hispanic), in April 2022, the Trust, MWO, and Wallace, individually as a group, began systematic and consistent mistreatment of Perez and Short's.

**50.** Perez decided on April 18, 2022 that Short's needed to temporarily suspended operations due to long-neglected structural issues including cracked basement walls, a leaking roof, 12 inches of standing water in the basement, a collapsing structural wall threatening gas piping and gas meter integrity, and smells of mold and mildew throughout the Premises.

**51.** On April 20, 2022, Defendant Wallace wrote to MWO Defendant Mitchell the following at 5:56 a.m.:

Dennis,

I will be going to the gym and will be there until 9:00 am.  This whole Short"s thing is ridiculous and these guys are acting like children   If Dan is going to drag his feet and Let Kevin walk all over him we need to move on.  I am tired of being helpless because of other people.  I think we should talk to Nate Kaeding see if he is interested, change the name but not the concept, and move ahead.   Dan needs to grow up.   Let me read the letter and why don't  you start composing a letter to send to Nate.   I will call you after the gym.

Thank you, SARAH

**52.** These April 20, 2022 statements by Wallace demonstrate that she will only transact business with Ouverson (Caucasian), not Perez (Hispanic) and Wallace's demand that MWO

contacting Kaeding (Caucasian) to replace Perez (Hispanic) as the operator of the Premises.

**53.** Wallace wants to have a Caucasian tenant, not a Hispanic tenant.

**54.** Mitchell, MWO and the Trust, prodded by and/or with the support of Wallace, took action the next day, April 21, 2022, and sent a letter to Short's declaring a possible future abandonment due to closure as the precursor to beginning the process, culminating in the filing of FED #1, to remove the Hispanic operated business from the Premises and replace that tenancy with a white-owned and operated business.

**55.** On April 21, 2022, the Iowa City Press Citizen reported Short's temporary closure. Statements from Short's were published by the Press Citizen describing the structural problems at the Building

**56.** On or about April 21, 2022 inspection personnel from the City came to inspect the Premises and discovered severe structural damage. The City required that the natural gas supply to the Premises be shut-down due to collapsing walls and support structures threatening natural gas pipe integrity. With natural gas shut-down, restaurant operations could not be conducted at the Premises.

**57.** On April 21, 2022, less than a week after Perez (Hispanic) assumed primary owner-managerial responsibility for Short's for the first time since 2011, MWO/Trustee/Landlord delivered a letter to Short's alleging its cessation of operations on April 18, 2022 constituted an abandonment of the Premises in breach of the Lease and demanded cure by Short's resuming restaurant operations.

**58.** MWO/Trust/Landlord knew that business operations by Short's was impossible due to the City-ordered gas service shut-down to the Premises.

**59.** During the time the Premises was unusable for operations, Short's expended time and

capital to redecorate and deep clean the interior as permitted under the Lease.

60.   MWO/Trustee/Landlord allegedly sent a letter dated May 5, 2022, entitled "Notice of Default under the Lease," to Short's based on the alleged abandonment by cessation of operations. The letters were delivered by email to Short's on May 10, 2022.

61.   On May 19, 2022 Short's responded to the "Notice of Default" by letter and stated that Short's was "in the process of remodeling and updating the space" and that it "anticipate[d] this work to take two to four months at which time we will reopen."

62.   On May 24, 2022, MWO/Trustee delivered a "Notice of Termination" stating Short's closure was an abandonment and breach that had not been timely cured under the Lease.

63.   The May 24, 2022 Notice of Termination also declared that the Lease would terminate June 30, 2022 because of the "abandonment" despite a remaining term through April 30, 2023.

64.   After receiving the Notice of Termination alleging a Lease termination date of June 30, 2022, Perez openly, and with MWO/Trustee & Wallace's awareness and knowledge, continued making interior redecorating changes to the Premises in anticipation of reopening and renewal.

65.   Short's operations were closed during April, May and June 2022 because of the landlord neglect, and structural damage causing a cut-off of the gas supply.

66.   Despite being closed, Short's paid all rent and other amounts due under the Lease for April, May and June 2022.

67.   During June and July 2022, MWO/Trustee contractors worked to repair the structural damage to the Building.

68.   During these repairs, Short's remained closed due to lack of natural gas and the construction. Short's used the idle time to continue its interior cleaning and redecorating.

69.   Short's tendered payment of amounts due under the lease for July 2022 by check using

the normal process as had been used for years.

**70.**    MWO/Trustee rejected Short's tender of payment for July 2022 rent and returned the

check, unendorsed and unprocessed, to Short's counsel asserting the Lease was terminated on June

30, 2022.

**71.**    On July 7, 2022, the Trustee delivered Short's a 3-Day Notice to Quit demanding the

premises be vacated due to abandonment and Lease termination.

**72.**    On July 15, 2022, the Trust filed a forcible entry and detainer action ("FED #1") seeking

to evict Short's alleging the Lease had been terminated as of June 30, 2022.

**73.**    Kaeding was not named as a defendant in FED #1 because MWO had released him from

personal responsibility in August 2021, only eight months prior to the beginning of the Trust's

attempts to remove Perez.

**74.**    On July 21, 2022, Iowa City Press Citizen reported that Perez (Hispanic) had stated to

the reporter that Short's planned to reopen as soon as possible after it completed hiring new staff.

**75.**    In response to the Press Citizen article, Wallace texted Mitchell on July 21, 2022:



**76.**    On July 27, 2022, Short's announced on its Facebook page that it's reopening was near.

**77.**    Upon seeing the Facebook post, on July 27, 2022, Wallace and Mitchell engaged in the

following text message exchange in which Mitchell concludes that Perez "is not on my list of

favorite people":



**78.** While FED #1 was pending, Short's restaurant operations recommenced in August 2022 consistent with the timeline in Short's reasonable offer and timeline it had provided to MWO as a reasonable proposal to reopen in cure the alleged abandonment.

### Eviction Attempts and Related Litigation

**79.** During the seven month period between July 2022 and January 2023, the Trust initiated three separate lawsuits against Short's alleging breaches of the Lease. In all three lawsuits, the plaintiff was MWO as the trustee of the Trust.

**80.** All three lawsuits were pending concurrently from January 27, 2023 to March 9, 2023. All three lawsuits were voluntarily dismissed by MWO/Trust between Thursday, March 9, 2023 and Wednesday, March 15, 2023.

**81.** The three suits brought by the MWO/Trust against Short's between January 27, 2023 and March 9, 2023 are the following:

    **a.**  <u>FED #1</u>:  On July 15, 2022, MWO/Trust filed Forcible Entry and Detainer (*Trust*

*v. Short's et al.,* Johnson County Case No. SCSC102261) ("FED #1") alleging breach of the Lease due to abandonment and that the Lease had terminated June 30, 2022. Evidentiary hearings in FED #1 were held on September 28, 2022 and December 20, 2022. A third-day of hearing was scheduled for 9:00 a.m. on March 9, 2023. At 8:30 a.m. on March 9, MWO *voluntarily dismissed with prejudice*.

**b.** FED #2:   On January 23, 2023, MWO/Trust filed Forcible Entry and Detainer (*Trust v. Short's et al.,* Johnson County Case No. SCSC103519) ("FED #2") alleging breach of the Lease due to Short's failure to pay rent for the period July 2022 to January 2023 (being entire period during which FED #1 was pending and in which the Trust was asserting the Lease had terminated as of June 30, 2022). FED #2 was *voluntarily dismissed without prejudice* on March 9, 2023.

**c.** Trust Civil Case:  On January 27, 2023, the Trust filed a civil petition at law (*Trust v. Short's et al.* Johnson County Case No. LACV084008) ("Trust Civil Case") alleging (i) breach of contract by Short's failure to pay rent for the period July 2022 to January 2023 (the same rent period as alleged in FED #2) and (ii) seeking a Writ of Attachment. The Civil Case was *voluntarily dismissed without prejudice* on March 15, 2023.

**d.** Short's Civil Case: Before MWO voluntarily dismissed the Trust Civil Case, Short's filed an Answer and Counterclaims.

**i.** Upon voluntary dismissal of the Trust Civil Case, on May 3, 2023 Short's converted its counterclaims into a Petition and commenced *Short's v. MWO et al.* (Johnson County Case No. LACV084204) ("Short's Civil Case").

**ii.** Short's alleges in the Short's Civil Case, among other claims: (i) abuse of process in filing FED #1 asserting the lease had terminated June 30, 2022 due to closure

and abandonment in the light of the failure to maintain, (ii) abuse of process in bringing FED #2 claiming rent due under the Lease claimed in FED #1 to have been terminated, (iii) abuse of process in bringing the Civil Case that duplicated the claim in FED #2 for rent due during a period in which the Lease was claimed to have been terminated in FED #1, (iv) breach of the Lease and the implied covenants of good faith and fair dealing and quiet enjoyment, and (iv) a request for a declaration that the March 10, 2023 Reaffirmation of Renewal (defined below) effectively exercised the Lease renewal option for 2023-2026.

     **iii.**  The Short's Civil Case asserts that FED #1, FED #2, and the Trust Civil Case were designed for the improper purpose of delay and obfuscating the status of the Lease only for the Trust to dismiss those cases voluntarily and then immediately (within two hours of dismissal) send a letter asserting non-renewal due to expiration of time to renew.

     **iv.**  The Short's Civil Case petition was amended to add Wallace and some of the Craft Defendants as defendants and to add claims against Wallace and the named Craft Defendants for interference with contract.

     **v.**  The Short's Civil Case currently is in discovery.

  **e.**  <u>FED #3</u>:

     **i.**  On March 9, 2023, less than an hour after dismissing FED #1 *with prejudice*, MWO sent Short's a letter declaring the Lease would terminate April 30, 2023, the end of the then existing term because Short's had failed to exercise the 2023-2026 Lease renewal option in writing prior to January 30, 2023.

     **ii.**  On March 10, 2023, the day after dismissal of FED #1 with prejudice, Short's delivered MWO a "Reaffirmation of Renewal" letter stating Short's had exercised

the renewal option for 2023-2026.

**iii.**   MWO rejected Short's claim to have validly renewed for the renewal term of May 1, 2023 to April 30, 2026.

**iv.**   MWO then proceeded to send a 3-Day Notice to Quit on May 1, 2023 demanding Short's vacate because of expiration of the Lease term on April 30, 2023.

**v.**   On May 8, 2023, MWO/Trust filed Forcible Entry and Detainer (*Trust v. Short's et al.,* Johnson County Case No. SCSC104238) ("FED #3") alleging the Lease term had expired on its own terms on April 30, 2023 and the option to renew/extend the Lease had not been properly exercised timely.

**vi.**   Short's contends in FED #3, among other things, that:

    **a.**   There was no renewal option to be exercised while FED #1 was pending in which MWO/Trust had been asserting the Lease had been terminated as of June 30, 2022 due to abandonment (declaration of termination revoked the offer to renew contained in the Lease);

    **b.**   Short's timely, verbally renewed and verbal renewals, not written renewals, were accepted in 2014, 2017, and 2020 thus modifying the Lease requirement of a writing; and

    **c.**   The declaration of Lease termination as of June 30, 2022 due to abandonment and commencement of FED #1 (voluntarily dismissed with prejudice on March 9, 2023):

        (i)   Was a wrongful repudiation of the Lease;

        (ii)   The repudiation of the Lease excused Short's of its duty to perform conditions within the Lease while the Lease was repudiated;

(iii)    Upon retraction of the repudiation (dismissal of FED #1 with prejudice) Short's is entitled to an opportunity to cure duties unperformed while the Lease was wrongfully repudiated, and

(iv)    The March 10, 2023 Reaffirmation of Renewal is a writing of renewal that relates back to January 30, 2023 as if given timely because of the wrongful repudiation of the Lease renewal option from July 1, 2022 to March 9, 2023.

**vii.**    Evidentiary hearings were held in FED #3 in August and September 2023.

**viii.**    On January 31, 2023, an Order to evict Short's was entered by the magistrate.

**ix.**    On February 7, 2024, Short's appealed the eviction order to the Iowa District Court

**x.**    Upon receiving the appeal, the District Court ordered a stay of execution of the writ of possession issued by the magistrate.

**xi.**    On April 20, 2024, without oral argument or taking of additional evidence. the District Court affirmed the magistrate's eviction order and ordered writ of possession issue on or after May 14, 2024.

**xii.**    On May 7, 2024, Short's appealed the FED #3 decision and filed an Application for Discretionary Review and Motion to Stay Issuance of Writ of Possession with the Iowa Supreme Court.

**xiii.**    On May 9, 2024, the Iowa Supreme Court granted a stay of issuance of the writ of possession.

**xiv.**    The parties to FED #3 await a decision from the Iowa Supreme Court on

the Application for Discretionary Review of FED #3, a briefing schedule, and oral argument dates.

**Kaeding & Craft Defendants**

82.   Defendant Kaeding is included in the group of Craft Defendants. Defendant Kaeding:

    **a.**   Was an owner of Short's from 2008 to 2012;

    **b.**   Was a consultant to Short's from 2012 to 2017;

    **c.**   Kaeding was employed by Defendant ICDD for several years beginning shortly after Kaeding sold his ownership interest in Short's;

    **d.**   In 2018, Kaeding was appointed to the Board of Directors of Defendant MWO and the Board of its parent company MidWestOne Financial Group ("MFG"). Kaeding remains a members of both Boards today.

83.   While employed by ICDD, Kaeding's responsibility was to promote downtown Iowa City and attract and recruit businesses into the Iowa City Downtown. Kaeding was employed by ICDD at the same time Kaeding was consulting for Short's. One of the first business recruited by Kaeding while at ICDD was Zombie Burger, a direct competitor with Short's.

84.   Kaeding maintains his relationship with the ICDD Defendants and has access to information regarding Iowa City Downtown business and developments.

85.   Kaeding and other Craft Defendants opened Pullman Bar & Diner ("Pullman") in the building located at 17 S. Dubuque ("Pullman Building"). The Building is the center of the Clinton St. side (west side) of the Block and the Pullman Building is the center of the Dubuque Street side (east side) of the Block. The rear of the Pullman Building is located directly across the alley from the rear of the Building. At all times relevant, the owner of the Building has also been the owner of the Pullman Building.

**86.** Pullman is now owned by Craft Defendant Gold Cap.

**87.** Kaeding is an owner of Gold Cap. The owners and management of Gold Cap also includes owners/operators of Big Grove Brewery ("Big Grove"). These Gold Cap owners-operators and managers include Defendant Swift (founding partner and CEO of Big Grove), Defendant Goettsch (managing partner of Big Grove) and Defendant Smart (executive chef at Big Grove). Kaeding also holds an interest in Big Grove.

**88.** In addition to Pullman, Gold Cap also owns St. Burch Tavern located on the Iowa/Dubuque corner of the Block and Hamburg Inn located 0.4 miles (four blocks) from the Block. Big Grove Brewery is located in Iowa City on Gilbert Street approximately 1.0 mile (10 blocks) south of the Block.

**89.** Joe's Place is also a member of the Craft Concepts group and is also located in the Iowa City Downtown and on the Block.

**90.** Pullman, St. Burch Tavern, Hamburg Inn, Joe's Place and Big Grove are competitors of Short's.

**91.** Kaeding and other Craft Defendants also have ownership interests in Defendant Craft Concepts (dba Craft Concepts Restaurant Group).

**92.** Craft Concepts describes itself on its website as "a proud collection of award winning restaurants and breweries in Iowa" and lists the following among those restaurants and breweries in the "collection":

    **a.** Big Grove;

    **b.** Pullman;

    **c.** St. Burch Tavern at the Iowa/Dubuque corner of the Block;

    **d.** Joe's Place, located at the center of the Iowa Avenue side (north side) of the Block;

**e.**   Donnelley's Pub located two blocks from Short's in the Pedestrian Mall;

**f.**   Brix Cheese Shop & Wine Bar located across the street from the Hamburg Inn

**g.**   Blackstone located in eastern portion of Iowa City 280 feet away from Short's Eastside location;

**h.**   30 Hop Brewery with a location in Coralville, IA;

**i.**   Iowa Athletic Club located in Coralville;

**j.**   Tribute Eatery & Bar located in Coralville;

**k.**   Vesta located in Coralville;

**l.**   Field Day Brewery located in North Liberty;

**m.**   Reds Ale House located in North Liberty;

**n.**   Tin Roost located in North Liberty.

**93.**   All of these restaurants compete with Short's, some more directly than others. Short's, Pullman, St. Burch, and Joe's Place are on the Block. Hamburg and Brix are four blocks from Short's. Big Grove is a mile away from Short's.

**94.**   Kaeding has served as a director of Defendant MWO and MFG since 2018. MWO's headquarters is on S. Clinton Street a half a block south of Short's just across the street from the Block. As a director of MWO, Kaeding is able to access information regarding the local economy, local loans made by MWO, distressed loans or business that can be solicited by the Craft Defendants, and other information that can be used by the Craft Defendants to expand.

**95.**   MWO Defendants have testified in related litigation that Kaeding and his various businesses are on a "short-list" of three or four people MWO will contact if a property they manage is likely to have a vacancy.

**96.**   Defendant Bird, former director of the ICDD now director of Defendant Greater Iowa

City, testified in related litigation that Kaeding and his group of entities is also on the ICDD short-list when ICDD is seeking potential retail business to enter the Iowa City Downtown market.

### The Break-In/Trespass By MWO & Craft Defendants

**97.**   On April 18, 2022, Short's temporarily closed due to structural issues at the Building.

**98.**   Due to the number of outstanding keys to the locks, Perez changed the locks to the Premises as a security measure to prevent entry while Short's was closed.

**99.**   On April 20, 2022, Defendant Wallace, by email to Defendants Mitchell and MWO, stated "I think we should talk to Nate Kaeding and see if he is interested. . . why don't you start composing a letter to Nate."

**100.**   Unaware of MWO and Kaeding's scheme, Perez provided MWO a key to the new locks on April 26, 2022.

**101.**   On May 2, 2022, MWO employee and trust officer Kevin Mote ("Mote") contacted Nate Kaeding by text message stating "Sarah [Wallace] wanted me to reach out and secretly show you the Shorts and Social Club spaces."

**102.**   On May 4, 2022, Mote met Kaeding, Swift and other Craft Defendants at Short's at 8:20 a.m.

**103.**   On May 4, 2022, Mote used the new key provided by Perez to enter the Short's Premises with the Craft Defendants to show the space to those Craft Defendants as possible tenants.

**104.**   Short's was not open at the time the group entered the Premises.

**105.**   Short's was not provided notice by MWO or the Trust that this group would be entering the Premises.

**106.**   No Short's employee was present at the time this group entered and trespassed on the space.

**107.** No provision of the Lease allows the landlord to enter the Premises.

**108.** No provision of the Lease allows the landlord to provide access to the Premises to third-parties.

**109.** Kaeding and the Craft Defendants knew there was an existing lease in effect between Short's and the Trust when they organized the meet and entry into Short's Premises.

**110.** Kaeding and the Craft Defendants were aware of the terms of the Lease because Kaeding was a former owner of Short's, a guarantor of the Lease up until seven-month prior to the entry, and a member of the MWO & MFG boards of directors.

**111.** On May 4, 2022, all of the Craft Defendants and Mote (acting on behalf of MWO and the Trust) knew when they entered the Premises that Short's had an existing Lease in effect pursuant to which Short's was entitled to exclusive occupancy and control of the Premises.

**112.** On May 4, 2022, at approximately 11:02 a.m., by email, Kaeding thanked Mote for showing the space to him, Swift, Kent and the Craft Defendants.  In that email, Kaeding stated: "We would definitely be interested in taking over the lease for both 18 S Clinton as well as (perhaps) 18 S Clinton (2nd/3rd floor)."

**113.** "We" referred to Kaeding, Swift, Kent and the other Craft Defendants.

**114.** While in Short's on May 4, 2022, Mote (acting on behalf of MWO) observed Short's inventory and equipment in the Premises.

**115.** Despite knowing Short's was still occupying the Premises from Mote's observations during the "break-in," the day after, on May 5, 2022, the Trust/MWO sent Short's notice of default under the Lease due to "abandonment." The Trust/MWO knew that Short's had not abandoned the Premises when the May 5, 2022 notice of default was sent.

**116.** It was not until 2024 that Short's, Perez, and Ouverson first became aware of and learned

that MWO, Trust, Wallace, Mote, Mitchell, Kaeding, Swift, Kent and the Craft Defendants planning to and then entering Short's on May 4, 2022.

### Short's Sidewalk Café & Patio

**117.**  The City requires restaurants to obtain licenses of patio seating in the public rights-of-way (e.g. sidewalks, pedestrian mall, on-street parking areas, etc.).

**118.**  Annually, Short's has obtained a renewal of its 2009 sidewalk cafe right-of-way license for the sidewalk area in-front of the Premises and in the on-street parking area in-front of the Building.

**119.**  Short's operated its patio attached to the façade of the Premises every spring through fall from 2009 through 2022.

**120.**  Short's operated the patio in the on-street parking area every spring through fall from 2016 through 2022.

**121.**  Short's 2022-2023 sidewalk license agreement extension with the City expired on January 31, 2023.

**122.**  On March 30, 2023, Short's General Manager, an authorized Short's signatory, executed, on behalf of Short's, a document entitled "2023 Renewal of License Agreement for Temporary Use of Public Right-of-Way" between the City of Iowa City and Short's Burger and Shine, LLC D/B/A Short's Burger and Shine, for a Sidewalk Café on the Public Right-of-Way at 18 South Clinton St., Iowa City, Iowa (the "Patio License Agreement"). Short's General Manager executed the document as "Tenant" on page 1 and the "Tenant Acknowledgment" section on page 2 was the notary of the General Manager's signature on page 1.

**123.**  On March 30, 2023 Mote, a vice president and trust officer of MWO, executed the exact same License Agreement document ("wet signatures" of both Short's and MWO on the same piece

of paper) as an authorized officer of MWO as trustee of the Landlord. Mr. Mote signed as "Landowner" on page 1 and the "Landowner Acknowledgment" section on page 2 provided the notarization of Mr. Mote's signature.

124.  Under the heading "Section 10-3-3 of the City Code" at paragraph B, the Sidewalk Café Ordinance provides "No person shall operate a sidewalk café without executing an easement agreement."

125.  Short's executed an easement agreement for the period of February 1, 2023 to January 31, 2024.

126.  The usual, customary, process is that the executed Patio License Agreement and fees are submitted to the City, the City signs the License Agreement, and the License Agreement is filed in the Johnson County real estate records.

127.  There is no provision in the Sidewalk Café Ordinance for the revocation of landlord consent after consent is provided by notarized signature.

128.  The only provision in the Sidewalk Café Ordinance providing for termination of a License Agreement is in the event the "City determines the right of way is needed."

129.  The Patio License Agreement is an agreement between the City and Short's, with the Landlord's consent. The introductory paragraph of the License Agreement provides:

> This Agreement is made between Short's Burger and Shine LLC d/b/a Short's Burger and Shine, and the City of Iowa City, Iowa, a municipal corporation, with the written consent of Landowner . . .

130.  On March 30, 2023, Short's delivered the License Agreement (executed and notarized by Short's and Mote on behalf of the landlord) along with checks for payment of license and recording fees in the amounts of $1,680 and $12, respectively.

131.  The City did not promptly process the License Agreement fully executed and notarized

by the Landlord and Short's and payment of fees of March 30, 2023.

**132.** At some time after April 6, 2023 but before April 18, 2023, the Trust, MWO and or their representatives verbally contacted the City and purportedly verbally revoked Mote's notarized signature consenting to the License Agreement.

**133.** Short's received a letter dated April 24, 2023 from the City returning the two checks submitted as payment of required fees and providing a blank form of the License Agreement to Short's to complete, but the City did not return the fully-executed License Agreement delivered to the City on March 30, 2023.

**134.** The April 24, 2023 letter from the Assistant City Attorney indicated "It is my understanding that the owner (your landlord) of 18 S. Clinton St. currently is not consenting to a sidewalk café."

**135.** On or about May 3, 2023, Short's received a letter from the Assistant City Attorney dated May 1, 2023 enclosing, according to the Assistant City Attorney's own words, "a copy of the 2023 Renewal of License Agreement which Kevin Mote did sign" and stating "As you can see the City never executed it because the owner (your landlord) of 18 S. Clinton St. no longer consents to a sidewalk café. A business cannot operate a sidewalk café without the consent of the property owner."

**136.** Short's has never received notice from the Trust that it had revoked its notarized signature to the License Agreement.

**137.** The City has never provided Short's any written evidence of the Trust's revocation of consent reflected by Mote's notarized March 30, 2023 signature.

**138.** During the first six months of 2023, Short's operated its small patio/ground-level-deck attached to the front façade of the building.

**139.** During 2023, Short's did not construct its usual café in the on-street parking area in-front of Short's building.

**140.** During the five-month period from January 31, 2023 to June 30, 2023, the City took no action to require Short's to remove its patio attached to the façade of the building.

**141.** During late June 2023, MWO, the Trust, Mitchell and/or counsel for those parties contacted the City seeking and requesting that the City demand Short's remove its patio attached to the façade.

**142.** On June 30, 2023, by letter, the City, in reaction to and working with MWO, the Trust, Mitchell and/or counsel for those parties to assist in harassing Perez and Short's with the goal of removing them from the Premises, demanded Short's remove its patio/deck attached the façade of the Building or the City would remove it after July 14, 2023.

**143.** On July 1, 2023, by letter:

    **a.**    Short's advised the City that Short's had provided, and the City was in possession of, a fully executed and notarized Patio License Agreement and all fees required had been tendered satisfying the requirements of the City's ordinance.

    **b.**    Short's put the City on notice that Short's position was that the City's sudden decision to take action against Short's small deck area, after five months of inaction, was prompted by communications with MWO/Trust and that the City was knowingly aiding and abetting retaliation against Short's and, in the process, violating City ordinances regarding historic preservation and depriving Perez of his equal protection and due process rights under the Iowa Constitution.

**144.** By email on July 14, 2023, Short's reiterated its position to the City and gave the same warnings as contained in the July 1, 2023 letter.

**145.**  The City extended the deadline for Short's to remove the small patio until July 25, 2023.

**146.**  On or about July 25, 2023, the City removed Short's patio and furniture and confiscated that property.

### Racial Discrimination Complaints

<u>Discrimination in 2022</u>

**147.**  From 2008 to June 2022, Short's paid all rent due under the Lease, including payment of all rent during COVID closures and rent due while closed temporarily from April to June 2022.

**148.**  From 2008 to May 2022, Short's had never received a notice of default under the Lease.

**149.**  In less than 48 hours of learning that Perez had taken over managerial control, MWO as trustee wrote a letter dated April 20, 2022 stating that Short's closure would be considered an abandonment and default under the Lease if the closure continued for longer than 15-business days.

**150.**  The day after the break-in by Mote and the Craft Defendants (plead above), on May 5, 2022, MWO/Trust sent Short's a notice of default declaring a breach due to abandonment by being closed more than 15-business days. Short's was provided 10-days to open to avoid declaration of default.

**151.**  The May 5, 2022 letter was sent days before Short's had been closed for the 15-business day minimum closure time to possibly constitute abandonment under the Lease. Abandonment cannot be considered a possible breach under the Lease until at least 15-business days have elapsed.

**152.**  Short's did not receive the May 5, 2022 letter until May 10, 2022.

**153.**  Short's could not reopen within 10-days because the gas had been shut-off by the City due to concerns for the structural integrity of the exterior wall on which the gas meters were

mounted.

**154.** The Lease provides that if a cure is not possible within the 10-days, the Landlord must accept a reasonable proposal for reopening.

**155.** Short's provided MWO/Trust a letter stating that while awaiting the repairs to the wall so that gas service to the kitchen could be re-established, Short's would be conducting a deep clean and re-decorating of the Premises and that when the work on the wall was completed, Short's would re-hire employees and reopen.  Short's stated it was hoping to be in a position to re-open in two to three months (July or August 2022).

**156.** Despite this reasonable proposal (and Short's payment of rent while closed), MWO/Trust, with the urging and support of Wallace, declared a default and declared the Lease terminated as of June 30, 2022, despite a remaining term through April 30, 2023.

**157.** Short's did not vacate and continued remodeling through June.

**158.** Short's and Perez tendered payment for July 2022 rent. The July 2022 rent tender was rejected by the Trust.

**159.** Given that payment of rent was not an issue, MWO/Trust/Landlord/Mitchell/Mote and Wallace were motivated to remove Short's for some reason other than economics.

**160.** MWO/Trust commenced FED #1 on July 15, 2022 seeking eviction of Short's due to abandonment.

**161.** Given (i) the temporal proximity of Perez's assumption of managerial duties around April 18, 2022 and the commencement of Defendants' actions to remove Short's beginning April 20, 2022; (ii) Short's had fully paid rent; (iii) despite repeated requests by Short's, MWO/Trust never articulated a legitimate non-discriminatory reason for its acts to seek eviction of a paying tenant and refusing Short's reasonable offer to reopen when gas was returned, the only possible reason

for seeking eviction and removal of Short's can be Perez's race and MWO/Trust/Wallace's demand to deal exclusively with the Caucasian partner in Short's, Ouverson.

**162.** FED #1 proceeded from July 15, 2022 to March 9, 2023.

**163.** MWO & the Trust took actions in furtherance of Wallace's demand to exclusively work with Ouverson and Kaeding (Caucasians) over Perez (Hispanic).

**164.** Not only was there no legitimate, good faith, non-discriminatory business reason ever articulated by MWO/Trust/Wallace for their adverse eviction action against Short's and Perez, all of the litigation commenced by the Trust/MWO (FED #1, FED #2, and MWO's Civil Case) was dismissed voluntarily (FED #1 alleging Lease abandonment being voluntarily dismissed *with prejudice*) after forcing Short's and Perez to incur the legal costs and expenses of defense.

**165.** The focus of the Defendants ire on the Hispanic Perez is evident from Defendant Bird's text to Kaeding in October 2022 in which Ms. Bird asks Kaeding "Any news on Short's? Assume Kevin [Perez] won the battle?"

    **a.** Ms. Bird did not write I assume Perez *and* Ouverson won the battle.

    **b.** This statement demonstrates animus against Perez, not Ouverson. The statement demonstrates cooperation and intent to remove Perez from the space.

    **c.** Perez is the only Hispanic involved and is being directly targeted for removal from the Iowa City Downtown through conspiracy among the ICDD Defendants, Craft Defendants, the City Defendants, the MWO Defendants, and Wallace.

<u>Discrimination Continues throughout 2023</u>

**166.** One hour after MWO/Trust voluntarily dismissed FED #1 with prejudice, on Thursday March 9, 2023, counsel for the Trust delivered notice to Short's that Short's had failed to timely exercise its option to renew the Lease for the May 1, 2023 to April 30, 2026 term and declared that

the Lease would terminate at the expiration of its term on April 30, 2023.

**167.** On Friday, March 10, 2023, Short's mailed its Reaffirmation of Renewal letter to MWO/Trust. On Monday March 13, 2023, at approximately 9:00 a.m. Short's paid all rent for July 2022 through March 2023 that was unpaid while FED #1 was pending and the Trust refusing to accept rent payments and hand-delivered a copy of the Reaffirmation of Renewal Letter to MWO/Trust.

**168.** Short's paid April 2023 rent.

**169.** Short's tendered payment of May 2023 rent. The May 2023 rent payment was accepted by a MWO teller, processed through the federal reserve system and cleared. The Trust/MWO attempted to return that rent payment by placing funds equaling the same amount into Short's account at MWO without notice or permission.  The Trust did not have authority to transact business in Short's MWO bank account.

**170.** Short's has tendered payment of rent for every month since May 2023 and those attempted payments have been refused by the Trust/MWO.

**171.** The Trust commenced FED #3 in May 2023 asserting the Lease term had expired on April 30, 2023 due to failure to timely renew by January 30, 2023 despite pendency of FED #1 from July 15, 2022 to March 9, 2023.

**172.** There is no business reason for the FED #3 action – Short's has paid all rent and its tenders of additional rent have been refused.

**173.** Mitchell testified in FED #3 that the Trust has not been marketing any units in the Building nor seeking a new tenant.

**174.** No legitimate non-discriminatory reason for seeking to evict Short's (a paying tenant of 15 years) has ever been articulated by MWO/Trust/Mitchell/Mote/Wallace or their counsel.

**175.** Perez's Hispanic race and assumption of managerial responsibilities in April 2022 is the reason the MWO Defendants and Wallace have continued to seek eviction of Short's.

**176.** Since 2008, Short's has been a perfect tenant. Rent has always been paid or tendered timely or within grace periods and no notices of default had ever been issued to Short's. From 2016 to 2022 Ouverson was responsible for interactions with the landlord. Almost immediately after the Short's owners shifted front of the house responsibility from a white man (Ouverson) to a Hispanic man (Perez), the Trust, MWO, and Wallace commenced an all-out assault in an attempt to remove a Hispanic run business from the Premises.

Iowa Civil Rights Commission Complaint #1

**177.** Perez filed a complaint of discrimination with the Iowa Civil Rights Commission on June 2, 2023 ("ICRC Complaint #1") alleging MWO/Trust/Wallace had engaged in discriminatory practices based on race in violation of the Iowa Civil Rights Act. Iowa Code Ch. 216.

**178.** ICRC assigned ICRC Complaint #1 Complaint No. 06-23-80113.

**179.** ICRC Complaint #1 alleges that the Trust, MWO, Mitchell, Mote, and Wallace violated Iowa Code § 216.7 by discriminating against Perez on the basis of his Hispanic race in the furnishing of accommodations, advantages, facilities, services or privileges.

**180.** The ICRC also investigated Complaint #1 under Iowa Code §216.8 (discrimination in real estate transactions).

**181.** ICRC Complaint #1 cited to the lack of landlord-tenant conflicts from 2008 to April 2022 while Ouverson (Caucasian) was managing the business and then the sudden spate of litigation and attempts to evict (despite Short's paying rent) only days after Perez (Hispanic) assumed managerial responsibility.

**182.** ICRC Complaint #1 asserted that this temporal proximity and the lack of a legitimate

non-discriminatory business reason demonstrated Perez's race was a motivating factor in the aggressiveness seeking eviction.

**183.** ICRC Complaint #1 also asserted that the filing and prosecution of FED #1, FED #2, and MWO's Civil Case from July 2022 to March 2023, only for all three to be voluntarily dismissed, demonstrates harassment and animus towards Perez.

<u>Retaliation for Filing ICRC Complaint #1</u>

**184.** Counsel for Perez provided counsel for MWO a courtesy copy of the ICRC Complaint #1 documents filed with the ICRC on or about June 2, 2023.

**185.** On June 19, 2023, before the ICRC had even processed ICRC Complaint #1 or delivered it to the respondents named therein, MWO filed an Answer and Counterclaims in Short's Civil case. The ICRC did not distribute ICRC Complaint #1 to the named respondents until after June 22, 2023. However, on June 19, 2023, MWO's Answer and Counterclaims in Short's Civil Case MWO alleged as follows:

**a.** MWO specifically named Perez as a Third-Party Counterclaim Defendant and joined Perez personally in the litigation.

**b.** MWO asserted a Counterclaim solely against Perez alleging that "the Civil Rights Complaint" [ICRC Complaint #1] was filed for the sole purpose of harassing the Trust, increasing litigation expenses, and/or pressuring the Trust into agreeing to dismiss the forcible entry and detainer action. [FED #3]".

**c.** MWO alleged in the counterclaim against Perez that the filing of ICRC Complaint #1 with the Iowa Civil Rights Commission constituted abuse of process and Perez was personally liable for monetary damages related to responding to ICRC Complaint #1.

<u>Amendment to ICRC Complaint #1 – Addition of Retaliation Claim</u>

**186.** Perez's filed an amendment to ICRC Complaint #1 with the ICRC on June 20, 2023 ("ICRC Complaint #1 Amendment") alleging unlawful retaliation.

**187.** The ICRC Complaint #1 Amendment alleges, in summary (quotes are from Perez's Complaint #1 Amendment):

    **a.** "Respondent MWO's counterclaims assert Complainant Perez personally is liable for money damages to MWO based solely upon his filing of the Initial Complaint with the ICRC."

    **b.** "MWO has sued Mr. Perez for monetary damages solely because he filed a complaint with the ICRC. There is no doubt such action constitutes unlawful retaliation under the ICRA."

    **c.** Iowa Code § 216.11(2) provides:

> It shall be an *unfair and discriminatory practice* for: . . . (2) any person *to discriminate or retaliate* against another person in any of the rights protected against discrimination by this chapter *because such person has lawfully opposed any practice forbidden under this chapter . . . or has filed a complaint* . . . under this chapter."

    **d.** "Respondent MWO has directly sued Mr. Perez because he opposed its unlawful practices and filed a complaint under the ICRA. Respondent MWO's act of suing Mr. Perez for damages because he filed the Initial Complaint is as direct a violation of the ICRA retaliation prohibition as could possibly exist. Suing anyone for damages solely because that party filed a complaint with the ICRC is a blatant and direct violation of the ICRA."

    **e.** It can be put no more simply than it is illegal to sue someone who files a complaint with the ICRC based solely upon the complaint being filed. The filing of a complaint of discrimination with the ICRC is a statutorily protected act. Suing a complainant because they filed a complaint is prohibited. The case for retaliation against Respondent MWO is as

clear-cut a violation of the ICRA as there can be.

**f.**   On July 1, 2024 the Trust doubled down on its retaliation described above and filed the same prohibited counterclaim in the litigation commenced by Perez upon receipt of his ICRC right-to-sue letters.

**g.**   The Trust failed to articulate a legitimate, non-discriminatory reason for filing another personal claim against Perez on July 1, 2024.

<u>Further Retaliation and Aiding and Abetting by the City – Short's Patio</u>

**188.**   As plead above, from 2008 through 2022, Short's annually renewed its Sidewalk Café License Agreement.

**189.**   Short's Sidewalk Café License Agreement renewal term ended on January 31, 2023.

**190.**   On March 30, 2023, Short's delivered a renewal document (executed by Mote and notarized) to the City and tendered payment of required fees by check.

**191.**   A week after MWO consented by notarized signature, Wallace, the beneficiary of the Trust, texted Mitchell and MWO with specific instructions to retaliate against Short's and Perez contrary to the history of the landlord consenting to Short's sidewalk café over the prior 15 years of annual renewals. Defendant Wallace wrote to Mitchell:



**192.**   Wallace's text to Mitchell states that Wallace and Mitchell were both aware on April 6, 2023 that landlord consent to Short's 2023 patio agreement was customary and that Mote either

had consented or would consent to that agreement.

193. Wallace demanded that Mitchell deprive Short's use of the patio solely based on her bias against the Hispanic Perez as the newly public face of the business.

194. Mitchell responded he left a voicemail with Mote.

195. Mote had authority to execute the renewal on March 30, 2023 and did so with a notarized signature.

196. At some point after April 6, 2023, MWO, through Mitchell and Mote, at the direction of and urging of Wallace, contacted one or more of the City Defendants or other City employees seeking to revoke Mote's notarized March 30, 2023 signature consenting to the renewal.

197. No writing exists whereby MWO states to the City that the notarized consent granted by Mote on March 30, 2023 was revoked.

198. The City refused to sign the February 1, 2023 to January 31, 2024 Sidewalk Café License Renewal for Short's despite Short's compliance with all prerequisites for such signature.

199. The actions of Wallace/ Mitchell/Mote in seeking to revoke consent were in furtherance of the discrimination and retaliation against Perez.

200. Despite no renewal, Short's operated its patio attached to the façade of the Building during March, April, May, and June 2023. This operation was consistent with Iowa City Code § 10-3-3B. During this time, the City took no action against Short's for conducting such operations without a renewal executed by the City.

201. On June 2, 2023 ICRC Complaint #1 was filed and a courtesy copy provided to MWO's counsel.

202. On June 19, 2023, MWO filed its Counterclaim against Perez described above.

203. On June 30, 2023, Short's received a letter from the City demanding that Short's remove

its patio attached to the façade or the City would remove it.

**204.** The letter was written by Assistant City Attorney Dulek.

**205.** Open Records Act requests obtained by Short's reveal that the June 30, 2023 letter was the *only* instance where a demand for compliance with the City patio ordinance was made directly by the City Attorney's Office. All other compliance communications with patio owners were initiated by City staff and managerial employees.

**206.** Open Records Act requests obtained by Short's reveal that the June 30, 2023 letter was the *only* instance where a demand for compliance with the City patio ordinance did not include notice of a right to appeal.

**207.** This disparate treatment of Mr. Perez is indicative of the following:

    **a.** Former Assistant City Attorney Mitchell communicating with Dulek, his successor in the City Attorney's Office, to assist in MWO's retaliation by confiscating the patio.

    **b.** The decision to eschew traditional City protocol and instead enlist direct involvement by City law enforcement was an effort to escalate retaliation against Perez.

**208.** The June 30, 2023 City letter to Short's included a "cc:" to MWO's counsel.

**209.** Prior to issuance of the City's June 30, 2023 letter, MWO communicated with the City requesting that the City enforce its sidewalk café ordinance against Short's despite full knowledge by all relevant parties that a notarized consent agreement for that café had been provided the City.

**210.** Prompting the City to take adverse action against Short's was retaliation for Perez filing ICRC Complaint #1 only two weeks earlier.

**211.** Counsel for Short's, in writing, advised the City's Assistant City Attorney (Defendant Dulek) that (i) the City had taken no action against Short's patio from February 1 – June 30, 2023, (ii) the City was now taking action at the bidding of MWO, and (iii) MWO was retaliating against

Short's and Perez for filing ICRC Complaint #1 and ICRC Complaint #1 Amendment by seeking the City assist in confiscating Short's property and damaging Short's business during the summer months.

212.  Short's counsel advised the City in writing that the City was on notice that action to take Short's patio would be knowing and intentional aiding and abetting MWO's retaliation in violation of the Iowa Civil Rights Act.

213.  Despite this knowledge, on or about July 25, 2023, the City ignored the warnings and intentionally dismantled Short's and Perez's small patio/deck, protruding into the public sidewalk right-of-way, including removing the iron fencing and its bolts attaching the fencing to the facade of the building, together with Short's furniture and floor of the patio and confiscated that property.

214.  The removal left damage to the façade of the Building and open holes in the façade.

<u>ICRC Complaint #2 – Retaliation & Aiding and Abetting</u>

215.  Perez filed a second complaint with the ICRC on August 3, 2023 ("<u>ICRC Complaint #2</u>")

216.  ICRC Complaint #2 was assigned ICRC Complaint No. 06-23-80434.

217.  ICRC Complaint #2 alleged that MWO as Trustee retaliated against Short's for filing ICRC Complaint #1 by (i) filing counterclaims in Short's Civil Action based solely upon Perez's exercise of his rights under the ICRA and (ii) seeking the City's enforcement of the Sidewalk Café Ordinance (which had not been enforced for five months).

218.  The temporal proximity between the June 2, 2023 ICRC Complaint #1 filing, the June 19, 2023 Counterclaim against Perez, and the June 30, 2023 letter from the City seeking removal of the patio (with a copy of such letter being provided to the same MWO counsel who signed and filed the Counterclaim 11-days earlier) demonstrates causation and retaliatory motive.

219.  ICRC Complaint #2 alleges (quotes are from Perez's ICRC Complaint #2):

**a.** "The outdoor dining, ambiance and visuals are important to attracting business. MWO's alleged revocation of consent to the sidewalk café license (consent having been provided each of the prior 15 years) was an adverse action based on the same discriminatory motive as the filing of Fed #1, FED #2, Trust Civil Case and FED #3. ICRC Complaint #1 alleged that the supposed verbal "revocation" of consent, if it occurred, was racially and ethnically motivated."

**b.** "Because the City would not sign the sidewalk café agreement due to an alleged verbal revocation of a written, notarized consent, Short's did not construct its usual dining area located outside in the street parking area. However, depending on weather, from February 1, 2023 to July 25, 2023 Short's continued to operate its two tables outside on a small deck attached to the front of the building and extending into the sidewalk."

**c.** "Despite no sidewalk café license being in effect from February 1, 2023 to July 2023, and Short's operating its attached deck during this period, the City took no action asserting that Short's was operating in violation of the City's sidewalk café ordinance."

**d.** On June 19, 2023, MWO filed its counterclaim in Short's Civil Case against Mr. Perez unjustifiably alleging abuse of process against Mr. Perez – these allegations are subject of the ICRC Complaint #2 alleging retaliation. A mere 11 days after retaliating by filing such counterclaim, Mr. Perez and Short's received a letter, dated June 30, 2023 from City Defendant Dulek acting as Assistant City Attorney stating that the "chairs, tables, and fencing" comprising the attached deck "must be removed from the public sidewalk."

**e.** Disturbingly, the June 30, 2023 letter includes the "copy w/ enc. to:" (i.e. "cc") included "Siobhan Briley," counsel for MWO.  There was no discernable basis for Defendant Briley to be cc'd on this letter, as its content is not relevant to Briley or her client

(MWO/Trust). Briley was included on that communication in furtherance of Dulek's demonstration of her compliance with requests made of her by Defendant Briley and/or other MWO Defendants (e.g. Defendant Mitchell, former Assistant City Attorney) to aid and abet retaliation against Perez.

    **f.**  When questioned in writing by Short's counsel about why Dulek included Briley on a communication that was only relevant to Perez, Dulek responded on July 10, 2023 that she had "never spoken to Siobhan Briley regarding this matter" and "I don't believe I have ever spoken to her.

    **g.**  When questioned further in writing by Short's counsel regarding Dulek's parsing of language through use of the word "spoken" Dulek responded on July 17, 2023 "Siobhan Briley is listed as the attorney of record representing the owner in the pending eviction action against Short's, which is why I copied her in. My only communication with her **in this matter** was to provide her a copy of the letter."

        **i.**  Open Record Act Requests obtained by Short's reveal that Dulek and Briley had communicated prior to 2023. Dulek's deliberate choice to use the word "spoken" was done to obfuscate the truth that the two lawyers know each other and have provably communicated in writing. Dulek then backpedaled on July 17 when she changed her answer to limit the scope of her July 10 claim from not ever communicating with Briley at all to only communicating with Briley once "in this matter."

        **ii.**  Dulek had no legitimate reason to be aware of or follow the litigation and eviction pattern between MWO and Short's. The City is not a party to that litigation. Dulek was aware of the FED action because Briley and/or her client (MWO/Trust) enlisted Dulek in its scheme to retaliate against Perez using the eviction process unlawfully.

**iii.** Dulek was by her own admission aware that MWO/Trust and Short's had counsel at the time she sent Perez the June 30, 2023 letter. Dulek contacted Perez directly despite knowing he was represented, yet did not contact the Trust/MWO directly. Multiple communications between Dulek and Defendant Mitchell exist demonstrating that Dulek routinely did favors for Mitchell and the Trust, yet Dulek chose to exclusively copy Briley on her June 30, 2023 communication.

**iv.** Dulek copied Briley because Briley and/or Briley's client (MWO/Trust) requested Dulek's aid in their retaliation against Perez.

**h.** By letter dated July 1, 2023, counsel for Short's "advised the Assistant City Attorney [Defendant Dulek] of MWO's retaliation against Mr. Perez" and "advised the City of the existence of the discrimination allegation in [ICRC Complaint #1] and the retaliation allegations in the [ICRC Complaint #1 Amendment].  In that letter to the City Short's counsel emphasized and advised the City that 'the City is now on notice that Perez and Short's view the April/May 2023 alleged revocation of consent . . . to have been an act of discrimination based on race/national origin' [ICRC Complaint #1] and that communications by MWO/Briley to the City seeking to "nudge the City down the path reflected in the [June 30, 2023] letter" to remove Short's patio was an act by MWO/Briley in retaliation for the filing of [ICRC Complaint #1]."

**i.** On July 1, 2023, Plaintiff's counsel further advised the City "of Iowa Code § 216.11(1) prohibiting any person from intentionally aiding and abetting another person to engage in prohibited unfair or discriminatory conduct." The City thereby was put on notice that its sudden interest in taking Short's and Mr. Perez's property was aiding and abetting retaliation by MWO/Briley against Mr. Perez for his filing of the Initial Complaint.

**220.** After a series of letters and emails between Short's counsel and the City between July 1 and July 13, Short's/Perez's position was synthesized to 19 points and delivered to the City. These include:

(i)   The City's admission that at no time since adoption of the Sidewalk Café Ordinances has the City rejected or denied a notarized, signed sidewalk café agreement for which fees were tendered – thus indicating that the City's rejection of Short's 2023 application was targeted at Mr. Perez,

(ii)   The City's knowledge of the ICRA claims pending before the ICRC, and (iii) the temporal proximity between the filing of ICRC Complaint #1 and the retaliation subject of [ICRC Complaint #2] and the City's June 30, 2023 letter.

**221.** These 19 points concluded with Short's/Perez's counsel advising the City that any action taken to dismantle the deck and take Short's and Mr. Perez's property would be knowingly aiding and abetting Defendants' retaliation in violation of the Iowa Civil Rights Act.

<u>Iowa Civil Rights Act Litigation</u>

**222.** Perez requested that the ICRC issue "right-to-sue" letters as ICRC Complaint #1, ICRC Complaint #1 Amendment and ICRC Complaint #2.

**223.** The ICRC issued right-to-sue letters for ICRC Case No. 06-23-80113 and Case No. 06-23-80434 on December 7, 2023.

**224.** On February 21, 2024, Perez and Short's filed a Petition in the Iowa District Court alleging (i) violations of the Iowa Civil Rights Act (discrimination, retaliation, aiding & abetting) against the Trust, MWO, Mitchell, Mote, Wallace and the City and (ii) violations of the due process, takings, and equal protection clauses of the Iowa Constitution by the City's confiscation of Short's patio. *Perez et al v. MWO et al.* (Johnson County Case No. CVCV085088) ("<u>ICRA</u>

Case").

**225.** The ICRA Case is pending. All motions to dismiss were denied and the defendants filed answers in late June 2024.

## Iowa City's Misuse of Historic Preservation

### History of the Building

**226.** H.D. Short was born in the 1870s as the son of recently freed slaves in Missouri who had remained on their former master's land as sharecroppers.

**227.** In the mid-1890's H.D. Short moved to Iowa City and began work with a shoeshine box.

**228.** In approximately 1925, H.D. Short, the son of former slaves, purchased the Building.

**229.** The University of Iowa admitted African-American student beginning in the 1870s. The University of Iowa constructed its dormitories in the 1910s. Until 1946, African-American students were not allowed to occupy the dorms.

**230.** During the time at which the University of Iowa admitted African-American students, but prohibited those students from living in the newly constructed dorms, H.D. Short provided housing to African-American students in the upper floors of the Building and provided those students, and other African-American student living elsewhere in the City, jobs in his shop.

**231.** During World War II, H.D. Short was contracted by the United States to repair and refurbish combat boots for the war effort.

**232.** Professor Phillip Hubbard was a distinguished University of Iowa professor, Dean and Vice President, and in 1971 became the first African-American Vice President at a Big Ten University. In his 1996 book "New Dawn: A 150-year look at Human Rights at The University of Iowa," Professor Hubbard recognized and lauded H.D. Short as a role model for the African-American community in Iowa City before, during and after segregation.

**233.** Haywood Belle was the grandson of H.D. Short and died in 2016.

**234.** From 1925 to 2016, the Building was owned by the son of freed slaves, his sons, and his grandson.

**235.** The Building became the foundation for H.D. Short, his sons and grandson to expand their real estate holdings in Iowa City, including acquisition of the Pullman Building.

**236.** With the passing of Haywood Belle in 2016, ownership of the Building was transferred to MWO as trustee of the Trust.

**237.** The Building and the story of H.D. Short is of historic importance to the City of Iowa City and the State of Iowa.

<u>Iowa City – Certified Local Government</u>

**238.** The State of Iowa certified the City of Iowa City as a "certified local government" ("<u>CLG</u>") satisfying the qualifications and criteria set forth by the State and the US Department of the Interior ("<u>DOI</u>") under the 1966 National Historic Preservation Act (54 U.S.C. §300101 *et seq.*)("<u>NHPA</u>") in 1987.

**239.** In 1987, the City entered a Certified Local Government Agreement with the State of Iowa attached hereto as <u>Exhibit</u> D ("<u>CLG Agreement</u>") and incorporated herein by this reference.

**240.** The CLG Agreement requires the City to "enforce all appropriate state and local ordinances for designating and protecting historic properties."

**241.** The CLG Agreement requires that the City "not unlawfully discriminate on the basis of sex, race, color, and/or national origin *in any of its activities* in implementing its programs."

**242.** The CLG Agreement requires that the City "provide for adequate public participation in the local historic preservation programs, including the process for recommending properties for nomination to the National Register of Historic Places." This obligation is to be "accomplished in

a format issued by the State in its program guidelines."

<u>Historic Property Survey</u>

**243.** The NHPA, DOI regulations, State of Iowa, and the CLG Agreement require that the City maintain a system for the survey and inventory of historic properties.

<u>The City's Inconsistent Description of the Building in Representations to the State and DOI</u>

**244.** The "Tate Arms Building" and the Iowa Federation Home for Colored Girls ("Iowa Federation Home") provided housing for African-American students at the University at the time African-Americans were prohibited from living in the dorms. At the time of these buildings' historic importance, the buildings were owned by African-Americans.

**245.** In 2018, the City, as CLG, recommended the Tate Arms and the Iowa Federation Home for listing on the National Register of Historic Places ("NRHP"). The nominations were accepted and the two buildings were listed in 2020.

**246.** At the time of the nominations, the buildings were owned by Caucasians.

**247.** Because of the listings on the NRHP, federal and state grants and loans became available to the owners.

**248.** In the 2018 application for the Tate Arms and Iowa Federation Home, the City's application noted its consideration of the Building once owned by H.D. Short for nomination for its contribution to African-American history in Iowa City, but the City did not include the Building ostensibly due to modifications made to the façade in the 1970s-1980s. The City overlooked comparable modifications made to the exterior Tate Arms Building in its nomination.

**249.** The 2018 Tate Arms and Federation Home nomination materials prepared by the City applied different standards to the Caucasian owned buildings than the African-American owned and Hispanic operated H.D. Short Building.

**250.** In the 2021 City application for the listing of the "Iowa City Downtown District" on the National Register, the City did not downgrade the Building as done in 2018 but rather the City identified the Building as a "key contributing resource" by local historic standards.

**251.** Both the 2018 and 2021 applications relied upon the same survey data.

**252.** In 2018, the City identified the Tate Arms and Iowa Federation Home as the only viable options for African-American historic buildings in Iowa City and excluded the Building ostensibly because of its exterior modifications.

**253.** Exterior design is not a requirement for listing on the NRHP when a building otherwise has historic local or national importance.

**254.** The City supported the successful application for the listing of MWO's headquarters on the NRHP despite significant modifications to building over time, including the relatively recent addition of floors.

**255.** City Defendant Boyd, then chair of the Iowa City Historic Preservation Commission ("ICHPC"), knew the 2018 application denigrating the importance of the Building was a false representation yet approved the application.

**256.** City Defendant Boyd was in charge in the 2021 application for NRHP listing of the Iowa City Downtown Historic District that included the Building as a key contributing resource.

<u>Historic Preservation Plan</u>

**257.** The City's historic preservation plan, adopted in 2008, states that the City will pursue local land-marking status for all properties listed on the NRHP.

**258.** In 2021, The City sought, and received NRHP designation for the Iowa City Downtown Historic District including classification of the Building as a "key contributing resource" in that district.

**259.** The City has not pursued local land-marking status for the Building.

**260.** Defendant Boyd was directly involved with and responsible for the 2018 and 2021 applications plead above.

**261.** Defendant Boyd was responsible for the implementation of the historic preservation plan while he was serving as the chair of the ICHPC.

**262.** Defendant Boyd failed to seek local landmarking of the buildings within the Iowa City Downtown Historic District.

**263.** Defendant Boyd described the NRHP listing of the Iowa City Downtown District to the press as "honorific" and stated to the press that it is his opinion that local landmarking is required to prevent demolition of the historic buildings in the district.

**264.** Defendant Boyd designed the historic district application process, including its boundaries, for purposes of feigning interest in historic preservation, quelling local demands for preservation, while at the same time working with the other Defendants to redevelop the Iowa City Downtown and redistribute the Iowa City Downtown assets to members of the enterprise, their affiliates and confederates to the exclusion of others as plead below.

<u>Requests for City Assistance</u>

**265.** Because the Trust advised Short's and others that it lacked cash for funding repairs to the Building, Short's, Perez and counsel, looked for sources of funding availability.

**266.** In 2023, Short's counsel advised the City, MWO, the Trust, and Wallace of the availability of federal and state funds to refurbish and repair buildings of historic importance to African-Americans.

**267.** The City, MWO, the Trust, and Wallace never responded to Short's, Perez, or counsel about the funding.

**268.** The City, MWO, the Trust and Wallace failed to apply for those available funds.

**269.** On a monthly basis beginning in August 2023 to present, Short's and Perez, through counsel, have requested to be placed on the agenda of the Iowa City Historic Preservation Commission ("ICHPC") to provide a presentation on the Building and its historic importance.

**270.** Perez and Short's have requested that the ICHPC and the City's Historic Preservation Planner assist in preparing the necessary applications for listing the Building on the NRHP and for local land-marking of the Building.

**271.** The City has refused to allow Perez and Short's to present at the ICHPC meetings because Short's and Perez had filed Writs of Certiorari against the City in State Court demanding (i) the City apply its "demolition-by-neglect" ordinance to force the owners of the Building to make required repairs and (ii) the City proceed through the historic review process for modifications to a historic building prior to the City physically removing Short's patio and damaging the façade of the building.

<u>Slezak Building</u>

**272.** The "Slezak Building" is located on the corner of Bloomington and Linn Streets in Iowa City and is in the Iowa City Downtown. The Slezak Building has housed Pagliai's Pizza for decades. The Slezak Building has "Bohemian roots" from 1870s immigration from what is now the Czech Republic.

**273.** The current Slezak Building owner (a decedent of the original owners) placed the building for sale in 2023. Some parties interested in the purchase allegedly intended to raze the land and begin new commercial or residential development.

**274.** Against the owner's wishes, the ICHPC declared the Slezak Building a local historic landmark in 2024. The City prepared all the necessary documents, held hearings, heard the owners

objections, but proceeded with the designation.

**275.** Defendant Bristow publicly stated that the Slezak Building and its Caucasian owners would be entitled to multiple significant financial benefits once the Slezak Building received local landmark status.

**276.** Defendant Bristow will not communicate with Perez, will not consider landmarking the African-American owned Building and will not offer the above referenced benefits to the minority-owned Building. This has directly deprived Perez participation in a program, historic preservation, directly funded by the federal government. Further, Bristow's refusal is in direct contravention of the Iowa City Historic Preservation Plan (which is incorporated in the City's Comprehensive Plan). Compliance with the Plan, and its equal participation and citizen participation requirements, is necessary to maintain certified local government status.

**277.** Short's and Perez requested that the City follow similar procedures for declaring the Building a local historic landmark and assistance in seeking listing of the Building on the NRHP.

**278.** The City refused Short's and Perez's requests.

**279.** Perez's requests remain unheard after nearly twelve months yet the City declared landmarking of the Slezak Building an emergency.

**280.** At all times relevant, the City and Bristow have been aware that the Building is being demolished by neglect and is in disrepair.

**281.** The City and Bristow will not seek to protect an African-American owned historic commercial building nor offer it the same benefits afforded to Caucasian-owned commercial historic buildings.

**282.** The Slezak Building is not on the NRHP. The Iowa City historic preservation plan makes it clear that buildings on the NRHP are to receive priority attention in matters of local landmarking.

The only reason the City will not adhere to its own plan and its CLG contract with the State of Iowa is due to racial bias against the African-American legacy and ownership of the Building and its current Hispanic tenant.

<u>Failure to Enforce Ordinances Against the Building Owners</u>

**283.**  Short's has repeatedly advised the Landlord of water leaking into the Premises from a source above the Premises (e.g. second floor plumbing or leaks in the roof).

**284.**  Despite this notice, water has continued to enter the Premises from above.

**285.**  In June and July 2023, Short's requested that the City inspect the Building (18-20 S. Clinton) for compliance with Iowa City Code (ICC) 14-3B-7 – Demolition by Neglect.

**286.**  On August 2, 2023, three City inspectors examined the building and found 12-18 inches of standing water in the basement.

**287.**  The City has taken no action to force the Landlord/Trust to repair the leaking building.

**288.**  The City inspectors' August 2023 report stated that the Trust, represented by Defendant Mitchell at the inspection, indicated repairs would commence within a month.  As of December 15, 2023, no repairs to the roof had been commenced.

**289.**  Despite repeated requests for the City to enforce its demolition-by-neglect ordinance, no action has been taken by the City against the Trust as owner of the Building for failure to make the required repairs to comply with the standards of ICC 14-3B-7 and its incorporation of residential standards requiring historic buildings to be maintained in a weathertight and watertight condition.

<u>State Suspension of City's CLG Status</u>

**290.**  The City is required to submit an annual application for re-certification as a CLG under the NHPA to the State Historic Preservation Office ("SHPO").

**291.** By letter of May 6, 2024 the SHPO found the City to be inadequately performing as an CLG and suspended the City's eligibility for a portion of the State's annual Historic Preservation Fund Award (CLG Pass-Through Grant).

**292.** A true and correct copy of the State's letter suspending the City's CLG status is attached hereto as <u>Exhibit</u> E.

<u>**Exclusion from Iowa City Ad Hoc Truth and Reconciliation Commission**</u>

**293.** Following the murder of George Floyd, the City of Iowa City, with the urging and effort of Defendant Bergus as City Council member, created the Iowa City Ad Hoc Truth and Reconciliation Commission ("<u>ICTRC</u>") and funded the organization with more than $1 million.

**294.** The purpose of the ICTRC, the brain-child of Defendant Bergus, was "to bear witness to the truth of racial injustice in Iowa City and to carry out restorative justice, through the collection of testimony and public hearings."

**295.** Perez and Short's, on a monthly basis beginning in October 2023, requested time on the ICTRC agenda to (i) inform the ICTRC of the importance of the Building to African-American history in Iowa City, (ii) inform the ICTRC of the City's failure to seek available federal and state grants to preserve the Building, and (iii) inform the ICTRC of the City's participation, aiding and abetting of MWO's discrimination against Perez as claimed below.

**296.** The City refused to allow Perez and Short's to present to the ICTRC other than in public comment (3 minute presentation limit and no discussion with the commission members allowed).

<u>**Iowa City Downtown District**</u>

**297.** The Iowa City Downtown District is a "Self-Supported Municipal Improvement District" encompassing the Iowa City Downtown area.

**298.** East Washington Defendant Hayek was a member of the Iowa City City Council from

2008 through 2015 and served as mayor of Iowa City from 2010 through 2015.

**299.** Defendant Hayek was instrumental in the re-establishment of the SSMID in 2012.

**300.** Defendant Hayek, as mayor and City Councilman, was directly involved in recruiting and hiring ICDD Defendant Bird as the director of the ICDD in 2012.

**301.** Both Hayek and Bird served in the Peace Corps contemporaneously in 1993-1994.

**302.** The ICDD claims that its purpose is to provide "a leadership directive that advocates for the Districts mission and serves as a mechanism to more efficiently implement District-wide marketing, programs, events, and projects that support vitality for the benefit of the businesses within it, the University of Iowa, community members and the region at large."

**303.** The ICDD acts as a private arm of the City.

**304.** The ICDD recruits businesses to the Iowa City Downtown.

**305.** The ICDD serves as a gatekeeper for entry into the Iowa City Downtown market.

**306.** The ICDD is advised of potential retail space openings prior to that availability being publically advertised or announced.

**307.** When Short's temporarily closed on April 18, 2022, Perez placed a sign on the window advising of its closure.

**308.** Defendant Bird saw the sign and contacted Perez by email inquiring as to Short's needs or problems.

**309.** At the same time, Defendant Bird was in contact with Defendant Kaeding, former employee of the ICDD, regarding the Craft Defendants' interest in the Premises.

**310.** Despite Short's having a current and valid Lease in April 2022, Defendant Bird emailed Defendant Kaeding indicating that the ICDD had been contacted by a business that would be interested in replacing Short's as a tenant but that Bird and ICDD would direct that contact to look

elsewhere for space if Kaeding and the Craft Defendants were interested in pursuing the space.

**311.** The ICDD Defendants were directly involved in preparing and submitting the application for the listing of the Iowa City Downtown Historic District on the NRHP.

**312.** The purpose of the City's promotion and execution of listing of the Iowa City Downtown District on the NRHP was to expose residential properties within the district to an additional tax under Iowa Code Ch. 368.

**313.** The Iowa Code Ch. 368 taxes are directed by the City to the ICDD as a SSMID.

**314.** Increases in taxes under Iowa Code Ch. 368 were not disclosed to the citizens of Iowa City when support for the SSMID was being solicited by the City, City Defendants, or ICDD Defendants.

**315.** The listing of the Iowa City Downtown Historic District on the NRHP did little to provide historic preservation and protection and served only to increase SSMID tax revenue for the ICCD Defendants.

## <u>Interlocking Relationships of the Enterprise</u>

**316.** The anti-trust and RICO claims plead below are based upon a number of enterprises organized into a larger enterprise designed to control commercial leases and real property ownership in the Iowa City Downtown.

**317.** This larger enterprise comprised of the Defendants and others operates through a series of interlocking relationships, including the following:

    **a.** East Washington Defendant Hayek served as councilman and mayor of the City from 2008 through 2016.

    **b.** East Washington Defendant Bergus has served on the City Council since 2020.

    **c.** East Washington Defendant Hayek and ICDD Defendant Bird served in the Peace

Corp during the same time.

**d.** East Washington Defendant Hayek as mayor oversaw the creation of the ICDD SSMID and recruited ICDD Defendant Bird as the first director.

**e.** East Washington Defendant Hayek promoted City Defendant Fruin and urged Fruin's hiring as City Manager.

**f.** City Defendant Fruin served on the ICDD Board when ICDD Defendant Bird was director of the ICDD.

**g.** The ICDD is funded with SSMID tax revenue and operates as a private arm of the City.

**h.** The East Washington Defendants serve as a clearinghouse of information among the enterprise as owner of the building at the center of the Washington Street side of the Block and as counsel to MWO and other members of the enterprise.

**i.** MWO's General Counsel departed in 2024 and MWO relied upon East Washington Defendant Moreland as temporary general counsel. Defendant Moreland appeared for MWO for less than 60 days in the Short's Civil Case. During that time, Moreland solicited a global settlement offer from Short's as to all claims against MWO, the Trust, and the City. A settlement offer was provided to Moreland which included a complete description of all of the Plaintiffs' claims plead herein as well as the claims pending in related litigation. Plaintiffs supplied a long memorandum (similar to a pre-mediation brief) with a global proposal.

**j.** After receiving the information, Moreland never responded to the offer and promptly withdrew from representation. Moreland acted on behalf of the enterprise to gain information from Plaintiffs under false pretenses of interest in a settlement.

**k.** East Washington Defendant Hayek is a member of Defendant MWO's Board of

Directors.

**l.**  Craft Defendant Kaeding is a member of Defendant MWO's Board of Directors.

**m.**  MWO Defendant Mitchell is a former Assistant City Attorney.

**n.**  While a City attorney, Mitchell provided legal support to the City department responsible for building inspections.  As counsel for that department, Mitchell had a working relationship with the current head of inspection, Hennes.

**o.**  Hennes rarely does inspections, but was assigned to and conducted the inspections of the Building in August 2023 and April 2024.

**p.**  Despite observing 12-18 inches of standing-water in the basement and signs of water stains and infiltration on the walls of the Premises provided a "pass" for the Building owned by the Trust, with Mitchell acting as trust officer.

**q.**  Upon Defendant Mitchell's departure from the City, Mitchell was replaced by City Defendant Dulek.

**r.**  City Defendant Dulek and MWO Defendant Winkleblack served as directors and senior officers of the Iowa City Foreign Relations Council (ICFRC) and met and communicated regularly for over a decade.

**s.**  The ICFRC was founded by Dick Summerwill, former MWO CEO, and Defendant Winkleblack is Summerwill's self-declared professional and civic protégé.

**t.**  The Craft Defendants, in different ownership iterations, own and control all of the Craft affiliated and confederated entities plead above as well as other enterprises.

**u.**  The individual establishments within the Craft Concepts "collection of restaurants and breweries" coordinate and communicate in an effort to obtain dominance, monopoly and control of the Iowa City Downtown through their affiliation with Craft Concepts.

**v.**   The PHP Defendants serve as a clearinghouse of information among the enterprise through their representation and service as registered agent. This representation and agency includes services provided to MWO, the Trust, Wallace and Kaeding owned businesses.

**w.**   Wallace, sole beneficiary of the Trust, is consulted and provides advice to MWO as Trustee in the administration of the Trust.

**x.**   Wallace communicates regularly with Craft Defendant Kaeding and MWO Defendant Mitchell.

**y.**   Boyd (City Defendant) and Mr. Kevin Monson (MWO Board Chair) were direct and active participants and influenced the listing of the Iowa City Historic District on the NRHP.

**z.**   Boyd (City Defendant) and Kaeding (MWO Defendant and Craft Defendant) were direct and active participants and influenced the listing of the Iowa City Historic District on the NRHP.

**aa.** Boyd (City Defendant) and Bird (ICDD Defendant) were direct and active participants and influenced the listing of the Iowa City Historic District on the NRHP.

**bb.** Hayek (East Washington Defendant and MWO Defendant) is a member of the MWO "Trust Committee" responsible for supervision of MWO's Trust Department.

**cc.** Bristow (City Defendant), Bird (ICDD Defendant), Boyd (City Defendant), Monson (MWO Board Chair), and Kaeding (MWO Defendant and Craft Defendant) worked in concert to obtain the listing of the Iowa City Downtown Historic District on the NRHP.

**dd.** The listing on the NRHP provided no benefit other than to increase the SSMID's revenue from taxation of residential properties within the listed district. These revenues are used by the ICDD to advance the interests of the enterprise.

**ee.** Bristow (City Defendant) is a former employee of Neuman Monson (formerly owned by Monson (MWO Board Chair) and worked closely with Monson on the NRHP listing project.

**ff.** Monson's business interests, including business in which he owns a 50% interest, include several buildings within the Iowa City Downtown.

**gg.** In 2023, Short's and Perez began requesting public records regarding the decade long relationship between Bird and the City Defendants. The City stated for months that there were no such records.

**hh.** After multiple requests and a complaint to the Iowa Public Information Board, the City subsequently stated the cost of reproducing all of the Bird-City communications would be more than $100,000 and require a full-time employee over a year to review all the documents.

**ii.** Defendant Bird, aware of the problem of voluminous responsive documents as to her interactions and relationship with the City Defendants, publicly requested on the record of a City Council meeting in late 2023 to place Assistant City Manager Rachel Kilburg-Varley (Defendant Fruin's direct subordinate) directly into GIC's offices for a minimum of one-day a week. The purpose of seeking a City employee to be in-person in GIC's offices was to obscure the enterprise relationship between Bird and the City and allow communications to be conducted personally and without need of documentation or the creation of records subject to the Iowa Open Records Act.

**318.** The City Attorney's Office, and the named individual City Defendants within that office, act as "consiglieri" to the enterprise for purposes of (i) providing legitimacy and City backing to the enterprises activities and (ii) to hide evidence and communications behind the veil of an over-

expansive and legally unjustifiable view of the attorney-client privilege espoused by the City Defendants within the City Attorney's Office.

319.  Approval of the listing of the Iowa City Historic Downtown District was fraudulently obtained from the citizens of Iowa City.

    **a.**  No disclosure of the increase in SSMID tax on residential properties occurred in soliciting citizen support.

    **b.**  The solicitation emphasized the "honorific" nature of the listing. MWO Chair Monson testified in deposition that he thought the listing would provide protection of the downtown buildings from demolition. The City Defendants have testified that the listing provides no protection from demolition. The listing was sold to the citizens of Iowa City as being good for historic preservation, without disclosure of the increase in taxes and knowing the City would take the legal position that the NRHP listing provided no actual protection for the historic buildings in the district.

    **c.**  The increased SSMID revenue from the listing the downtown district on the NRHP was used to promote the goals of the enterprise.

**CLAIM 1**
**VIOLATION OF TITLE VI OF THE UNITED STATES CIVIL RIGHTS ACT**
**<u>(Short's & Perez v. MWO)</u>**

320.  Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

321.  Title VI of the Civil Rights Act 42 U.S.C. §2000d et seq provides "No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

322.  MWO is a "person" for purposes of Title VI and its implementing regulations.

**323.** MWO is a recipient of federal financial assistance (e.g. federal reserve funds, federal loan grant and guaranty programs, etc.) for purposes of Title VI and its implementing regulations.

**324.** Pursuant to Title VI and its implementing regulations of all federal departments from which MWO receives federal financial assistance, Title VI's non-discrimination obligations apply "to all operations of " MWO when "any part" of MWO is "extended Federal financial assistance."

<u>Discrimination</u>

**325.** MWO, as a bank and as trustee of the Trust, and at the behest and influence of Wallace, was motivated by anti-Hispanic animus in its taking of the following acts:

    **a.** Serial attempts to evict Short's;

    **b.** Organizing and facilitating the May 4, 2022 "break-in" and trespass by Mote and the Craft Defendants;

    **c.** Providing false testimony through affidavits, live testimony in FED #3 and in depositions;

    **d.** Filing claims against Perez alleging abuse of process for Perez filing complaints with the ICRC;

    **e.** Revoking consent to Short's 2023 Sidewalk Café Agreement despite no legal mechanism to do so;

    **f.** Soliciting City assistance in retaliating against Short's and Perez by encouraging confiscation of Short's patio and property; and

    **g.** Seeking the PHP Defendants participation in retaliation against Perez by unjustifiably threatening Perez business "*Stella*" with litigation.

    **h.** Failing to seek available historic preservation funds available for African-American owned historic buildings.

**i.** Failing to support the Building's listing on the NRHP and local land-marking after MWO had sought and obtained its NRHP listing of its headquarters.

**j.** Kaeding testified in deposition that MWO, landlord for both Pullman and the Building, responds promptly to any Pullman needed repairs. When Perez demanded repairs to the collapsing wall in April 2022, MWO delayed action and commenced FED #1.

**k.** FED #1 was threatened less than 48 hours after Perez assumed operational management of Short's on April 18, 2022. The temporal proximity of the change of management from Ouverson (Caucasian) to Perez (Hispanic) gives rise to more than a presumption of discrimination when MWO has failed after repeated requests to name a legitimate, non-discriminatory reason for its seeking removal of Short's from the Premises.

**l.** MWO filed a Motion to dismiss in the ICRA Case asserting that Iowa law did not prohibit discrimination on the basis of race in the marketing and entry of commercial real property leases.

326. MWO's took these acts intentionally with discriminatory intent and with racial animus towards Perez.

327. MWO was deliberately indifferent to the racial harassment and anti-Hispanic animus of Wallace and acted in the manner Wallace requested despite knowledge the Wallace preferred Caucasian tenants and management (e.g. Kaeding or Ouverson) to Hispanic tenants and management (Perez).

328. These actions by MWO plead above violated Title VI.

<u>Retaliation</u>

329. MWO has engaged in the following acts of retaliation against Short's and Perez because Perez raised issues of racial discrimination with the ICRC and in the ICRA Case:

**a.** MWO filed a counterclaim in the Short's Civil Case seeking monetary damages against Perez because he filed a complaint of discrimination with the ICRC;

**b.** MWO solicited the assistance of the City to remove Short's patio;

**c.** MWO as trustee filed counterclaims against Perez in the ICRA Case seeking monetary damages because Perez filed the case; and

**d.** MWO, acting through its counsel, PHP Defendants, harassed Perez's other business, Stella by trolling the PHP client list to find clients with anti-Hispanic animus to threaten Stella, a Perez owned business, with litigation by PHP client Bailey American Waygu.

**330.** MWO's retaliatory conduct plead above violated Title VI.

**331.** Plaintiffs have been damaged by these unlawful acts in violation of Title VI.

## CLAIM 2
## VIOLATION OF TITLE VI OF THE UNITED STATES CIVIL RIGHTS ACT
### (Short's & Perez v. the City)

**332.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**333.** The City is a "person" for purposes of Title VI and its implementing regulations.

**334.** The City is a recipient of federal financial assistance (e.g USDOT, Department of the Interior, National Park Service, Department of Education, etc. funding programs) for purposes of Title VI and its implementing regulations.

**335.** Pursuant to Title VI and the implementing regulations of all federal departments from which the City receives federal financial assistance, Title VI's non-discrimination obligations apply "to all operations of [the City]]" when "any part of [the City is extended Federal financial assistance."

**336.** In accordance with the Department of Interior's ("DOI") historic preservation regulations

and requirements, the State of Iowa entered a "certified local government" ("CLG") agreement with the City that is a prerequisite for the City receiving federal financial assistance in DOI programs.

**337.** The City's status as a CLG was suspended by the State of Iowa in May 2024 because of the State's concerns for the City's compliance with the non-discrimination provisions of the CLG Agreement and Title VI.

**338.** Plaintiffs have been damaged by the following unlawful acts in violation of Title VI:

Direct Discrimination

**339.** The City Defendants, with discriminatory intent and anti-Hispanic animus took the following actions, each in violation of Title VI:

**a.** Refusing Perez's requests for time to present to the ICHPC and ICTRC;

**b.** Confiscating Short's patio when the City had never taken such an action before;

**c.** Allowing verbal revocation of MWO's consent to the 2023 Sidewalk Café Agreement when the City had never allowed verbal revocation before and no process for verbal revocation exists;

**d.** Failing to seek State and Federal grants and loans available for preservation of African-American owned historic properties;

**e.** Providing all needed work and assistance to seek local land-marking and NRHP listing of the Caucasian-owned Slezak Building and refusing any assistance to obtain local land-marking and NRHP listing of the Building;

**f.** The City favors Caucasian-owned buildings of historic African-American importance (Tate Arms and Iowa Federation Home) and assisting such owners with obtaining historic preservation funding over the Building, an African-American owned

building with historic significance;

**g.**   Preventing Perez and Short's and their counsel of choice from directly petitioning City officers and commissions by asserting the City Attorney's office represents all City employees and requiring all Perez communications to be sent to the City Attorney's Office and not directly to the City official in charge.

**340.**   The City Defendants took the above identified acts, and others, intentionally, with discriminatory intent and motivated by racial animus towards Perez.

**341.**   The City acted with deliberate indifference to the racial harassment and anti-Hispanic animus of Wallace. MWO acted in the manner Wallace requested despite knowledge that Wallace demands Caucasian tenants and management (e.g. Kaeding or Ouverson) and removal of Hispanic tenants and management (Perez).

**342.**   These actions by the City Defendants plead above violated Title VI.

<u>Retaliation</u>

**343.**   The City has engaged in the following acts of retaliation in violation of Title VI:

**a.**   The City refused to allow Perez to speak to the ICHPC and ICTRC because Perez filed a complaint of discrimination against the City with the ICRC;

**b.**   The City, after being informed that it would be participating in retaliation against Perez by MWO and the Trust, confiscated Short's patio despite the City being in possession of a notarized sidewalk café agreement fully executed by Short's and the Landlord (MWO/Trust) and tender of payment of all fees.

<u>Aiding and Abetting Retaliation</u>

**344.**   The City knowingly and intentionally took the actions set forth above to aid and abet racially motivated retaliation by the MWO Defendants and Wallace against Perez and Short's.

**345.** The City's aiding and abetting MWO and Wallace's retaliation violated Title VI.

<u>Deliberate Indifference</u>

**346.** The City was deliberately indifferent to the racial harassment and anti-Hispanic animus of Wallace and MWO. The City, with knowledge of the anti-Hispanic and retaliatory motives of MWO, participated in, and assisted MWO in continuing harassment and retaliation.

**347.** The City's deliberate indifference to MWO and Wallace's discriminatory motivation and retaliation, and direct participation therein, violated Title VI.

## CLAIM 3
## VIOLATION OF TITLE VI OF THE UNITED STATES CIVIL RIGHTS ACT
<u>(Short's & Perez v. the Craft Defendants)</u>

**348.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**349.** Each Craft Defendant is a "person" for purposes of Title VI and its implementing regulations.

**350.** Craft and the Craft Defendants are recipients or sub-recipients of federal financial assistance (e.g Paycheck Protection Program) for purposes of Title VI and its implementing regulations.

**351.** Pursuant to Title VI and the implementing regulations of all federal departments from which the Craft Defendants receive federal financial assistance, Title VI's non-discrimination obligations apply "to all operations" of a Craft Defendant when "any part" of that Craft Defendant is "extended Federal financial assistance."

**352.** The Craft Defendants aided and abetted the direct discrimination and retaliation by MWO and Wallace by affirmatively encouraging MWO and Wallace to evict Short's in favor of a replacement tenant that is a Craft Defendant related, Caucasian-owned enterprise.

**353.** The Craft Defendants' "break-in" to Short's on May 4, 2022, together with the Craft

Defendants' repeated requests for the status of Short's removal encouraged MWO and Wallace to proceed forward with their attempts to serially evict Short's. The attempts to evict Short's were racially motivated as plead in Claim 1 above.

**354.** The Craft Defendants acts of aiding and abetting MWO and Wallace's racial discrimination violated Title VI.

**355.** Plaintiff has been damaged by the Craft Defendants unlawful acts in violation of Title VI.

**CLAIM 4**
**VIOLATION OF 42 U.S.C. § 1981**
**<u>(Short's & Perez v. All Defendants)</u>**

**356.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**357.** 42 U.S.C. §1981 provides:

(a) STATEMENT OF EQUAL RIGHTS All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "MAKE AND ENFORCE CONTRACTS" DEFINED For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) PROTECTION AGAINST IMPAIRMENT The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

**358.** A plaintiff establishes a prima facie case under § 1981 by showing (1) membership in a protected class; (2) the intent to discriminate on the basis of race on the part of the defendant; and (3) discrimination interfering with a protected activity (i.e., the making and enforcement of contracts). *Bediako v. Stein Mart, Inc.,*354 F.3d 835, 839 (8th Cir. 2004).

**Membership in Protected Class**

**359.** Plaintiff Perez is Hispanic and a member of a protected class as to his race.

**MWO Defendants & Wallace – Discrimination and Interference with Protected Activity**

**360.** From 2008 to April 2022, Dan Ouverson (Caucasian), part-owner of Short's, was the front-of-the-house face of Short's.

**361.** In August 2021, the MWO Defendants and Wallace believed Ouverson was the sole owner of Short's.

**362.** Two days after Perez assumed front-of-the-house duties in April 2022, the MWO Defendants and Wallace began threatening suits against Short's and Perez for breach of the Lease (contract) and eviction of Short's.

**363.** From 1998 to April 2022 the landlord of the Building never threatened eviction of the tenant of the Premises (Short's operated by Ouverson and prior Ouverson owned businesses).

**364.** Short's has paid all rent other than that the Trust refuses to accept.

**365.** The MWO Defendants and Wallace have permitted other tenants (Caucasians) of the Building and other properties owned or managed by the MWO Defendants and Wallace to close for remodeling without declaring an abandonment.

**366.** When Perez closed Short's for remodeling, the MWO Defendants and Wallace sought to evict Short's (FED #1) for abandonment.

**367.** Wallace's animus towards Hispanics caused her to suggest to the MWO Defendants that Short's be evicted.

**368.** Wallace provided support, encouragement, and direction to the MWO Defendants in their efforts to evict Short's and deprive Perez of his business and benefits of the Lease and its renewals.

**369.** Perez and Short's requested that the MWO Defendants and Wallace provide a legitimate

non-discriminatory reason for evicting a 25 year tenant who has paid all rent.

370.  No legitimate non-discriminatory reason for evicting Short's has ever been articulated by the MWO Defendants or Wallace.

371.  The MWO Defendants and Wallace attempted to evict Short's because Perez (Hispanic) replaced Ouverson (Caucasian) as the primary owner/operator of Short's

372.  But for Perez's race the MWO Defendants and Wallace would not have engaged in the acts of discrimination and retaliation delineated in the pleadings above.

373.  Discriminatory intent is evident from the temporal proximity of (i) Perez taking lead at Short's on April 18, 2022 in comparison to the history of the prior 25 years of tenancy with Ouverson in lead and (ii) the April 20, 2022 beginning of the attempts to evict Short's with no legitimate non-discriminatory reason articulated. Immediately upon the appearance of the Hispanic Mr. Perez , the eviction process started.

374.  Attempting to deprive Short's and Perez of the benefits of the Lease of the Premises and the options to renew that Lease constitutes interference with an activity protected by §1981 (making and enforcing the Lease).

## City Defendants – Discrimination and Interference with Protected Activity

375.  This Claim 4 against the individuals included in the City Defendants (e.g. Fruin, Goers, Dulek and Craig) is alleged against such person both in their individual capacity and in their capacity as a City officials.

376.  Short's and Perez presented the City Defendants a fully-executed and notarized sidewalk café agreement for the period February 2023 to January 2024 and payment of all required fees.

377.  The City refused to process the sidewalk café agreement based upon MWO's/Trust's alleged verbal revocation of consent to the agreement.

**378.** The City had never refused to process a completed sidewalk café agreement before this Short's application.

**379.** The City had never accepted a verbal revocation of consent to a sidewalk café agreement before it did so from MWO and has no written procedure allowing verbal revocation of such an agreement.

**380.** The City had never confiscated and removed a sidewalk café prior to doing so to Short's in July 2023.

**381.** The City was advised by Short's that the MWO Defendants were acting in retaliation against Perez for his filing a discrimination complaint with the Iowa Civil Rights Commission.

**382.** The City's action of refusing to enter the sidewalk café agreement was intentional discrimination and knowingly aiding and abetting the MWO Defendants' and Wallace's discrimination and retaliation against Perez on the basis of his race.

**383.** The City's action of physically removing Short's patio was intentional discrimination and knowingly aiding and abetting the MWO Defendants' and Wallace's discrimination and retaliation against Perez on the basis of his race.

**384.** The City deprived Short's and Perez of the benefits of the sidewalk café agreement on the basis of race in violation of §1981.

**385.** Plaintiffs have been damaged by these unlawful acts in violation of § 1981.

**CLAIM 5**
**VIOLATION OF 42 U.S.C. § 1982**
**(Short's & Perez v. MWO Defendants, Wallace, and City Defendants)**

**386.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**387.** This Claim 5 against the individuals included in the City Defendants (e.g. Fruin, Goers, Dulek and Craig) is alleged against such person both individually and in their capacity as a City

officials.

**388.** 42 U.S.C. § 1982 ("§1982") provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

**389.** The prima facie elements of a § 1982 require that a plaintiff show (1) membership in a protected class; (2) discriminatory intent on the part of the defendant and (3) interference with the rights or benefits connected with the ownership of property. *Mosby v. Devalls Bluff Housing Authority*, No. 4:07CV00266 SWW, at *13 (E.D. Ark. Oct. 29, 2007).

**390.** Section 1982 applies to abandonment of services previously provided to white tenants and then denied to minority tenants. *Memphis v. Greene*, 451 U.S. 100, 123 n.35 (1981)

**391.** Perez is a member of a protected class.

**392.** Perez and Short's have been damaged by the following unlawful acts in violation of § 1982.

## MWO Defendants and Wallace – Discriminatory Intent and Depravation of Benefits

**393.** The allegations contained above regarding the MWO Defendants and Wallace's discrimination pursuant to Title VI and § 1981 are incorporated herein.

**394.** Perez's partial ownership interest in Short's is property.

**395.** Short's Lease of the Premises is a real property interest.

**396.** For the reasons stated above, the MWO Defendants and Wallace intended to discriminate against Perez and deprive him and his business of its tenancy at the Premises through initiation of wrongful eviction proceedings.

**397.** For the reasons stated above, the MWO Defendants and Wallace provided services and accommodations for remodeling to white-owned and operated business (including Short's while

operated by Ouverson and Pullman operated by the Craft Defendants) and deprived the Hispanic owned and operated Short's of those services and accommodations.  These deprivations included:

    **a.**   Timely response and repair of white tenant facilities and buildings but delays or refusal to repair when requested by Perez;

    **b.**   Granting accommodation to white-owned and operated tenants for periods of business closure for remodeling (e.g. Clinton Street Social Club, Coa Cantina, Pullman) but declaring abandonment and breach of the Lease when Perez closed Short's for remodeling.

**398.**   When the Craft Defendants (Caucasians) engaged in negotiations to replace Short's as the tenant in the Premises in 2022 and 2023, the MWO Defendants were willing to make repairs as a condition to the Craft Defendants entry but the MWO Defendants had refused to make the very same repairs when requested by Perez. The deprivation of services was taken with discriminatory intent.

**399.**   As plead above, the temporal proximity (48 hours) between Perez assuming lead of Short's operations and the MWO Defendants' first threat of evictions demonstrates intent to discriminate on the basis of race.

**400.**   Pleadings above and below regarding the MWO Defendants and Wallace's failure to articulate a legitimate non-discriminatory basis for their actions are incorporated herein.

**401.**   The MWO Defendants and Wallace intended to deprive Perez's business, Short's, of the benefits of their property interest in the Lease because Perez is Hispanic.

**402.**   The MWO Defendants and Wallace's interference with Perez's and his businesses ability to lease and maintain a lease, including wrongful eviction actions, deprive Perez and Short's of the rights and benefits of the Lease.

**City Defendants – Discriminatory Intent and Depravation of Benefits**

**403.** The allegations contained above regarding the City Defendants' discrimination pursuant to Title VI and § 1981 are incorporated herein.

**404.** Incorporating the allegations above, the City Defendants, with intent to discriminate on the basis of race, deprived Perez and Short's ownership interest in Short's patio (deprivation of personal property ownership interest and benefits).

**405.** The City Defendants with intent to discriminate aided and abetted discrimination and retaliation by the MWO Defendants through refusing to execute a completed sidewalk café agreement/easement/license for Short's use of the public-right-of-way (a real property interest).

**406.** For the factual reasons plead herein, the City, with the intent to discriminate on the basis of race or with the intent to knowingly aid and abet the MWO Defendants discrimination and retaliation, interfered with the rights and benefits connected with Short's and Perez's ownership of property, right-of-way licenses, and leasehold interests in violation of §1982.

**CLAIM 6**
**VIOLATION OF 42 U.S.C. § 1983**
**(Short's & Perez v. City Defendants Other than Boyd, MWO Defendants PHP Defendants, & Craft Defendants)**

**407.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**408.** This Claim 6 against the individuals included in the City Defendants (e.g. Fruin, Goers, Dulek and Craig) is alleged against such person both individually and in their capacity as a City officials.

**409.** 42 U.S.C. § 1983 ("§1983") provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## Color of Law

**410.**  All actions taken by the City Defendants alleged herein were taken under the color of law for purposes of §1983.

**411.**  The City Defendants acted under color of state law to deprive Plaintiffs of rights, privileges, and immunities secured by the Constitution or laws of the United States.

## Rights, Privileges & Immunities Deprived

**412.**  The City Defendants have asserted an overly-broad and expansive interpretation of the attorney-client privilege in response to Plaintiffs' Iowa Open Records Act requests, in responses to discovery in related litigation, and in deposition testimony.

**413.**  The City's position that all communication by or to a City attorney are privileged, exempt from discovery, and exempt from disclosure under the Iowa Open Records Act is without legal basis.

**414.**  Only communications in which a City employee is seeking legal advice or the City Attorney's office is providing legal advice are privileged.

**415.**  Communications by City attorneys to third-parties are not attorney-client privileged communications.

**416.**  Communications by or to City attorneys related to City business and not legal advice are not privileged.

**417.**  The City's use of the attorney-client privilege to deprive Perez and Short's of information to which they are entitled under the Iowa Open Records Act and in discovery in litigation has

deprived Perez and Short's of due process and equal protection under the laws and constitution of the State of Iowa and the United States.

**418.**   The City Defendants, individually and together, acted to deprive Perez of his rights under the First Amendment of the United States Constitution, and corresponding protections under the Iowa Constitution, to petition and speak by:

      **a.**   Denying Perez the ability to be placed on the agenda of the Iowa City Historic Preservation Commission ("ICHPC");

      **b.**   Denying Perez the ability to be placed on the agenda of the Iowa City Ad Hoc Truth and Reconciliation Commission ("ICTRC");

      **c.**   Depriving access to the ICHPC and ICTRC in retaliation against Perez for his exercise of his First Amendment and Iowa Constitutional right to petition by writ of certiorari to seek redress of grievances related to the taking of Perez's and Short's patio and for failing to equally apply inspection standards at the Building (e.g. inspecting under the nuisance standards rather than the demolition by neglect standards)..

**419.**   The City Defendants, individually and together, acted to deprive Perez and Short's of substantive and procedural due process in violation of the Fifth and Fourteenth Amendments of the United States Constitution, and the corresponding protections under the Iowa Constitution, by:

      **a.**   Refusing to enter the fully dually executed, notarized sidewalk café agreement;

      **b.**   Confiscating Short's and Perez's property (patio) despite the City possessing a fully dually executed and notarized agreement and tender of fee payment.

      **c.**   Failing to provide Perez and Short's notice of and rights to appeal the City's decisions in (a) and (b) immediately preceding.

      **d.**   The City knowingly and intentionally failed to apply the "demolition-by-neglect"

standards to its inspection of the Building in August 2023.

    **e.**   The City knowingly fabricated "passing" results during its August 2023 and April 2024 inspections of the Building and applied standards to those inspections divergent from the standards applied to other inspections under the residential building ordinance, which is applicable to Building eligible for listing on the NRHP under ICC 14-3B-7.

**420.**  The City Defendants, individually and together, acted to deprive Perez and Short's equal protection of the laws in violation of the Fifth and Fourteenth Amendments of the United States Constitution, and the corresponding protections under the Iowa Constitution by the following:

    **a.**   Allowing, for the first time ever, a verbal revocation of a notarized consent to entry of a sidewalk café agreement despite no existence of a legal mechanism to do so;

    **b.**   For the first time ever, confiscating the patio of a business that had provided a fully dually executed notarized sidewalk café agreement and tender of fees;

    **c.**   Seeking to obtain local historic preservation protection of the white-owned Slezak building and refusing to seek local protection or provide assistance in seeking  federal funding for the protection of the African-American owned Building with Perez (Hispanic) as a tenant;

**421.**  The City Defendants fabrication, destruction, or non-collection of evidence violates constitutional rights. *Mills v. Barnard*, 869 F.3d 473, 486 (6th Cir. 2017).

**422.**  The City Defendants, individually and together, acted to deprive Perez and Short's of rights, privileges and immunities under the Iowa Civil Rights Act by discriminating and retaliating as alleged above.

**423.**  The City Defendants, individually and together, acted to deprive Perez and Short's of rights, privileges and immunities under the Iowa Civil Rights Act by aiding and abetting

discrimination and retaliation by the MWO Defendants and Wallace as plead above. Discriminating and retaliating as alleged above.

424.  The City Defendants, individually and together, acted to deprive Perez and Short's of rights, privileges and immunities under Title VI, § 1981, §1982, and §1985 as plead above and below.

425.  Each of the rights alleged above were clearly established rights at all times relevant to the factual allegations contained herein.

426.  Plaintiffs have been damaged by these unlawful acts in violation of § 1983.

## CLAIM 7
## CONSPIRACY TO VIOLATE 42 U.S.C. § 1983
### (Short's & Perez v. All Defendants Other than Boyd)

427.  Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

428.  This Claim 5 against the individuals included in the City Defendants (e.g. Fruin, Goers, Dulek and Craig) is alleged against such person both individually and in their capacity as a City officials.

429.  §1983 provides a remedy for conspiracy to deprive Short's and Perez of rights, privileges and immunities.

430.  To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *See Carson v. Lewis*, 35 F. Supp.2d 250, 271 (E.D.N.Y. 1999); *see*, *e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (citing *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (setting forth elements)).

431.  A §1983 conspiracy claim arises when a private actor conspires with state actor to deprive

a person of a constitutional right under color of law.

**432.** The overt acts (eviction proceedings, revocation of consent, allowing verbal revocation of consent, confiscation of the patio, refusal to accept a completed sidewalk agreement and tender of payment and overly-broad, expansive, and unjustified claims to attorney-client privilege by the City) to deprive Plaintiffs' over their rights, privileges and immunities are plead above and incorporated herein by this reference.

**433.** Kaeding acted to deprive Perez and Short's of speech and communication intended for Short's by Kaeding receiving and deleting emails from Google Business and Facebook, containing business information such as customer comments, leads for business opportunities, and communications seeking employment and thereby depriving Short's and Perez of that information.

**434.** Each of the conspiracies outlined below were formed through a mutual agreement between those identified in such allegation:

**a.** Dulek, Goers, Fruin and Craig (City Defendants) conspired among themselves to deprive Perez and Short's of their rights, privileges and immunities as plead in Claim 6.

**b.** Dulek, Goers, Fruin, and Craig (City Defendants) and MWO (through Mitchell, Mote, and Winkleblack) conspired to deny Short's its sidewalk café agreement in violation of Plaintiffs' rights, privileges and immunities alleged in Claim 6.

**c.** The MWO Defendants and the City Defendants conspired to deprive Perez and Short's of the rights, privileges and immunities delineated above.

**d.** The MWO Defendants solicited the City Defendants' assistance in retaliating against Perez and Short's by refusing to enter the sidewalk café agreement and confiscating Short's and Perez's patio.

**e.** The Craft Defendants conspired with the MWO Defendants and the City

Defendants to deprive Short's and Perez of their contract rights (Lease) by preparing to replace Short's as a tenant with a Craft Defendant affiliated enterprise and used unlawful means to do so with the lack of prosecution or application of proper legal standards by the City.

    **f.**  The City Defendants and Craft Defendants aided and abetted the MWO Defendant's anti-Hispanic animus by providing enforcement (refusal to enter the sidewalk café agreement and confiscation of Short's patio) and economic protection (Craft Defendants intent to replace Short's as tenant).

    **g.**  Wallace conspired with the MWO Defendants to seek the City's assistance and aid (patio agreement denial and patio confiscation) in furtherance of retaliation against Perez and Short's for filing complaints with the ICRC.

    **h.**  City Defendants Goers, Dulek, and Craig have conspired to knowingly assert and implement a legally unjustifiable position as to the scope attorney-client privilege related to City Attorney office communications (sent and received) to deprive Short's and Perez of their rights to due process, equal protection, and access to government information.

**435.** The MWO Defendants, Wallace, Craft Defendants, and City Defendants are co-conspirators subject to joint and several liability for the acts of the others in furtherance of the conspiracy to deprive Perez and Short's of their rights under the Constitution and laws.

**436.** Perez and Short's have been damaged monetarily and Perez's and Short's reputations have been damaged by these conspiracies to violate their rights.

## CLAIM 8
## VIOLATION OF 42 U.S.C. §§ 1985(2) & (3) & 1986
### (Short's & Perez v. All Defendants Other than Boyd)

**437.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**438.** Specifically, the conspiracy and enterprise allegations set forth below in the anti-trust and RICO claims, and conspiracy allegations above in the Title VI and § 1983 claims above are incorporated herein incorporated herein.

### §1985(2) - Obstructing Justice

**439.** 42 U.S.C. § 1985(2) provides that "[I]f two or more persons in any State . . . conspire to deter, by force, intimidation or threat, any party or witness . . . testifying to any matter pending therein freely, fully and truthfully, or to injure such party or witness in his person or property on account of his having so . . . testified . . . or if two or more persons conspire for purposes of impeding, hindering, obstructing or defeating, in any manner, the due course of justice in any State, with  intent to deny any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

**440.** The MWO Defendants and PHP Defendants conspired to intimidate and threaten Mote and Mitchell with personal repercussions if they did not provide false testimony (i) in FED #3, (ii) in affidavits submitted to the ICRC and (iii) in affidavits provided to to Plaintiff's counsel in related litigation.

**441.** The allegations set forth below regarding the RICO predicate acts of perjury and suborning perjury are specifically incorporated herein by this reference.

**442.** Plaintiffs have been damaged by the false testimony obtained through threats of personal

repercussions against Mote and Mitchell.

§1985(3) – Depriving of Rights of Privileges

**443.** All factual allegations above and below are incorporated herein.

**444.** Specifically, and without limiting the generality of the immediately preceding incorporation, the allegations contained in the Title VI claims above and the anti-trust and RICO conspiracy allegations below are incorporated herein.

**445.** "If two or more persons . . . conspire or go in disguise . . . on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have action for the recovery of damages occasioned by such injury or deprivation, against one or more of the conspirators." 42 U.S.C. § 1985(3).

**446.** The Mote and Craft Defendants "break-in" to Short's on May 4, 2022, with planning text messages voicing concern over whether Short's had security cameras that would record their entry and messages referencing a *disguise* in "Groucho Marx glasses" constituted conspiring and going in disguise onto the premises of Short's.

**447.** The purposes of the break-in were to deprive Perez and Short's of (i) their rights under their contract (the Lease) and (ii) the enjoyment of their property and contract.

**448.** The City Defendants aided and abetted MWO's attempts to harass and remove Short's and MWO's retaliation against Short's through allowing verbal revocation of the signed and notarized 2023 sidewalk café agreement and by confiscating Short's patio at the request of MWO.

**449.** All of the Defendants, other than Boyd, participated in the actions designed to deprive Short's and Perez of their contractual rights under the law based upon the race of Perez, or as retaliation against Perez for asserting his rights to equal protection before the ICRC and the courts of Iowa.

**450.** The individual City Defendants conspired to deprive Short's and Perez of their First Amendment rights to petition and speak by denying Short's time on the agenda to present to the ICHPC and ICTRC regarding the historic importance of the Building and to publically state Perez's concerns as to the City's racial bias in favor of Caucasians comprised of the MWO Defendants and the Craft Defendants.

**451.** The undergirding and impetus for the acts of the conspiracy violating §1985 was invidious anti-Hispanic racial animus of Wallace, MWO and the City against Perez that was spread throughout the conspiracy (whether known or unknown to the other conspirators).

**452.** Perez and Short's have been damaged by these violations of § 1985.

<u>§ 1986 Neglect to Prevent Violations of § 1985</u>

**453.** "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action . . ." 42 U.S.C. § 1986.

**454.** The MWO Defendants, City Defendants, and Craft Defendants all knew of and had the power to prevent the commission of the offenses set forth in the §1985 claims (and the claims

incorporated therein). These Defendants with reasonable diligence could have prevented those §
1985 violations and did not. These Defendants violated § 1986 and Plaintiffs were damaged
thereby.

## CLAIM 9
## VIOLATION OF IOWA COMPETITION LAW – IOWA CODE CHAPTER 553
### (Short's & Perez v. All Defendants)

**455.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**456.** Without limiting the generality of the foregoing incorporation, Plaintiff specifically
incorporates and realleges all allegations contained in the RICO Claim below as to the enterprise.

**457.** Iowa Code § 553.4 provides "A contract, combination, or conspiracy between two or
more persons shall not restrain or monopolize trade or commerce in a relevant market."

**458.** Iowa Code §553.5 provides "A person shall not attempt to establish or establish,
maintain, or use a monopoly of trade or commerce in a relevant market for purpose of excluding
competition or of controlling, fixing or maintaining prices."

### Iowa River Landing

**459.** The IRL Market is a geographic "relevant market" for purposes of the Iowa Competition
Law. The IRL Market is physically separated from other areas of Iowa City and is a retail
development destination where pedestrian traffic prevails after arrival.

**460.** The relevant product market within this geographic area are (i) restaurant and bar
businesses and (ii) commercial real estate ownership and leasing.

**461.** The group comprised of the members of the Craft Defendants and their affiliates and
confederated groups have ownership and operation of nearly 70% of the available restaurant seats
in the IRL Market

**462.** The group comprising the Craft Defendants and affiliates and confederates and the City

through the City Defendants acted together to unreasonably restrain trade and to monopolize the IRL Market.

463.  The Craft Defendants together with assistance from the City Defendants and the ICDD Defendants attempted to and have monopolized the IRL Market to the exclusion of other restaurant and hospitality business operators.

464.  During events held in the IRL Market, Perez and Short's have attempted to obtain a tent or other location but a condition to participation was a requirement that Short's sell Big Grove Brewery products.

465.  Big Grove is affiliated with Craft Concepts.

### Iowa City Downtown & the Block

466.  The Iowa City Downtown is a geographic "relevant market" for purposes of the Iowa Competition Law.

467.  The City has defined the Iowa City Downtown as a geographic market and refers to the Iowa City Downtown as a separate and distinct geographic market.

468.  The ICDD is a self-supported municipal improvement district and the Iowa City Downtown is defined as a separate geographical market for purpose of imposing the SSMID taxes.

469.  The product markets within these geographic areas are (i) commercial real estate ownership and leasing and (ii) restaurants/bars operating in this geographical area.

470.  The Block is a geographic "relevant market" for purposes of the Iowa Competition Law.

471.  The geography of the Block is unique in its location directly across the street from the University of Iowa Pentacrest. Nearly every student to attend the University of Iowa walked on the Block often in their day-to-day travels across or through campus.

472.  The Block is one of only a few blocks in the southern portion of the Iowa City Downtown

that is not abutting to the pedestrian mall in downtown Iowa City and is separate and unique from the pedestrian mall market and the northside market reflected in the Iowa City Downtown district map attached hereto to define the Iowa City Downtown.

**473.** The product markets within this geographic areas are (i) commercial real estate ownership and leasing and (ii) restaurants/bars operating in this geographical area.

**474.** The ICDD Defendants, the East Washington Defendants, Craft Defendants, City Defendants, MWO Defendants, and PHP Defendants have acted in concert to control and select entrants into the Iowa City Downtown. These acts have included, among others plead herein:

   **a.** The ICDD Defendants acting as gatekeepers for tenants seeking available space in the Iowa City Downtown market.

   **b.** MWO limiting is property availability to a select few on the "short-list";

   **c.** Hayek (an East Washington Defendant) when mayor, Bergus (an East Washington Defendant) as city council member, and the City Defendants obtaining "TIF" financing assistance from the City for businesses included within or confederated with one or more of the Craft Defendants.

**475.** MWO, Mitchell, and Mote have testified that they keep a "short-list" of people to contact when commercial properties managed by MWO's trust department or property managers becomes vacant. ICDD Defendants Bird, ICDD, and GIC, and the Craft Defendants (including, specifically Kaeding) are on that "short-list."

**476.** MWO does not, or rarely does, publically advertise space available in its managed properties but instead limits its offering of space availability to those on the "short-list" comprised of co-conspirators or confederates of those involved in the conspiracy/enterprise alleged herein.

**477.** In the spring of 2022, the ICDD Defendants expressed to Kaeding preference for a Craft

Defendant affiliated, related or confederated business to be in control of the Premises to the exclusion of Perez and Short's.

**478.** By email from Defendant Bird to Defendant Kaeding in April and May 2022, Defendant Bird stated that ICDD had a business interested in taking the Premises but that Bird and ICDD would steer that interested business towards other locations if Kaeding or the Craft Defendants were interested in the Premises.

**479.** After being offered to replace Short's as tenant in 18 S. Clinton, the Craft Defendants specifically stated in writings that their taking of 18 S. Clinton would expand their "Iowa City Downtown empire."

**480.** From the spring of 2022 to present, the City Defendants have expressed in writing preference for a Craft Concepts affiliated, confederated, or related business to be in control of the Premises to the exclusion of Perez and Short's.

**481.** The MWO Defendants and City Defendants conspired to revoke Short's 2023 sidewalk café agreement and refuse to enter a 2024 sidewalk café agreement to restrain Short's ability to compete against other restaurants, including those operated by the Craft Defendants and their affiliates and confederates, with sidewalk food and beverage service.

**482.** The City Defendants and the MWO Defendants conspired and acted to restrain trade and exclude Perez and Short's from competing in the Iowa City Downtown market and the market on the Block through serial eviction actions, refusal to allow Short's to operate a sidewalk café, and confiscation of Short's patio property.

**483.** The "Block" is defined by Iowa Avenue, Dubuque Street, Washington Street, and Clinton Street.

    **a.** Joes Place is affiliated with the Craft Defendants and is located in the center of the

Iowa Avenue side of the Block.

**b.**  Pullman is affiliated with the Craft Defendants and is located in the center of the Dubuque side of the Block.

**c.**  St. Burch is affiliated with the Craft Defendants and is on the Iowa/Dubuque corner of the Block.

**d.**  The East Washington Defendants, include a current member of the Iowa City City Council and the former mayor of Iowa City, own the building in the center of the Washington Street side of the block. Short's is located in the middle of the Clinton Street side of the Block.

**484.**  The Craft Defendants, with the assistance and cooperation of the East Washington Defendants, the City Defendants, and the ICDD Defendants, have made overtures and attempts to purchase or lease space on the Block, including the attempts within the last three years to acquire interests in 10 S. Clinton, 14 S. Clinton, 18 S. Clinton, 18 ½ S. Clinton, 20 S. Clinton, 22 S. Clinton, 24 S. Clinton, 26 S. Clinton, and 23 S. Dubuque.

**485.**  The City Defendants have conspired to manipulate real property valuations and to limit entry of non-preferred competitors into the Iowa City Downtown. These efforts have included:

**a.**  Seeking local historic protection for the Slezak Building against the owners wishes and with knowledge of the owner's market studies indicating such local historic protection would depress the value of the property. The City Defendants knew the Slezak Building owner was seeking to sell the property to a developer with a vision for the property that would conflict with the requirements if the Slezak Building were declared a local landmark.

**b.**  Resisting and refusing to apply the City's demolition by neglect ordinance (Iowa City Code 14-3B-7) to the owners of the Building and thereby allowing continuing

structural deterioration of the Building to reduce the value so that a business associated with the conspiracy could acquire the Building for less and to drive Short's and its operation from the Premises due to the neglect.

486. The MWO Defendants engaged in a series of loan transactions secured by the Building and the building at 17 S. Dubuque (occupied by Craft Defendant affiliate Pullman Bar & Diner) and secured by an assignment of rents due to the Trust from tenants of those Buildings. In these transactions, MWO was both lender and borrower as it served as both the lending bank and as trustee/executor of the borrower.

487. The MWO Defendants' conflicted loan transactions have over-leveraged the Building and 17 S. Dubuque.

488. The MWO Defendants acts of refusing to accept rents from Short's while attempting to evict Short's, failing to keep the tenant of 20 S. Clinton in place, failing to market 20 S. Clinton publically, and allowing for rent waivers for tenants of 18 ½ S. Clinton make the Trust's service of the current $1.66 million loan difficult if not impossible given the reduced incoming rent payments.

489. The likelihood of default by the Trust on the existing $1.66 million loan secured by the Building is high. If the Trust (MWO as trustee) defaults on the loan and MWO (as secured lender) forecloses on its mortgage securing the loan, MWO as the lending bank will gain direct ownership of the real estate in the middle of Dubuque Street and in the middle of Clinton Street on the Block.

490. MWO does not publically market commercial leasing properties under its management.

491. Upon a vacancy in a managed property or a property acquired in foreclosure, MWO utilizes a "short-list" of possible candidate businesses (including Draft Defendants and their related, affiliated and confederated businesses) to whom to transfer control (either by ownership

or tenancy). These opportunities are not offered to the public and are kept to the small group of the same businesses to the exclusion of others.

**492.** The Craft Defendants, with the aid and assistance of the other Defendants, are horizontally integrating the Iowa City Downtown and Block by attempting to exclude and remove non-Craft-affiliated restaurants/bars from these markets.

**493.** The Craft Defendants are owners of a vertically integrated line of confederated business including breweries, hemp based drink manufacturers, and retail restaurants and businesses distributing those products. The Craft Defendants are an exclusionary "buying group" designed to reduce costs by bulk ordering and pricing of products across the group of affiliated and confederated restaurants.

**494.** The Craft Defendants, and their affiliated and confederated businesses, operate to exclude, and operate under a relationship of common ownership interests and exclusive relationships for referral.

**495.** The Craft Defendants, with the assistance and aid of the City Defendants, ICDD Defendants, and MWO Defendants have attempted to monopolize the Iowa City Downtown and the Block.

**496.** The Defendants have displayed a conscious commitment to a common scheme in the Iowa City Downtown market and the Block market to (i) unduly restrain competition from non-Craft Defendant related, affiliated or confederated businesses such as Short's, (ii) limit entry, and to monopolize the Iowa City Downtown and the Block. The Defendants acted with unity of purpose and with a common design or understanding.

**497.** Members of the Defendants have discussed and plan a re-development of downtown Iowa City, including specifically a redevelopment and reconstruction of the Block. The Defendants

have conspired and have attempted to place ownership and control of the real estate on the Block in "friendly" hands so as to limit any economic participation in such redevelopment to those business blessed by the conspiracy of Defendants.

498.  The attempts to evict Short's are designed to eliminate any economic interest of Short's in the Premises, to eliminate Short's twelve years of renewal options available under the Lease, and to exclude Perez (Hispanic) by eviction and the Trust's beneficiary (African-American) by overleveraging the Building from any economic benefits of the planned redevelopment and construction on the Block.

499.  The City Defendants have participated in this redevelopment planning and have acted to prepare the Block by initiating a project to replace and expand the sewer system and water delivery piping system on South Dubuque Street in anticipation of higher volume sewer and water needs upon completion of redevelopment.

## Iowa Competition Law Conclusions

500.  The Craft Defendants, when aided by the ICDD Defendants, MWO Defendants, and City Defendants, have market power and preferred and privileged entry to the Iowa City Downtown market and the IRL Market.

501.  The Defendants have not acted independently. The Defendants have "conspired" to violate or attempt to violate the Iowa Competition Law Iowa Code §§ 553.4 & 553.5 through restraint of trade and monopolization of the IRL Market, the Iowa City Downtown Market, and the Block.

502.  The Defendants have monopolized the IRL Market.

503.  The Defendants have attempted to monopolize the IRL Market, the Iowa City Downtown Market and the Block (in the product markets of restaurant/bar business and commercial real estate

markets).

**504.** The Defendants monopolization and attempts to monopolize have been conducted by the conspiracies exclusionary practices and preferences for confederates of co-conspirators. The Defendants monopolization and attempts to monopolize have not seen fruition due to a superior product, superior business acumen, or historic accident.

**CLAIM 10**
**CIVIL RICO – 18 U.S.C. §1961 et seq.**
**(Short's & Perez v. All Defendants Other than the City)**

**505.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**A.  STATUTORY PROVISIONS**

**506.** 18 U.S.C. § 1962(b) makes it "unlawful for any person through a pattern of racketing activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

**507.** 18 U.S.C. §1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To establish a federal civil RICO violation under 18 U.S.C. § 1962(c), the plaintiffs "must satisfy four elements of proof: `(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"" Williams v. Mohawk Industries, Inc., 465 F.3d 1277, 1282 (11th Cir. 2006).

**508.** 18 U.S.C. §1964(c) provides a private right of action to persons injured in their business or property by reason of a violation of §1962.

**509.** 18 U.S.C. §1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of [18 U.S.C. §1962] subsections (a), (b), or (c).

### B.  **CULPABLE PERSONS**

**510.**  Each of the Defendants (other than the City itself) is a Person (i.e. an entity or individual capable of holding a legal or beneficial interest in property) for purposes of RICO.

**511.**  Each of the Defendants (other than the City itself) have taken acts in furtherance of the enterprises identified below.

**512.**  For purposes of the RICO Claims, the term "RICO Defendants" shall mean all Defendants named in this Complaint other than the City.

### C.  **ENTERPRISES**

**513.**  An enterprise is "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

**514.**  Each of the business entity Defendants is an enterprise.

**515.**  The Craft Defendants, including entities and individual named as defendants and other business interests affiliated or confederated with those named defendants, are an enterprise engaged in vertically and horizontally integrated restaurant/bar operations, supply chain, brewing, and related businesses.

**516.**  The ICDD Defendants are an enterprise with the common goal of integrating their private services (including selection and placement of vendors) in furtherance of limiting the identity and participation of businesses in the greater Iowa City area.

**517.**  The MWO Defendants are an enterprise engaged in banking, bank trustee services, and commercial leasing and commercial property management.

**518.**  The East Washington Defendants are an enterprise engaged in fee ownership of real property in Iowa City Downtown and integration and interlocking directorships with, and legal representation of, other Defendants, including the City, MWO and ICDD.

**519.** The individuals within the City Defendants are engaged in the enterprise of City involvement in the economy of Iowa City and in attracting students, residents, and businesses to Iowa City using private actors (e.g. ICDD Defendants) to circumvent limitations (legal and political) on the City itself.

**520.** This Claim 10 alleges against all Defendants (other than the City) that each is associated in fact with, controls and participates in, not only their own enterprises plead immediately above, but also in an enterprise formed informally as an associated group of individuals and businesses (including the Defendants) that is maintained through each conduct towards common purposes including, without limitation:

(i)     Domination and control of the Iowa City Downtown commercial retail space leasing and tenancy market,

(ii)    Consolidation of restaurant/bar ownership and operations in Iowa City and Iowa, including control of distribution of beverages (Big Grove Brewery, Climbing Kites, and DayDreamer products – each owned in whole or in part by one or more Defendants and/or their affiliated business) and restaurant grocery and supply distribution,

(iii)   Pursuing the removal and exclusion of those restaurant/bar owners and operators whom are not affiliated or connected with the enterprise from meaningful participation in the market, and

(iv)    Pursuing exclusion of minority business owners from economic benefits available from operations in Iowa City.

### D.  <u>INTERSTATE COMMERCE</u>

**521.** Each of these enterprises identified above affect interstate commerce. These interstate affects include, but are not limited to the following;

    (i)      Banking;

    (ii)     Interstate grocery and beverage supplies;

    (iii)    Recruiting and soliciting out-of-state businesses, tourism, employees, and students;

    (iv)    Feeding and serving individuals (including students) from across the country;

    (v)     Participation in national and international industry and governmental organizations.

**522.** The predicate acts plead below were accomplished through the use of means affecting interstate commerce.

## E. RACKETEERING ACTIVITY – PREDICATE ACTS

**523.** A "pattern of racketeering" requires as least two events of "racketeering activity."

**524.** "Racketeering activity" includes (A) "any act or threat involving . . . robbery, bribery, extortion . . . which is chargeable under State law and punishable by imprisonment of more than one year" and (B) any act which indictable under any of the provisions of federal law listed in 18 U.S.C. § 1961.

**525.** Each of the predicate acts identified below were willful acts of the alleged perpetrators taken with actual knowledge the act was illegal.

**526.** The predicate acts identified below are part of the identified offenders' regular course of business conduct.

### 1. Iowa Code § 711.4 Extortion

**527.** The factual allegations alleged throughout this Complaint are incorporated herein.

**528.** Iowa Code §711.4 defines extortion: "A person commits extortion if the person does any of the following with the purpose of obtaining for oneself or another anything of value, tangible or intangible, including labor or services: . . . (3) Threatens to expose any person to hatred, contempt, or ridicule. (4) Threatens to harm the credit or business or professional reputation of any

person. (5) Threatens to take or withhold action as a public officer or employee, or to cause some public official or employee to take or withhold action. (6) Threatens to testify or provide information or to withhold testimony or information with respect to another's legal claim or defense; or (7) Threatens to wrongfully injure the property of another." Extortion is punishable by more than one-year imprisonment.

529.  Acts of extortion taken by Defendants in furtherance of their enterprises goals include the following:

a.     The serial attempts (and dismissals) to evict Short's taken by the MWO Defendants threatened and did expose Short's and Perez to hatred, contempt and ridicule for purposes of gain control of Short's lease of the Premises;

b.     The serial attempts (and dismissals) to evict Short's threatened and did expose Short's and Perez business representation.

c.     The solicitation and coordination of the MWO Defendants and City Defendants related to the revocation of consent to Short's Sidewalk Café Agreement, the solicitation of City action to enforce, the City's enforcement of the Sidewalk Café Ordinance, the confiscation of Short's patio by the City were acts and threats of acts by the public officer and employee City Defendants and were threats against Short's by the MWO Defendants to cause public officials and public employees to take or withhold action.

d.     The City's refusal, enacted through the individual City Defendants, to allow Perez to speak to the ICHPC and TRC because Perez had brought Writs of Certiorari and filed a discrimination complaint with the ICRC were unlawful acts coordinated among the Defendants to extort Short's and Perez into dropping valid claims and vacating the Premises.

**e.**     The unjustified attempts by the MWO Defendants to assert a counterclaim for money damages because a discrimination complaint was filed with the ICRC was an act to extort Perez into dropping his claims of discrimination before the ICRC had even acted on the claims.

**f.**     The false testimony, in person and in affidavits, by MWO employees Mote and Mitchell suborned by Briley, during the eviction proceedings were threats to provide false testimony against Short's and Perez, and such testimony was suborned by the PHP Defendants.

**g.**     MWO extorted Mote by threatening Mote with adverse action against his employment status if Mote did not testify falsely during FED #3, in his affidavits in support of motions in litigation with Short's, in his affidavit in responses to ICRA complaints, and in his deposition during discovery in litigation against Short's.

**h.**     Defendant Briley wrote by email to Short's counsel in 2023 that if Short's did not like how MWO was maintaining the Building Short's was free to leave. MWO Defendants failure to maintain the Building from 2020 to 2024 were designed to drive Short's and Perez out of the Premises through water and weather damaging Short's property and limiting the use of the Premises.

**i.**     In the spring of 2024, the PHP Defendants combed through their existing client list to locate another client (Bailey American Wagyu) to threaten another business owned by Perez (Stella) with litigation without any material factual basis. On behalf of Bailey American Wagyu, the PHP Defendants delivered a demand letter to Short's counsel and threatened litigation for Stella's wrongful use of Bailey American Wagyu on Stella's menus. These allegations were factually false.   Stella had terminated its business with

American Wagyu and had removed the name from its current menus. These threats to Perez's other business interest (Stella) without basis was designed to threaten and injure property of Perez. When presented with proof about the actual relationship between Stella and Bailey American Wagyu and faced with the failure of their extortion, PHP, Defendant Briley and MWO never rescinded the extortion attempt, nor denied that it was an extortion attempt. The threat remains.

> **j.**     The common goal of each of these extortion acts was to drive Short's and Perez from the Premises so that a new tenant affiliated with the enterprise, most likely a Craft Defendant or one of their affiliated or confederate organization, could gain the valuable asset (possession of the Premises) from Short's and Perez without any compensation to Short's and Perez and to intimidate Short's for seeking legal remedies in defense or as to discrimination in court.

### 2.     Iowa Code § 722.1 Bribery

**530.**  The factual allegations alleged throughout this Complaint are incorporated herein.

**531.**  Iowa Code § 722.1 defines the crime of bribery: "A person who offers, promises, or gives anything of value or any benefit to a person who is serving or has been elected, selected, appointed, employed, or otherwise engaged to serve in a public capacity, including a public officer or employee, a referee, juror, or jury panel member, or a witness in a judicial or arbitration hearing or any official inquiry, or a member of a board of arbitration, pursuant to an agreement or arrangement or with the understanding that the promise or thing of value or benefit will influence the act, vote, opinion, judgment, decision, or exercise of discretion of the person with respect to the person's services in that capacity commits a class "D" felony."

**532.**  Acts of bribery taken by Defendants in furtherance of their enterprises goals include the

following:

   a.   The MWO Defendants contacted the City Defendants and promised things of value and benefits to one or more of the City Defendants pursuant to an understanding that the thing of value or benefit would incent the City, acting through the individual City Defendants, to (i) allow the Trust to verbally revoke consent to Short's 2023 Sidewalk Café Agreement, (ii) enforce the Sidewalk Café Ordinance against Short's uniquely and in a manner never before done by the City, (iii) apply the incorrect inspection standards to the City's inspection of the Building, (iv) provide an inspection "pass" determination to the Building when City inspectors had observed 12 to 18 inches of standing water in the basement of the building and clear signs of water infiltration of leaking roofing and siding, and (v) take other adverse actions against Short's and Perez.

   b.   The continuing interlocking of members of the East Washington Defendants with the City (e.g. Hayek on the City Council and serving as Mayor during the creation, development and initial operation of the ICDD followed by Bergus serving on the City Council) is designed to provide things of value to City employees in favor of the City acting favorably to members of the enterprise to the exclusion of others.

   c.   The relationship between the ICDD Defendants and City is by its very nature the ICDD transferring things of value to the City Defendants to entice City officials to act in the manner requested by the ICDD Defendants, including without limitation incenting City and County officials to participate in the ICDD's attempts (together with MWO and the Craft Defendants) to place ICDD approved retailers into the Iowa City Downtown and to remove non-enterprise affiliated retailers, such as Short's, from the market.

**533.** The common goal of each of these acts of bribery is to drive Short's and Perez from the

Premises so that a new tenant affiliated with the enterprise, most likely a Craft Defendant or one of their affiliated or confederate organization, can gain the valuable asset (possession of the Premises) from Short's and Perez without any compensation to Short's and Perez and to intimidate Short's for seeking legal remedies in defense or as to discrimination in court.

### 3. <u>**Iowa Code § 714.1 (1) – Theft/Robbery**</u>

**534.** The factual allegations alleged throughout this Complaint are incorporated herein.

**535.** Under Iowa Code §714.1 "A person commits theft when the person does any of the following: 1. Takes possession or control of the property of another, or property in the possession of another, with the intent to deprive the other thereof."

**536.** The MWO Defendants and the Craft Defendants clandestine entry into the Premises the first week of May 2022 was designed for Kaeding, one of the other Craft Defendants, or an affiliated business enterprise to take possession and control of the property, including without limitation any personal property at the Premises on which MWO may have had a landlord's lien in the event of FED #1 (dismissed with prejudice) had been successful. The Lease did not provide any right of access to any of the persons or entities who entered that morning. Short's was told of the entry and permission to enter was never requested.

**537.** The common goal was to drive Short's and Perez from the Premises so that a new tenant affiliated with the enterprise, most likely a Craft Defendant or one of their affiliated or confederate organization, could gain the valuable asset (possession of the Premises) from Short's and Perez without any compensation to Short's and Perez and to intimidate Short's for seeking legal remedies in defense or as to discrimination in court.

### 4. <u>Iowa Code § 714 – Fraudulent Practices</u>

**538.** The factual allegations alleged throughout this Complaint are incorporated herein.

**539.** Iowa Code § 714 provides: "A person who does any of the following acts is guilty of a fraudulent practice: . . . (3) Knowingly executes or tenders a false certification under penalty of perjury, false affidavit, or false certificate, if the certification, affidavit, or certificate is required by law or given in support of a claim for compensation, indemnification, restitution, or other payment. (4) Makes any entry in or alteration of any public records, or any records of any corporation, partnership, or other business enterprise or nonprofit enterprise, knowing the same to be false. . . ."

**540.** Acts constituting fraudulent practices taken by Defendants in furtherance of their enterprises goals include the following:

    **a.** Mote's false testimony and false affidavits described above;

    **b.** Mitchell's false testimony and false affidavits described above;

    **c.** PHP Defendants suborning Mote and Mitchell's false testimony and affidavits;

    **d.** Mitchell's filing of knowingly incorrect mortgage and assignment of rents into the public record in September 2020 and again in August 2024.

        i. The 2020 documents were to secure a loan from MWO in excess of $1.6 million with a signature block designed to obscure from the public the real trustee of the Trust.

        ii. The loan was a conflicted transaction MWO as lender and MWO as trustee of the borrower.

        iii. The loan was designed to overleverage the Building.

        iv. The Trust beneficiary has testified to no recollection of disclosure of the

loan or consenting to the loan.

v.  MWO then refused to accept rent from Short's making default by the Trust more likely.

vi.  The planned result is MWO's declaration of default on the loan and obtaining the Building for the enterprise through foreclosure.

vii.  The 2024 affidavit document filed in the public record by Mitchell was an attempt to gloss over the fraudulent filing from 2020 discovered by Short's.

**541.**  The common goal of the Iowa defined "fraudulent acts" is  (i) to further the enterprise's domination and control of the Iowa City Downtown real estate market and retail market into the hands of enterprise participants and (ii) to drive Short's and Perez from the Premises so that a new tenant affiliated with the enterprise, most likely a Craft Defendant or one of their affiliated or confederate organization, can gain the valuable asset (possession of the Premises) from Short's and Perez without any compensation to Short's and Perez and to intimidate Short's for seeking legal remedies in defense or as to discrimination in court.

### 5.  **Iowa Code § 716.7 – Criminal Trespass**

**542.**  The factual allegations alleged throughout this Complaint are incorporated herein.

**543.**  Iowa Code §716.7 defines a criminal "Trespass" as "one or more of the following acts: (1) Entering upon or in property without the express permission of the owner, lessee, or person in lawful possession with the intent to commit a public offense, to use, remove therefrom, alter, damage, harass, or place thereon or therein anything animate or inanimate, . . .

**544.**  Acts constituting fraudulent practices taken by Defendants in furtherance of their enterprises goals include the following:

a.  The unauthorized entry into Short's by Mote and the group of Craft Defendants

the first week of May 2022 (plead in detail above) constituted entry into the Premises without permission of the lessee or person in lawful possession of the Premises for the purpose of a public offense, for the purpose of evaluating Short's business practices and inventory to use that information in other Craft Defendants' enterprises, to harass Perez and Short's.

**b.** The City Defendants July 2023 entered upon and took Short's patio without permission because when Short's had presented to the City a fully executed and notarized 2023 Sidewalk Café Agreement and tendered all payments of fees.

**545.** The common goal of these unlawful trespasses included (i) to further the enterprises domination and control of the Iowa City Downtown real estate market and retail market into the hands of enterprise participants, (ii) to drive Short's and Perez from the Premises so that a new tenant affiliated with the enterprise, most likely a Craft Defendant or one of their affiliated or confederate organization, could gain the valuable asset (possession of the Premises) from Short's and Perez without any compensation to Short's and Perez and to intimidate Short's for seeking legal remedies in defense or as to discrimination in court, and to harass Short's into submission through deprivation of Short's and Perez's rights as plead above.

### 6.   Iowa Code § 720.2 Perjury & § 720.3 Suborning Perjury

**546.** The factual allegations alleged throughout this Complaint are incorporated herein

**547.** Perjury – Iowa Code § 720.2 provides: "A person who, while under oath or affirmation in any proceeding or other matter in which statements under oath or affirmation are required or authorized by law, knowingly makes a false statement of material facts or who falsely denies knowledge of material facts, commits a class "D" felony. Where, while under oath or affirmation, in the same proceeding or different proceedings where oath or affirmation is required, a person has

made contradictory statements, the indictment will be sufficient if it states that one or the other of the contradictory statements was false, to the knowledge of such person, and it shall be sufficient proof of perjury that one of the statements must be false, and that the person making the statements knew that one of them was false when the person made the statement, provided that both statements have been made within the period prescribed by the applicable statute of limitations."

**548.** Suborning Perjury – Iowa Code § 720.3 provides: "A person who procures or offers any inducement to another to make a statement under oath or affirmation in any proceeding or other matter in which statements under oath or affirmation are required or authorized, with the intent that such person will make a false statement, or who procures or offers any inducement to one who the person reasonably believes will be called upon for a statement in any such proceeding or matter, to conceal material facts known to such person, commits a class "D" felony."

**549.** Acts constituting perjury and suborning perjury taken by Defendants in furtherance of their enterprises goals include the following:

    **a.**    Mote's false testimony and false affidavits described above;

    **b.**    Mitchell's false testimony and false affidavits described above;

    **c.**    MWO Defendant's threatening adverse action against Mote if he refused to falsely testify (described above)

    **d.**    PHP Defendants suborning Mote and Mitchell's false testimony and affidavits;

    **e.**    Mitchell's filing of knowingly incorrect mortgage and assignment of rents into the public record in September 2020 and again in August 2024. Either the document set filed in September 2020 or the Certificate filed in August 2024 was inaccurate. Mitchell testified both were accurate. One of those statements made by Mitchell is knowingly false.

    **f.**    Mote, Mitchell and PHP Defendant Briley have each been offered opportunity

to recant their suborning of and/or provision of false sworn testimony by Short's counsel prior to such perjury materially affecting the litigation. All three have refused to do so.

    **g.**    The aforementioned perjuries and subornation have now materially affected the litigation.

    **h.**    Former ICDD director, Defendant Bird, falsely testified in her deposition on April 24, 2024 that she could not recall how on April 18, 2022 she knew of structural issues in the basement of the Building. This false testimony was designed to obfuscate the enterprise as such information could have only been obtained from co-conspirators Kaeding, Wallace or the MWO Defendants.

    **i.**    Short's counsel offered Defendant Bird an opportunity to recant her false statement made under oath from April 24, 2024 before it materially affected the litigation, and Bird declined to do so.

    **j.**    Bird's false statements have now materially affected the litigation.

**550.**  The common goal of these acts of perjury included: (i) furthering the enterprises domination and control of the Iowa City Downtown real estate market and retail market into the hands of enterprise participants, (ii) driving Short's and Perez from the Premises so that a new tenant affiliated with the enterprise, most likely a Craft Defendant or one of their affiliated or confederate organization, could gain the valuable asset (possession of the Premises) from Short's and Perez without any compensation to Short's and Perez and (iii) to intimidate Short's for seeking legal remedies in defense or as to discrimination in court, and to harass Short's into submission through deprivation of Short's and Perez's rights as plead above.

### 7. <u>Iowa Code § 720.4 Witness Tampering</u>

**551.** The factual allegations alleged throughout this Complaint are incorporated herein.

**552.** Iowa Code § 720 "Tampering with witnesses or jurors" provides: "A person who offers any bribe to any person who the offeror believes has been or may be summoned as a witness or juror in any judicial or arbitration proceeding, or any legislative hearing, or who makes any threats toward such person or who forcibly or fraudulently detains or restrains such person, with the intent to improperly influence such witness or juror with respect to the witness' or juror's testimony or decision in such case, or to prevent such person from testifying or serving in such case, or who, in retaliation for anything lawfully done by any witness or juror in any case, harasses such witness or juror, commits an aggravated misdemeanor."

**553.** Acts of witness tampering include the threats of adverse action against Mote and Mitchell for failing to testify truthfully in sworn testimony and affidavits.

**554.** The unlawful purposes of these acts are plead above with respect to other predicate act claims and those pleadings are incorporated herein.

### 8. <u>Iowa Code § 808B.2 Unlawful acts — Interception of Communications.</u>

**555.** The factual allegations alleged throughout this Complaint are incorporated herein.

**556.** Iowa Code § 808B.2(1) provides that "a person who does any of the following commits a class "D" felony: a. Willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, a wire, oral, or electronic communication. . . . . c. Willfully discloses, or endeavors to disclose, to any other person the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection. D. Willfully uses, or endeavors to use, the contents of a wire, oral, or electronic communication,

knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection."

557. From 2015 through 2023, Defendant Kaeding intercepted all Google Business and Facebook email communications intended for Short's. These intercepted communications included business opportunities intended for Short's for use by Kaeding, the other Craft Defendants, and business affiliated therewith, to the exclusion of Short's. These Google Business and Facebook emails included customer complaints and concerns that went unanswered and unaddressed by Short's damaging Short's business reputation. These communications also included potential employees, chefs, and investors that never had their communication received by Short's and gave the Craft Defendants business advantage, deliberately depriving Short's and Perez of market expansion and economic benefits.

### 9.      18 USC 201(b) & (c) Bribery

558. The factual allegations alleged throughout this Complaint are incorporated herein.

559. Similar to Iowa's Bribery statute, 18 U.S.C. §201(b) prohibits directly or indirectly, corruptly giving, offering or promising anything of value to a public official to influence official acts or to induce a public official to act or omit to act.

560. 18 U.S.C. §201(c) prohibits directly or indirectly, giving, offering, or promising anything of value to any person for or because of testimony under oath or a person to receive anything of value because of sworn testimony.

561. The predicate acts constituting violations of 18 U.S.C. §201(b) are the same acts plead above with respect to Iowa Bribery and those pleadings are incorporated herein.

562. The predicate acts constituting violations of 18 U.S.C. §201(c) are the same acts plead above with respect to Iowa Perjury, Suborning Perjury, and Witness Tampering and those

pleadings are incorporated herein.

**563.** The common goal of these acts in violation of 18 U.S.C. §201(b) & (c) included (i) furthering the enterprises domination and control of the Iowa City Downtown real estate market and retail market into the hands of enterprise participants, (ii) driving Short's and Perez from the Premises so that a new tenant affiliated with the enterprise, most likely a Craft Defendant or one of their affiliated or confederate organization, could gain the valuable asset (possession of the Premises) from Short's and Perez without any compensation to Short's and Perez and (iii) to intimidate Short's for seeking legal remedies in defense or as to discrimination in court, and to harass Short's into submission through deprivation of Short's and Perez's rights as plead above.

### 10.    18 U.S.C. § 1344 – Bank Fraud

**564.** The factual allegations alleged throughout this Complaint are incorporated herein.

**565.** "Whoever knowingly executes, or attempts to execute a scheme or artifice (1) to defraud a financial institution or (2) to obtain moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1344.

**566.** The signatures of Defendant Mitchell and Defendant Turner on the September 2020 $1.6 million loan by MWO to the Trust was knowingly and intentionally false and misrepresentation of those two Defendants status as trustee.

**567.** Testimony from the MWO Defendants in related litigation has revealed that the use of proceeds of the $1.6 million loan cannot be explained and at least $1 million of bank assets cannot be accounted for.

**568.** The September 2020 self-interested $1.6 million loan from MWO as bank to the Trust

(MWO personnel serving as trustees) was a fraudulent transaction in violation of 18 U.S.C. § 1344.

569.   The goal of this fraudulent transaction was to overleverage the Trust so as to create a default that would allow MWO as lender to foreclose on the Building and the Pullman Building and to take control of these assets on the block for the benefit of the enterprise.

### 11.   18 U.S.C. § 1512 – Witness Tampering

570.   The factual allegations alleged throughout this Complaint are incorporated herein.

571.   18 U.S.C. §1512 provides "(c) Whoever corruptly - . . . (2) otherwise obstructs, influences, or impedes any official proceeding or attempts to do so shall be fined under this title or imprisoned not more than 20 years, or both. . . (k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

572.   The predicate acts constituting violations of 18 U.S.C. § 1512(c) & (k) are the same acts plead above with respect to Iowa Perjury, Suborning Perjury, and Witness Tampering and those pleadings are incorporated herein.

573.   The group of MWO Defendants conspired to tamper with and intimidate Defendant Mote to falsely testify (i) during FED #3, (ii) in affidavits provided to Short's counsel, the Court and the ICRC and (iii) during depositions in related litigation.

574.   The group of MWO Defendants conspired to tamper with and intimidate Defendant Mitchell to falsely testify (i) during FED #3, (ii) in affidavits provided to Short's counsel, the Court and the ICRC and (iii) during depositions in related litigation.

575.   The PHP Defendants knew the testimony of Mitchell and Mote was false and suborned that false testimony through preparation of the affidavits and through leading questions during FED #3 testimony.

**576.**  The goal of this false testimony was to further the enterprises interest in removing Short's and Perez from the Premises so as to replace Short's tenancy with a Craft Concepts or enterprise affiliated or confederate business.

### 12.    18 U.S.C. §§ 891-894 – Extortionate Extension of Credit

**577.**  The factual allegations alleged throughout this Complaint are incorporated herein.

**578.**  "An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(6).

**579.**  "Whoever makes any extortionate extension of credit or conspires to do so shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 892.

**580.**  "An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C § 891(7).

**581.**  "Whoever knowingly participates, in any way, or conspired to do so, in the use of any extortionate means (1) to collect or attempt to collection any extension of credit, or (2) to punish any person for the nonrepayment thereof, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 894.

**582.**  The Lease is an extension of credit.

**583.**  The MWO Defendants, PHP Defendants and City Defendants conspired to remove Plaintiff's from the Premises and to cause harm to Short's and Perez's reputation and property interests using the extortionate means identified in the pleadings as to Iowa Code § 711.4 Extortion pled above, and such pleadings incorporated herein by this reference.

**584.** The goal of the extortionate activity was to further the enterprises interest in removing Short's and Perez from the Premises so as to replace Short's tenancy with a Craft Concepts or enterprise affiliated or confederate business.

### 13.    18 U.S.C. § 1951 – Interference with Commerce by Threats

**585.** The factual allegations alleged throughout this Complaint are incorporated herein.

**586.** "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a).

**587.** "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

**588.** Short's restaurant/bar business is engaged in commerce.

**589.** The MWO Defendants and City Defendants conspired to remove Plaintiff's from the Premises and to cause harm to Short's and Perez's reputation and property interests using the extortionate means identified in the pleadings as to Iowa Code § 711.4 Extortion pled above, and such pleadings incorporated herein by this reference.

**590.** The MWO Defendants seeking serial evictions and civil proceedings (FED #1, FED #2, the MWO Civil Case, all voluntarily dismissed) against Short's and Perez were "under color of official right" to extort Short's to vacate the Premises to further the enterprises goal of removing non-enterprise related businesses from the Iowa City Downtown.

**591.** Extortionate acts also includes MWO wrongfully seeking a Writ of Attachment in *MWO*

*v. Short's et al.* (Johnson County Case No. LACV084088) to confiscate Short's property. No grounds for such a Writ of Attachment were found.

592. The City Defendants extortion included confiscating Short's and Perez's property (patio) after receiving a completed sidewalk café agreement and payment of fees under "color of official right."

593. The PHP Defendants extortion include the groundless threats against Stella on behalf of other clients.

594. The MWO Defendants engaged in interference with commerce by intentionally and willfully failing to maintain the Premises, allowing water to collect in the basement, allowing mold and mildew to grow in the Premises to damage Short's business and property. Short's was forced to temporarily close as a result thus interfering with commerce.

595. The threats of extortion were made by Defendant Briley on behalf of MWO when Briley told Short's counsel by email in 2023 that if Short's did not like the way the Premises was being maintained, Short's was free to leave. The alternative being continued litigation and unlawful attempts to remove Short's from the Premises.

596. The MWO Defendants, PHP Defendants and City Defendants conspired to remove Plaintiff's from the Premises and to cause harm to Short's and Perez's reputation and property interests using the extortionate means identified in the pleadings as to Iowa Code § 711.4 Extortion pled above, and such pleadings incorporated herein by this reference.

597. The goal of the extortionate activity was to further the enterprises interest in removing Short's and Perez from the Premises so as to replace Short's tenancy with a Craft Concepts or enterprise affiliated or confederate business.

### 14.    18 U.S.C. § 1956 – Laundering

**598.** The factual allegations alleged throughout this Complaint are incorporated herein.

**599.** "Whoever, knowing that the property involved in a financial transaction represents the proceeds from some form of unlawful activity, conducts or attempts to conduct such financial transaction which in fact involves the proceeds of specified unlawful activity (A)(i) with the intent to promote the carrying on of specified unlawful activity; . . . or (B) knowing the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the course, the ownership or the control of the proceeds of specified unlawful activity or (ii) to avoid a transaction reporting requirement under State or Federal law shall be sentenced to a fine . . . or imprisonment for not more than twenty-years." 18 U.S.C. § 1956(a).

**600.** The MWO Defendants, through Defendants Mitchell and Turner engaged in a fraudulent $1.66 million loan to the Trust in September 2020. The specific facts as to which are plead above and incorporated herein.

**601.** At least $1 million of the proceeds of the $1.6 million loan cannot be accounted for by MWO witnesses.

**602.** The MWO Defendants knew the proceeds of the $1.66 million loan were obtained through a "specified unlawful activity" including without limitation the illegal acts listed in RICO and plead herein).

**603.** The ultimate disposition of the $1.6 million loan proceeds constituted acts of laundering in violation of 18 U.S.C § 1956.

**604.** The additional SSMID revenue derived from listing the Iowa City Downtown District on the NRHP was not disclosed to the public in meetings and public forums required as part of the NRHP listing process. The City Defendants and ICDD Defendants intentionally withheld material

information regarding the effects of the NRHP listing. These SSMID revenues were used by the ICDD to promote the interests of the enterprise.

### 15.   18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity

**605.** The factual allegations alleged throughout this Complaint are incorporated herein.

**606.** "Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity shall be punished . . . [by] a fine . . . or imprisoned not more than ten years, or both." 18 U.S.C § 1957(a),(b).

**607.** The proceeds of the September 2020 $1.66 million loan was a monetary transaction in excess of $10,000 and were criminally derived as plead above.

**608.** The proceeds of the September 2020 $1.66 million loan were criminally derived from the "specified unlawful activity" of the MWO Defendants, particularly Defendants Mitchell and Turner, engaging in the interested loan transaction with the Trust over their signatures as individual trustees when acting as agents of MWO.

**609.** The additional SSMID revenues were obtained through intentional omission of information provided by the City and ICDD Defendants in connection with the listing of the district on the NRHP.

### 16.   18 U.S.C. § 2511 Electronic Communications Privacy Act

**610.** The factual allegations alleged throughout this Complaint are incorporated herein.

**611.** The Electronic Communication Privacy Act prohibits any person from intentionally intercepting electronic communications or using intercepted information. 18 U.S.C. § 2511.

**612.** The factual allegations set forth in Claim 11 below are incorporated herein.

**613.** Defendant Kaeding violated 18 U.S.C. § 2511 through his interception of email

communications intended for Short's.

### 17.   18 U.S.C. § 1341 Mail Fraud

**614.**   The factual allegations alleged throughout this Complaint are incorporated herein.

**615.**   "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1341.

**616.**   "The term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

**617.**   The enterprise engaged in the following acts of mail fraud in furtherance of its common goals plead above, including depriving Short's and Perez of their business and property in favor of enterprise affiliated or confederated businesses

    **a.**   MWO claims that it sent a letter to Short's on April 20, 2022 advising Short's that its temporary closure would be considered an abandonment of the Premises if the closure continued for more than 10 business days.

        **i.**   The April 20, 2022 letter was not sent on the date represented by MWO.

        **ii.**   The letter was allegedly returned for non-acceptance and MWO produced

copies of the envelope on which the yellow USPS return stickers ("nixie stickers") were placed. The information contained on nixie stickers on the produced envelopes are not consistent with the information that should be contained on such stickers if actually produced by the USPS and placed on the envelope.

    **iii.** MWO's statements that the April 20, 2022 letter was sent on that date were false. MWO use of the USPS and fraudulent use of USPS nixie stickers were part of the fraudulent scheme and artifice seeking to deprive Short's of its property interest in the Premises (Lease).

### 18.    18 U.S.C. § 1343 Wire Fraud

**618.** The factual allegations alleged throughout this Complaint are incorporated herein.

**619.** "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. §1343

**620.** "The term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

**621.** The enterprise engaged in the following acts of mail fraud in furtherance of its common goals plead above, including depriving Short's and Perez of their business and property in favor of enterprise affiliated or confederated businesses

    **a.** On May 6, 2024 at approximately 5:57 p.m. PHP Defendant Briley transmitted MWO Defendant Mitchell's affidavit dated May 6, 2024 by wire (email).

   **i.**   Both Briley and Mitchell knew the statement contained in paragraph 5 of that affidavit swearing that no documents responsive to the production requests at issue (all related to the relationship between MWO and Kaeding) was false when made.

   **ii.**   This Mitchell affidavit was transmitted with the intent that Short's rely thereon to its detriment.

   **iii.**   MWO and Mitchell produced documents responsive to the request less than two weeks after swearing under oath in the affidavit that no such documents existed.

   **iv.**   This Mitchell affidavit was part of the fraudulent scheme and artifice of removing Short's from the Premises in favor of an enterprise affiliated or confederated replacement tenant.

**b.**   On March 26, 2024, at approximately 3:14 p.m., PHP Defendant Briley, through her legal assistant, transmitted a letter to Short's counsel by wire (email).

   **i.**   Ms. Briley knew the statements contained therein regarding Stella deliberately misrepresenting the source of its beef was false.

   **ii.**   The letter was sent to intimidate, harass, and threaten through knowingly false statements as to Stella's menu and business practices.

   **iii.**   The letter was sent to cause Perez and Stella to expend funds in response to these fraudulent and untruthful allegations.

   **iv.**   This letter was part of the fraudulent scheme and artifice to force Short's and Perez to abandon their defense of the Lease and Short's entitlement to occupancy and possession of the Premises.

**c.**   From 2014 to 2023, Defendant Kaeding wrongfully intercepted

communications sent by wire (email) from Google Business and Facebook intended for Short's.

    **i.** The claims and allegations contained in Claim 11 below are incorporated herein.

    **ii.** The interception of these wire communications (emails) was designed to deprive Short's of its customer information for the benefit of the Craft Defendants, domination of the market and removal of Short's for an enterprise affiliated or confederated business.

### F. RICO § 1962(a)

**622.** The factual allegations alleged throughout this Complaint are incorporated herein.

**623.** The § 1962(a) claims are against all RICO Defendants.

**624.** Each of the enterprises identified above in Section C of this RICO Claim is an enterprise engaged in and whose activities affect interstate commerce.

**625.** The RICO Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. This use and investment includes the missing loan proceeds from the September 2020 $1.6 million loan from MWO (bank) to MWO (trustee).

**626.** The racketing activity plead above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

**627.** As direct and proximate result of the RICO Defendants' racketeering activities in violation of 18 U.S.C. § 1962(a) Plaintiffs have been injured in their business and property by, among others, the cooperation and coordination of a bank, City employees, the public-private partnership between ICDD and City personnel, the Craft Defendants and MWO's cooperation and planning to oust Short's from the Premises for purposes of the Craft Defendants and their affiliated

and confederated business replacing Short's as a tenant and to remove all non-enterprise affiliated businesses from the Iowa City Downtown economic opportunities.

**628.** This coordination has occurred through, among other means, the interlocking relationships identified in the factual allegations above.

**629.** Plaintiff requests that this Court enter judgment against the RICO Defendants for violation of 18 U.S.C. § 1962(a) including all damages provided by 18 U.S.C. § 1964 including actual damages, attorneys' fees, costs, expense and treble damages.

### G. RICO § 1962(b)

**630.** The factual allegations alleged throughout this Complaint are incorporated herein.

**631.** The § 1962(b) claims are against all RICO Defendants.

**632.** Each of the enterprises identified above in Section C of this RICO Claim is an enterprise engaged in interstate commerce

**633.** Each of the enterprises identified above in Section C of this RICO Claim is an enterprise whose activities affect interstate commerce.

**634.** The RICO Defendants acquired and maintained interests in and control of each enterprise identified in Section C of this RICO claim through a pattern of racketeering activity.

**635.** The common purposes and goals of all the enterprises identified above include: (i) dominate, control and monopolize the Iowa City Downtown market, (ii) place as much of the Iowa City Downtown real estate interests (fee and leasehold) into the hands of members of the enterprise or their affiliated and confederated interests, and (iii) remove and exclude others, including minorities, from participation in the economic development and economic opportunities in the greater Iowa City area, in the Iowa City Downtown, and on the Block.

**636.** The racketeering activity plead above constitutes a pattern of racketeering activity

pursuant to 18 U.S.C. § 1961(5).

**637.** The RICO Defendants have directly and indirectly acquired and maintained interests in and control of these enterprises through the pattern of racketeering activity described above in violation of 18 U.S.C. § 1962(b).

**638.** As direct and proximate result of the RICO Defendants' racketeering activities in violation of 18 U.S.C. § 1962(b) Plaintiffs have been injured in their business and property by, among others, the cooperation and coordination of a bank, City employees, the public-private partnership between ICDD and City personnel, the Craft Defendants and MWO's cooperation and planning to oust Short's from the Premises for purposes of the Craft Defendants and their affiliated and confederated business replacing Short's as a tenant and to remove all non-enterprise affiliated businesses from the Iowa City Downtown economic opportunities.

**639.** This coordination has occurred through, among other means, the interlocking relationships identified in the factual allegations above.

**640.** Plaintiff requests that this Court enter judgment against the RICO Defendants for violation of 18 U.S.C. § 1962(b) including all damages provided by 18 U.S.C. § 1964 including actual damages, attorneys' fees, costs, expense and treble damages.

## H.  <u>RICO § 1962(c)</u>

**641.** The factual allegations alleged throughout this Complaint are incorporated herein.

**642.** The § 1962(c) claims are against all RICO Defendants.

**643.** Each of the RICO Defendants is employed by or associated with one or more the enterprises plead above in Section C of this RICO Claim.

**644.** All of the enterprises identified above in Section C of this RICO Claim are engaged in interstate commerce.

**645.**  The activities of all of the enterprises identified above in Section C of this RICO Claim affect interstate commerce.

**646.**  The racketing activity plead above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

**647.**  Each of the RICO Defendants conducted or participated in, directly or indirectly, conduct of the enterprises affairs through a pattern of racketing activity.

**648.**  As direct and proximate result of the RICO Defendants' racketeering activities in violation of 18 U.S.C. § 1962(c) Plaintiffs have been injured in their business and property by, among others, the cooperation and coordination of a bank, City employees, the public-private partnership between ICDD and City personnel, the Craft Defendants and MWO's cooperation and planning to oust Short's from the Premises for purposes of the Craft Defendants and their affiliated and confederated business replacing Short's as a tenant and to remove all non-enterprise affiliated businesses from the Iowa City Downtown economic opportunities.

**649.**  This coordination has occurred through, among other means, the interlocking relationships identified in the factual allegations above.

**650.**  Plaintiff requests that this Court enter judgment against the RICO Defendants for violation of 18 U.S.C. § 1962(c) including all damages provided by 18 U.S.C. § 1964 including actual damages, attorneys' fees, costs, expense and treble damages.

## I.   RICO § 1962(d)

**651.**  The factual allegations alleged throughout this Complaint are incorporated herein.

**652.**  The § 1962(d) claims are against all RICO Defendants.

**653.**  As plead above, the RICO Defendants agreed and conspired to violate 18 U.S.C. § 1962 (a), (b) & (c).

**654.** The RICO Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity, and conduct and participate in conduct of the affairs of the enterprises through a pattern of racketeering activity.

**655.** The RICO Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

**656.** This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a)(, (b), and (c) in violation of 18 U.S.C. § 1962(d).

**657.** As direct and proximate result of the RICO Defendants' racketeering activities in violation of 18 U.S.C. § 1962(d) Plaintiffs have been injured in their business and property by, among others, the cooperation and coordination of a bank, City employees, the public-private partnership between ICDD and City personnel, the Craft Defendants and MWO's cooperation and planning to oust Short's from the Premises for purposes of the Craft Defendants and their affiliated and confederated business replacing Short's as a tenant and to remove all non-enterprise affiliated businesses from the Iowa City Downtown economic opportunities.

**658.** This coordination has occurred through, among other means, the interlocking relationships identified in the factual allegations above.

**659.** Plaintiff requests that this Court enter judgment against the RICO Defendants for violation of 18 U.S.C. § 1962(c) including all damages provided by 18 U.S.C. § 1964 including actual damages, attorneys' fees, costs, expense and treble damages.

## CLAIM 11
## UNLAWFUL INTERCEPTION OF ELECTRONIC COMMUNICATIONS –
## IOWA CODE CH. 808B
## (Short's & Perez v. Craft Defendants)

**660.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**661.** Iowa Code § 808B.2(a), (c), & (d) declares to be unlawful the following: (i) willfully intercepting, endeavoring to intercept, or procuring another person to intercept or endeavor to intercept a wire, oral, or electronic communication the interception; (ii) willfully disclosing, or endeavoring to disclose, to any other person the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication; and (iii) willfully using, or endeavoring to use, the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication.

**662.** Iowa Code § 808B.8(1)(a) provides that "a person whose wire, oral or electronic communication is intercepted, disclosed or used in violation of Chapter 808B has a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use such communications."

**663.** Iowa Code § 808B.8(1)(b) provides for recovery of "(1) actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation, or one thousand dollars, whichever is higher; (2) punitive damages upon a finding of a willful malicious, or reckless violation of Chapter 808B; and (3) a reasonable attorney fee and other litigation costs reasonably incurred."

**664.** Kaeding held an ownership interest in Short's from 2008 to 2012. Kaeding had a consulting agreement with Short's from 2012-2016.

665. During Kaeding's ownership or consulting periods, Short's created a ""Google Business" account.

666. During Kaeding's ownership or consulting periods, Short's created a ""Facebook" business account.

667. Short's Google Business and Facebook accounts provide means for customers use electronic communications to comment and voice customer service concerns with these concerns and comments forwarded to the account owner by email.

668. Short's Google Business and Facebook accounts also provide means for solicitation of Short's business or offers for new locations or business opportunities to be transmitted by electronic communication to the account owner by email.

669. During Kaeding's period of ownership of Short's or consulting for Short's Kaeding set Short's Google Business and Facebook accounts to send notification emails to a personal email address controlled by Kaeding.

670. When Kaeding's consulting for Short's ended, Kaeding did not change the Google Business and Facebook notification email address.

671. From 2016 to 2023, Kaeding received all of the email communications from Google Business and Face book intended for Short's.

672. Kaeding's interception of these emails damaged Short's including by denying Short's potential business opportunities including information about potential locations or expansion opportunities and by harming Short's customer relations with customer complaints going unanswered.

673. Kaeding on behalf of, and working with, the other Craft Defendants used the information, intended for Short's, to their business advantage and to Short's detriment.

**674.** The other Craft Defendants knew or should have known that the information obtained by Kaeding were intercepted electronic communications intended for Short's.

**675.** More than seven years of receiving email intended for Short's without changing the email address was willful, malicious and/or reckless violation of Iowa Code Ch. 808B.

**676.** The Craft Defendants interception, disclosure and use of intercepted electronic communications intended for Short's violated Iowa Code Ch. 808B and Short's is entitled to recover (i) actual damages in the minimum liquidated amount of $1,000 plus such additional liquidated damages that may be proven at trial; (ii) punitive damages for the willful, malicious and/or reckless failure to cease interception; and (iii) attorney's fees and costs.

## CLAIM 12
## ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2520
### (Short's & Perez v. Craft Defendants)

**677.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**678.** Plaintiffs specifically reallege and incorporate by reference the allegations contained in Claim 11.

**679.** The Craft Defendants interception and use of emails intended for Short's as plead above violated 18 U.S.C. § 2511 (Electronic Communications Privacy Act)("ECPA").

**680.** 18 U.S.C. §2520(a) provides that "any person whose wire, oral or electronic communication is intercepted, disclosed or intentionally used in violation of this chapter may in a civil action recover . . . such relief as may be appropriate."

**681.** Relief available includes damages, punitive damages and fees and costs. 18 U.S.C. §2520(b). Damages are calculated as the greater of (i) actual damages or (ii) statutory damages of $100 per day or $10,000. 18 U.S.C. § 2520(c).

**682.** Defendant Kaeding intercepted email communications intended for Short's for multiple

years. Kaeding knew these communications were intended for Short's. Kaeding knew he no longer

was associated with Short's from 2017 to 2024 yet continued to receive and read these messages

for more than five years.

**683.** Plaintiffs first learned of and discovered Kaeding's interception of these emails in 2024

and this claim is timely under 18 U.S.C. §2520(e).

**684.** Plaintiffs are entitled to recover at least $10,000, fees and costs from the Craft Defendants

for violations of the ECPA

**685.** Plaintiffs are entitled to recover actual damages to be proven at trial, punitive damages

for the intentional use of intercepted communications by the Craft Defendants, fees and costs.

**CLAIM 13**
**NEGLIGENT SUPERVISION**
**(Short's & Perez v. MWO)**

**686.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**687.** MWO has a duty to supervise its employees, including Defendants Mitchell and Turner

during their time of employment.

**688.** MWO has no policies or procedures in place for monitoring, supervising, or assuring

proper disclosures are made when MWO as bank lends to a trust for which MWO also serves as

trustee.

**689.** Defendants Turner and Mitchell signed the September 2020 approximately $1.6 million

loan documents for a loan from MWO as lender to the Trust as borrower.

**690.** The principle loan amount of the September 2020 loan, which was secured by a mortgage

on the Building and an assignment of rents, was approximately $1 million more than the principle

amount prior MWO loan to the estate of Mr. Belle in December 2016, also so secured.

**691.** Defendant Mote has testified that repairs to the Building could not be made in 2020,

2021, 2022, and 2023 because the Trust lacked funding.

**692.** Defendant Wallace has testified that the Trust had not distributed $1 million to her.

**693.** The Trust made no acquisitions using the proceeds of the $1.6 million loan.

**694.** MWO witnesses in related litigation have been unable to explain where the $1 million or more of loan proceeds were used.

**695.** MWO failed to implement internal controls, policies, and procedures to supervise its trust officers such as Defendants Mitchell and Turner.

**696.** MWO failed to supervise Mitchell's and Turner's operation of the Trust and decisions made on behalf of the Trust.

**697.** MWO has a statutory and regulatory duty, under federal and Iowa state banking laws, to supervise its employees and trust officers for the safety and soundness of the bank.

**698.** The Trust as landlord had a contractual duty under the Lease to maintain the Building and Premises.

**699.** MWO breached its duty to supervise Defendant Mitchell resulting in mismanagement of the Trust. This mismanagement includes the inability of MWO to explain the use of proceeds from the $1.6 million loan entered by Defendants Mitchell and Turner on behalf of the Trust.

**700.** Because of the mismanagement of the loan proceeds, the Trust lacked funds to maintain the Building and fulfill its duties contractual and common law to Plaintiff.

**701.** Because the Trust was unable to maintain the Building, Perez had to temporarily close Short's in April 2022, the City cut the gas supply to the Premises until repairs to the basement walls had been made, and MWO commenced FED #1 against Short's alleging abandonment due to the closure.

**702.** MWO's failure to supervise Defendants Mitchell and Turner was the direct and

proximate cause of the chain of events leading to FED #1, voluntarily dismissed with prejudice. Short's and Perez have been directly damaged by MWO's negligent supervision of Mitchell and Turner's acts on behalf of MWO as trustee of the Trust.

## CLAIM 14
## DEFAMATION
### (Short's & Perez v. MWO Defendants, Kaeding, Swift, Bird and Wallace)

**703.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**704.** Charlie Funk, former CEO of MWO, testified under oath in July 2024 that his understanding was that Short's was being evicted by the Trust for non-payment for rent. This belief is false, FED #1 asserted Short's abandoned (dismissed with prejudice voluntarily) and FED #3 asserted that Short's failed to timely exercise an option to renew. Non-payment of rent was never the basis of either eviction action.

**705.** Mr. Funk learned his information from the MWO Defendants.

**706.** From May 2022 to present, whether by written or verbal statements, the MWO Defendants falsely stated, internally within MWO in a manner that resulted in the  information being received by MWO's CEO, that the MWO/Trust eviction actions against Perez and Short's were based failure to pay rent when in reality no monetary default occurred under the Lease prior to the initiation of any of the eviction action.

**707.** The MWO Defendants statements that the Short's evictions were based upon failure to pay rent were knowingly false when made and designed to impugn Perez and Short's and damage their business reputation.

**708.** Such defamation is defamation *per se* (statements asserting an individual is unable to their job or lacks integrity and statements that harm the plaintiff's profession or employment). and goes to the heart of Perez and Short's credibility and ability to compete in the market.

709. Kaeding sent emails to Swift, Smart, Kent, Maske, and Breitbach on February 5, 2024 asserting Perez was blaming the "man" for Perez's "business failing." This statement was knowingly false.

710. Swift texted Kaeding in 2021 urging Kaeding to take Short's "just to stick it [to] those guys".

711. By text in April 2022 Kaeding denigrated Perez as bad business partner to Peter Matthes, an important figure for Perez's business. Kaeding testified under oath in related litigation that he did not and does not believe that Perez is a bad business man.

712. On April 28, 2022 Bird wrote Kaeding a text message in which she indicated that she had communicated with Wallace and that Wallace was "done with [Perez]."

713. The conversation between Wallace and Bird was defamatory.

714. The conversation between Wallace and Bird led Bird to text to Kaeding that "it was a pretty shitty thing to do to blame his [Perez's] business failures on the building."

715. No examples of Short's having "business failures" or "blaming" the building are provided by Defendant Bird.

716. Defendant Bird made these statements in furtherance of the enterprise and to defame Perez.

717. These statements, whether made by Bird or made by Wallace and repeated by Bird, or both, were knowingly false.

    a. Short's business was not failing and Perez had never indicated such.

    b. The collapse of the Building's back wall caused the City to cut-off the gas supply. A restaurant kitchen cannot operate without a gas supply. The Building's physical deterioration was reason for Short's closure.

**718.** Bird's and Wallace's false statement as to Perez's business failure constitute defamation *per se*.

**719.** In response to Bird's text on April 28, 2022, Kaeding responded to Bird "Of course I have dealt with him [Perez]. Bad dude."

**720.** No examples of Perez being a "bad dude" are provided.

**721.** Kaeding's statements are knowingly false and made in furtherance of the enterprise and to defame Perez.

**722.** By this statement, Kaeding was confirming Bird's false premise of a failing business being blamed on the building. By this statement, Kaeding was impugning Perez and Short's business ethics.

**723.** Kaeding's statements constitute defamation *per se*.

**724.** In 2024, Kaeding testified in a related litigation deposition that he thought Perez was a good business man.

    **a.** Kaeding's text of April 28, 2022 re-enforcing and confirming Wallace's and Bird's false statements that Perez was wrongfully blaming the building for a business failure was a knowingly false statement by Kaeding when made. Kaeding's subsequent sworn testimony as to his real beliefs about Perez's business acumen denies the truth of Kaeding's earlier statements.

    **b.** Kaeding's text of April 28, 2022 re-enforcing and confirming Wallace's and Bird's false statements that Perez was wrongfully blaming the building for a business failure constituted defamation *per se* impugning Perez and Short's business reputation.

    **c.** As a direct result of these false statements, Bird and Kaeding reinforced Wallace's animus towards Perez, and that reinforced racial animus was directed by Wallace to the

MWO Defendants to fulfill Wallace's demand that Perez and Short's be evicted in favor of Kaeding or Craft Concepts affiliated or confederated enterprise becoming the replacement tenant.

**d.** The Mote/Craft Concepts "break-in" at Short's occurred less than a week after the Bird-Kaeding texts of April 28, 2022.

**e.** The existence of the Bird-Kaeding text messages referencing Bird's communications with Wallace prior to April 28, 2022 prove that Defendant Bird is aware as to how she learned information about Short's during April 2022.

**f.** Nonetheless, Bird has refused to retract her April 24, 2024 false sworn statement given in furtherance of the enterprise, and constitutes perjury, as plead above.

725. On or about June 9, 2022, Wallace texted Kaeding regarding giving the Premises to Kaeding's affiliates and in doing so Wallace stated Ouverson was understanding but that "Kevin is an idiot."

726. No actual examples of Perez's idiocy are provided.

727. On April 18, 2023, Kaeding texted Swift, Kent, Smart that Short's was "a shit show" and that "Perez is a complete douche."

728. No actual examples of why Short's is a "shit show" or why Perez is a "complete douche" are provided.

729. Kaeding stated under oath in 2024 that he did not hold these opinions.

730. Wallace and Kaeding wrote those statements knowing they are baseless, in furtherance of the enterprise and to defame Perez.

731. Kaeding by February 5, 2024 text message to the group of Defendants Swift, Maske, Kent, Smart and Breitbach that Perez and Short's release of information regarding the coordinated

May 4, 2022 "break-in" was a "completely baseless accusation designed to make him look like the victim and blame the 'man' for his business failing."

 **a.** Kaeding's use of the term "the man" belies his belief that he (Kaeding) is "the man" a superior white male and Perez is a jealous, inferior Hispanic minority. This statement proves Kaeding's racial animus against Perez.

 **b.** If there was no racial motivation involved, Kaeding would simply have said the accusation was completely baseless and not have made reference to Perez's racial "inferiority" in his statement.

 **c.** Kaeding knew this statement was false when made. The accusation that the Craft Concepts break-in and interest in taking Short's business location is based in facts known to Kaeding.

 **d.** Short's business was not failing and Kaeding knew as much from his time as an owner, consultant, member of the MWO Board, employment at the ICDD, and his connections.

 **e.** Kaeding's post-Short's tenure in Iowa City has included ongoing attempts to steal concepts originated in Iowa City by Perez, including Kaeding's multiple failed efforts to place burger restaurants in close proximity to Short's while simultaneously receiving consulting fees from Short's.

 **f.** Such attempts by Kaeding demonstrate that Kaeding has never believed that Perez is a failed business man.

 **g.** Kaeding's statement was designed to intentionally impugn Perez and Short's business practices and damage Perez and Short's business reputation.

 **h.** Kaeding's knowing lies about his own actions were written in furtherance of the

enterprise and to defame Perez.

**732.** Kaeding, by text message to Peter Matthes on February 6, 2024, stated that Perez was "crazy."

**733.** No actual example of Perez being "crazy" is provided.

**734.** Kaeding stated under oath at deposition in 2024 that he does not hold that opinion of Perez.

**735.** Kaeding made that knowingly false statement to Matthes in furtherance of the enterprise and to defame Perez.

**736.** Kaeding, by text message on or about February 6, 2024 texted to Swift that "Dan Ouverson brought this clown [referring to Perez] into Short's after we started. I didn't know any better."

> **a.** This statement was knowingly false. Perez *was not brought in **after*** Kaeding and Ouverson started Short's.

> **b.** This statement and reference to Perez as a "clown" was designed and intended to impugn Perez and Short's business practices and reputation.

> **c.** This statement constitutes defamation *per se.*

**737.** In response to Kaeding's text message described in the preceding paragraph, Defendant Swift wrote to Defendant Kaeding (emphasis added):

> I told [my wife] when we went for a run in Palm Beach *by a homeless camp*, they don't play by the same rules.  When you have *nothing to lose*, you don't conform to anything that is 'normal'. So be fucking careful….

> **a.** Swift drops in his location in the well-to-do community of Palm Beach.

> **b.** Swift chose to use an example of his experience in a Miami suburb, as opposed to the location where he actually resides, Johnson County, Iowa.

**c.**   The Hispanic/Latino population in Miami is 70%.

**d.**   It stands to reason that a city with a 70% Hispanic population would have a large Hispanic unhoused population.

**e.**   Swift is not unhoused, and has no first-hand knowledge of whether or not an unhoused population has "nothing to lose."

**f.**   Swift chose to highlight this location in his statement solely due to the heavy Hispanic population of Miami so that he could use untrue stereotypes to disparage Perez despite knowing that Perez is neither unhoused (homeless) nor a resident of Palm Beach.

**g.**   Swift's statement then characterizes Perez as being the equivalent of residing in a homeless encampment.

**h.**   Swift knew this statement was not true as he and Kaeding both know where in Iowa City Perez has lived and owned his home for more than 25 years.

**i.**   Defendant Swift's statement belies his racial animus towards Hispanics and Perez.

**j.**   Swift's statement then states Perez has "nothing to lose." This statement was knowingly false. Perez had something valuable and the Craft Defendants are trying to take it – occupancy and operation of a restaurant in the Premises.

**k.**   Swift then states that there is danger because Perez won't conform to anything normal.  There is no basis for a conclusion of "danger" necessitating a "fucking" qualifier.

**l.**   Swift provides no definition of his understanding of what the word "normal" means.

**m.**   Swift provides no examples of how Perez refuses to comply with Swift's, or any definition of "normal."

**n.**   Defendant Swift, a white male, believes that by virtue of Perez's race, Perez can never be "normal" and therefore, like the homeless Hispanic encampment near Palm

Beach, Perez is a "danger." The danger Swift sees is to the enterprises' goal of white male dominance in the Iowa City Downtown and all other markets in which the Craft Defendants compete.

    **o.** Swift's false statements regarding Perez's person, business and danger were designed to impugn Perez and Short's personally and their business acumen, practices, and finances.

    **p.** Swift's false statements constituted defamation *per se*.

**738.** On or about February 15, 2024, Kaeding and Swift engaged in a text message exchange discussing the status of Short's eviction. In that message Kaeding accused Perez and Short's of "taking texts illegally . . . then using them out of context to try and play the victim. Its all about dragging down the winners in society." In response, Swift wrote "Agree."

    **a.** Kaeding's statement was knowingly false. Short's did not take texts illegally. The text messages between Kaeding and Mote regarding the break-in planning and execution were produced by MWO in related litigation and no protective order was in place at the time of production. Perez came into possession and control of the Kaeding-Mote texts lawfully and pursuant to judicial process. Kaeding knew that to be the case.

    **b.** The statement alleging Perez and Short's committed a crime by obtaining relevant communications during discovery was defamation *per se* as it alleges criminal conduct.

    **c.** Referring to the Craft Defendants as the "winners in society" Kaeding makes the statement that Perez and Short's are the "losers in society" was designed to impugn the business practices and reputation of Perez and Short's. Kaeding's statements and Swift's agreement are defamation *per se* as to Perez and Short's business reputation.

**739.** The City Defendants, the MWO Defendants, the Craft Defendants, Wallace and Bird

engaged in a systematic and coordinated effort to defame Short's and Perez. These coordinated acts constitute a civil conspiracy for purposes of assignment of liability.

740. MWO and the Trust's serial attempts to evict have generated the false belief in the community that Short's is economically stressed and that Perez and Short's are unable to pay their bills.

741. These false statements have damaged ***

742. All of plead false statements (whether written or verbal) plead herein constitute both defamation *per se* and/or defamation *per quod*.

743. The above plead false statements were made maliciously.

744. The above plead false statements have damaged Plaintiffs' personal and business reputations in the community.

745. This defamation has restricted Perez and Short's access to the banking, leasing, and financing markets by placing a taint on Perez and Short's names.

746. The Plaintiffs have been damaged, including emotional damages, from this defamation.

747. The Plaintiffs are entitled to compensation and awards of damages, of all types legally available, in an amount to be proven at trial,

## <u>CONCLUSION</u>

748. The enterprises plead above concertedly and with coordination towards a common goal acted and attempted to monopolize the Iowa City Downtown and remove minority participation of the economic development and re-development of the Iowa City Downtown. In doing so, the enterprises have discriminated, intimidate, extorted and engaged in racketeering activity towards those ends.

749. Economic opportunities in Iowa City are being allocated and distributed to the same

group of individuals, all Caucasian males, to the exclusion of Perez and other racial minorities.

**750.** Plaintiffs have been damaged directly by these unlawful and discriminatory acts.

## <u>REMEDIES AND REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs request the following relief:

(i)   Trial by jury as to all issues and claims made in this Complaint;

(ii)  Award to Plaintiffs monetary damages in an amount to proven at trial;

(iii) Award Plaintiffs all other compensatory and monetary damages to which Plaintiff is entitled and due, the amount of which will be proven as trial;

(iv)  Treble damages as permitted by statute;

(v)   Punitive, special, and other monetary damages to the extent legally available to which Plaintiff is entitled;

(vi)  All non-monetary relief, including without limitation injunctive and other equitable relief to which Plaintiff is entitled or as necessary to otherwise implement the orders of the Court;

(vii) Reasonable attorney's fees, reasonable expert fees, and other costs to which the Plaintiffs are legally entitled; and

(viii) Such other and further monetary and non-monetary relief, including equitable relief, certiorari, and mandamus relief to which Plaintiff may be entitled and this Court deems appropriate.

Dated: July 17, 2024

ATTORNEY FOR PLAINTIFFS

<u>/s/ Shawn Shearer </u>(AT0014824)
The Shearer Law Office, P.C.
108 Third Street, Suite 302
Des Moines, Iowa 50309-4758
Telephone (214) 717-1828
Email shawn@shearerlaw.pro