**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| **SHORT'S BURGER & SHINE, LLC**, AN IOWA LIMITED LIABILITY COMPANY AND **KEVIN PEREZ**, AN INDIVIDUAL<br><br>**Plaintiffs**,<br><br>v.<br><br>**MIDWESTONE BANK**, AN IOWA STATE BANK, BOTH INDIVIDUALLY AND AS TRUSTEE OF THE **HAYWOOD B. BELLE FAMILY TRUST**; **DENNIS MITCHELL**, AN INDIVIDUAL AND TRUST OFFICER OF MIDWESTONE BANK; **GREG TURNER**, AN INDIVIDUAL AND FORMER OFFICER OF MIDWESTONE BANK, **THAIS WINKLEBLACK**, AN INDIVIDUAL AND OFFICER OF MIDWESTONE BANK; **CITY OF IOWA CITY, IOWA**; **GEOFF FRUIN**, INDIVIDUALLY AND AS CITY MANAGER; **ERIC GOERS**, INDIVIDUALLY AND AS CITY ATTORNEY; **SUSAN DULEK**, INDIVIDUALLY AND AS ASSISTANT CITY ATTORNEY; **ELIZABETH CRAIG**; INDIVIDUALLY AND AS ASSISTANT CITY ATTORNEY; **JESSICA BRISTOW**, INDIVIDUALLY AND AS CITY HISTORIC PRESERVATION PLANNER, **KEVIN BOYD**, INDIVIDUALLY AND AS FORMER CHAIR OF THE IOWA CITY HISTORIC PRESERVATION COMMITTEE;<br><br>**IOWA CITY DOWNTOWN SELF-SUPPORTED MUNICIPAL IMPROVEMENT DISTRICT (AKA IOWA CITY DOWNTOWN DISTRICT, IOWA CITY DOWNTOWN ASSOCIATION & DOWNTOWN ASSOCIATION OF IOWA CITY) AN IOWA NONPROFIT CORPORATION; GREATER IOWA CITY, INC.**, AN IOWA | **Case No. 3:24-cv-00059-RGE-SBJ**<br><br><br><br>**ANSWER TO FIRST AMENDED COMPLAINT** |

CORPORATION, **NANCY BIRD,** AN INDIVIDUAL;

**CRAFT CONCEPTS, L.L.C,** AN IOWA LIMITED LIABILITY COMPANY; **IC BURG, LLC** (DBA GOLD CAP HOSPITALITY) AN IOWA LIMITED LIABILITY COMPANY; **MIDWEST PROPERTY MANAGEMENT IC, LLC** (AKA KMB PROPERTY MANAGEMENT & KMB PROPERTY MANAGEMENT – IOWA CITY), AN IOWA LIMITED LIABILITY COMPANY; **MH LEGACY, LLC,** AN IOWA LIMITED LIABILITY COMPANY; **NS HOLDINGS, LLC** (FORMERLY MIDWEST S.N. INVESTORS, LLC), AN IOWA LIMITED LIABILITY COMPANY; **NATHANIEL KAEDING**, AN INDIVIDUAL AND MEMBER OF THE BOARD OF DIRECTORS OF MIDWESTONE BANK; **MATTHEW SWIFT**, AN INDIVIDUAL; **CORY KENT**, AN INDIVIDUAL; **BENJAMIN SMART**, AN INDIVIDUAL  **JOHN MASKE**, AN INDIVIDUAL, **STEPHANIE BREITBACH**, AN INDIVIDUAL; **DOUG GOETTSCH**, AN INDIVIDUAL; **BRIAN FLYNN**, AN INDIVIDUAL; **LANE ERIK SHEWMAKER**, AN INDIVIDUAL

**120 EAST WASHINGTON L.L.P**, AN IOWA LIMITED LIABILITY PARTNERSHIP; **MATTHEW HAYEK**, AN INDIVIDUAL, MEMBER OF THE BOARD OF DIRECTORS OF MIDWESTONE, FORMER IOWA CITY COUNCIL MEMBER, AND FORMER IOWA CITY MAYOR; **JOSEPH MORELAND**, AN INDIVIDUAL; **LAURA BERGUS**, AN INDIVIDUAL AND CITY COUNCIL MEMBER; **HAYEK, MORELAND, SMITH & BERGUS, L.L.P.**, AN IOWA LIMITED LIABILITY PARTNERSHIP;

**SIOBHAN BRILEY**, AN INDIVIDUAL; **PUGH HAGAN PRAHM PLC**, AN IOWA PROFESSIONAL LIMITED LIABILITY

| | |
|---|---|
| COMPANY; <br><br> **SARAH WALLACE** (AKA SARAH WALLACE BELLE), AN INDIVIDUAL, <br><br> **Defendants.** | |

Defendants IC Burg, LLC, MH Legacy, LLC, NS Holdings, LLC, Nathaniel Kaeding, Matthew Swift, Cory Kent, Benjamin Smart, John Maske, Stephanie Breitbach and Doug Goettsch (hereinafter "Answering Defendants") hereby answer and defend Plaintiffs' First Amended Complaint as follows:

## INTRODUCTION

1.      The Defendants, individually and as co-conspirators as part of an enterprise, have acted to deprive Plaintiffs of their civil rights and have damaged Plaintiffs in furtherance of the common goal to unlawfully dominate the downtown Iowa City real estate and restaurant markets to the exclusion of Plaintiffs in violation of (i) Title VI of the United States Civil Rights Act (42 U.S.C. §2000d et seq)("Title VI"), (ii) 42 U.S.C. §§ 1981, 1982, 1983, 1985 & 1986, (iii) the United States Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.)("RICO") (iv) the Iowa Competition Law (Iowa Code Chapter 553), and (v) Iowa and federal electronic communications laws.

**ANSWER: Denied.**

2.      The "enterprises" (defined below), with each consisting of some or all of the defendants as its members, have used unlawful and fraudulent means to attempt to:

     **a.**  Remove Plaintiff Perez and his business, Plaintiff Short's, from downtown Iowa City because of Perez's Hispanic race;

     **b.**  Fraudulently seize real estate interests (both leasehold and fee title) of the Building housing Short's operations;

    **c.** Replace Plaintiffs business operations in the building with a new tenant/business owned by the Craft Defendants (white-owned) or affiliates and confederates of the group of Defendants choosing;

    **d.** Unlawfully conspire and attempt to interfere with the markets for commercial retail leasing, commercial real estate valuations and restaurant/bar businesses in the Iowa City Downtown market;

**ANSWER: Denied.**

**3.** The City's and its personnel (whether acting individually or on behalf of the City) are participating in the furtherance of these goals for the benefit of the "enterprises" and their goals of removing Perez and Short's (Hispanics) from participating in the Iowa City downtown economy and in interfering in markets to direct properties into the hands of City and enterprise blessed businesses to the exclusion of competitors.

**ANSWER: Paragraph 3 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

**4.** All statements of claims herein are plead in the alternative. Fed. R. Civ. P. 8(d)(2).

**ANSWER: Paragraph 4 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

**THE PARTIES**

**5.** Plaintiff Short's Burger & Shine, LLC ("Short's") is an Iowa limited liability company with its principle place of business in Iowa City, Iowa. Short's is authorized and in good standing to conduct business in the State of Iowa.

**ANSWER: Admitted.**

6.      Plaintiff Kevin Perez is an individual residing in Johnson County, Iowa.

**ANSWER: Admitted.**

7.      The "**MWO Defendants**" are the following:

    **a.** MidWestOne Bank ("MWO"), an Iowa state bank with its principle place of business in Iowa City, Iowa.

    **b.** MWO as trustee of the Haywood B. Belle Family Trust ("Trust"), an Iowa trust formed pursuant to Iowa Code Chapter 633A.

    **c.** Dennis Mitchell ("Mitchell"), an individual and officer employed by MWO who resides in Johnson County, Iowa.

    **d.** Greg Turner ("Turner"), an individual and former officer of MWO who resides in Johnson County, Iowa.

    **e.** Thais Winkleblack ("Winkleblack"), an individual and officer employed by MWO who resides in Johnson County, Iowa.

    **f.** Kaeding, defined below

    **g.** Hayek, defined below.

**ANSWER: Subparagraphs 7(a) – (e), (g) are not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, said subparagraphs are denied. In response to Subparagraph 7(f), Answering Defendants incorporate their response to Paragraph 9(f) below by this reference as if fully set forth herein.**

8.      The "**City Defendants**" are the following:

    **a.** The City of Iowa City, Iowa ("City").

    **b.** Geoff Fruin ("Fruin") as an individual residing in Johnson County, Iowa and as City Manager of Iowa City.

    **c.** Eric Goers ("Goers") as an individual residing in Johnson County, Iowa and as City Attorney of Iowa City.

    **d.** Susan Dulek ("Dulek") as an individual residing in Johnson County, Iowa and as Assistant City Attorney of Iowa City.

**e.** Elizabeth Craig ("Craig") as an individual residing in Johnson County, Iowa and as Assistant City Attorney of Iowa City.

**f.** Jessica Bristow ("Bristow") as an individual residing in Johnson County, Iowa and as City Historic Preservation Planner,

**g.** Bergus, defined below.

**h.** Boyd, defined below.

**i.** Hayek, defined below.

**ANSWER: Paragraph 8 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

**9.** The "**Craft Defendants**" are the following

**a.** Craft Concepts, LLC ("Craft Concepts"), an Iowa limited liability company doing business in Johnson County, Iowa.

**b.** IC Burg, LLC, doing business as Gold Cap Hospitality ("Gold Cap"), an Iowa limited liability company doing business in Johnson County, Iowa.

**c.** Midwest Property Management IC, LLC ("Midwest Property"), also known or formerly known as KMB Property Management and KMB Property Management- Iowa City), an Iowa limited liability company doing business in Johnson County, Iowa.

**d.** MH Legacy, LLC ("MH Legacy"), an Iowa limited liability company doing business in Johnson County, Iowa.

**e.** NS Holdings, LLC ("NS Holdings"), formerly Midwest S.N. Investors, LLC, an Iowa limited liability company doing business in Johnson County, Iowa.

**f.** Nathaniel Kaeding ("Kaeding"), an individual residing in Johnson County, Iowa and as a member of the boards of directors of MWO and MidWestOne Financial Group ("MFG"), an Iowa corporation doing business in Johnson County, Iowa.

**g.** Matthew Swift ("Swift"), an individual residing in Johnson County.

**h.** Cory Kent ("Kent"), an individual residing in Johnson County.

**i.** Benjamin Smart ("Smart"), an individual residing in Johnson County.

**j.** John Maske ("Maske"), an individual residing in Johnson County.

    **k.** Stephanie Breitbach ("<u>Breitbach</u>"), an individual residing in Johnson County.

    **l.** Doug Goettsch ("<u>Goettsch</u>"), an individual residing in Johnson County.

    **m.** Brian Flynn ("<u>Flynn</u>"), an individual residing in Johnson County.

    **n.** Lane Erik Shewmaker ("<u>Shewmaker</u>"), an individual residing in Johnson County.

**ANSWER: Subparagraphs 9(a), (c), (m) and (n) are not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, said subparagraphs are denied. In response to remaining Subparagraphs, Answering Defendants answer as follows:**

    **b. Admitted.**

    **d. Admitted.**

    **e. Admitted.**

    **f. Admitted.**

    **g. Admitted.**

    **h. Denied.**

    **i. Admitted.**

    **j. Admitted.**

    **k. Admitted.**

    **l. Admitted.**

**10.** The "**<u>ICDD Defendants</u>**" are the following:

    **a.** Iowa City Downtown Self-Supported Municipal Improvement District (also known as or formerly known as Iowa City Downtown District & Iowa City Downtown Association) ("<u>ICDD</u>"), an Iowa nonprofit corporation, doing business in Johnson County, Iowa.

    **b.** Greater Iowa City, Inc. ("<u>GIC</u>"), an Iowa nonprofit corporation doing business in Johnson County, Iowa.

    **c.** Nancy Bird, an individual residing in Johnson County, Iowa and as former officer of ICDD and current officer of GIC.

    **d.** Kaeding.

**ANSWER: Subparagraphs 10(a) – (c) are not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, said subparagraphs are denied. In response to Subparagraph 10(d), Answering Defendants incorporate their response to Paragraph 9(f) above by this reference as if fully set forth herein.**

11.    The "<u>**East Washington Defendants**</u>" are the following:

    **a.** 120 East Washington L.L.P. ("<u>120 East</u>"), an Iowa limited liability partnership doing business in Johnson County, Iowa.

    **b.** Matthew Hayek ("<u>Hayek</u>"), an individual residing in Johnson County, Iowa, and as a member of the Board of Directors of MWO and MFG, as a former member of the Iowa City City Council and former mayor of Iowa City.

    **c.** Joseph Moreland ("<u>Moreland</u>"), an individual residing in Johnson County, Iowa.

    **d.** Laura Bergus ("<u>Bergus</u>") an individual residing in Johnson County, Iowa and as a member of the Iowa City City Council.

    **e.** Hayek, Moreland, Smith & Bergus, LLP ("<u>HMSB</u>"), an Iowa limited liability partnership doing business in Johnson County, Iowa.

**ANSWER: Paragraph 11 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

12.    The "<u>**PHP Defendants**</u>" are the following:

    **a.** Siobhan Briley ("<u>Briley</u>"), an individual residing in Johnson County, Iowa

    **b.** Pugh Hagan Prahm PLC ("<u>PHP</u>"), an Iowa professional limited liability company doing business in Johnson County Iowa.

**ANSWER: Paragraph 12 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

**13.** Sarah Wallace (aka Sarah Wallace Belle) ("Wallace") an individual residing in Johnson County Iowa and sole beneficiary of the Trust.

**ANSWER: Paragraph 13 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

### JURISDICTION & VENUE

**14.** This Court has subject matter jurisdiction over Plaintiffs' claims under Title VI, 42 U.S.C. §§ 1981, 1982, 1983, 1985 & 1986, RICO, 18 U.S.C. §1961 et seq., and Electronic Communications Privacy Act, 18 U.S.C. § 2520 (Claims 1 to 8 and 10 & 11) under 28 U.S.C. §1331 because these claims arise under federal law. This Court also has jurisdiction over the civil RICO claim (Claim 10) pursuant to 18 U.S.C. § 1964(a), (c) and § 1965(a).

**ANSWER: Paragraph 14 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

**15.** Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiffs' claims under the Iowa Competition Law (Iowa Code Chapter 553) (Claim 9), under the Iowa Interception of Communications statute (Iowa Code Chapter 808B) (Claim 11), at common law for Negligent Supervision (Claim 13) and for Defamation (Claim 14) .

**ANSWER: Paragraph 15 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

**16.** The Court is authorized to issue declaratory and injunctive relief under 28 U.S.C §§ 2201- 2202.

**ANSWER: Paragraph 16 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

17.    Venue is proper under 18 U.S.C. § 1965 (RICO venue), 28 U.S.C. §1391(b)(1) (all defendants are residents of Iowa and more than one defendant resides in the Southern District of Iowa) and 28 U.S.C. §1391(b)(2) (a substantial portion of the events or omissions giving rise to the claims occurred in the Southern District of Iowa).

**ANSWER: Paragraph 17 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

## DEFINITIONS

18.    As used herein, the following terms have the meaning set forth below:

    **a.** "Block" means the city block in Iowa City, Iowa bounded by Iowa Avenue to the north, Dubuque Street to the east, Washington Street to the south, and Clinton Street to the  west delineated by blue borders in Exhibit A attached hereto and incorporate herein.

    **b.** "Defendants" means the group comprised of the MWO Defendants, City Defendants, Craft Defendants, ICDD Defendants, East Washington Defendants, PHP Defendants, and Wallace.

    **c.** "Iowa City Downtown" means the area within Iowa City, Iowa delineated by red borders and pink shading in Exhibit B attached hereto and incorporated herein.

    **d.** "IRL Market" means the Iowa River Landing Area ("IRL Area") depicted  in Exhibit C.

**ANSWER: Paragraph 18 sets forth terms defined by Plaintiff for purposes of this Complaint and no response is required. To the extent a response is required, Answering Defendants acknowledge Plaintiff's defined terms for purposes of this Answer.**

## FACTUAL ALLEGATIONS
### Perez Background

19.    Perez's grandfather was born in Mexico and was a teenager when he immigrated to the United States in the 1910s.

**ANSWER: Denied for lack of knowledge or information.**

**20.**    Perez is a 57-year old man, Hispanic in race and his surname is Hispanic in origin.

**ANSWER: Answering Defendants admit Perez is Hispanic in race and his surname is Hispanic in origin. Answering Defendants deny the remaining allegations of Paragraph 20 for lack of knowledge.**

**21.**    Perez attended West Des Moines Valley High School and graduated in 1985 and attended and graduated from the University of Iowa.

**ANSWER: Denied for lack of knowledge or information.**

**22.**    Perez has owned and operated retail businesses and restaurants in and around downtown Iowa City since 1992.

**ANSWER: Answering Defendants admit Perez has owned and operated business and restaurants in and around Iowa City. Answering Defendants deny the remaining allegations of Paragraph 22 for lack of knowledge.**

**23.**    Short's was formed as a limited liability company in 2008. The initial members, each owning 1/3rd interests in the entity were Plaintiff Perez, Defendant Kaeding, and Daniel Ouverson ("Ouverson"). Short's was formed to operate a restaurant/bar in downtown Iowa City.

**ANSWER: Admitted.**

**24.**    Ouverson and Kaeding are both Caucasian.

**ANSWER: Admitted.**

**25.**    From 2008 to 2011 Short's operated at 18 S. Clinton Street, Iowa City, Iowa 52240 ("Premises") pursuant to a sublease from an entity owned by Ouverson.

**ANSWER: Denied for lack of knowledge or information.**

26.    The Premises is part of a building (the "<u>Building</u>") comprised of (i) 18 S. Clinton being the ground level and basement of the northern half of the Building, (ii) 20 S. Clinton being the ground level and basement of the southern half of the Building and (iii) 18 ½ S. Clinton being the second and third floors of the entire Building.

**ANSWER: Admitted.**

27.    The Premises (18 S. Clinton) is located in a prime location directly across the street from the University of Iowa Pentacrest in the middle of the block between East Washington and Iowa Avenue. This block experiences student, faculty, university employee and Iowa City resident foot-traffic and is a block from the Iowa City Pedestrian Mall.

**ANSWER: Admitted.**

28.    In 2011 the sublease expired and Short's entered the "Lease – Business Property" ("<u>Lease</u>") directly with H.D. Short and Sons, an Iowa General Partnership ("<u>Landlord</u>"), for rental of the Premises, for an initial term of three (3) years (May 1, 2011 to April 30, 2014) with the option to renew for seven (7) additional terms of three (3) years. Perez, Ouverson and Kaeding each also individually signed the Lease as "Tenants" effectively making Perez, Ouverson and Kaeding individual guarantors responsible for the obligations under the Lease.

**ANSWER: In answer to Paragraph 28, Answering Defendants admit Short's entered into a lease with H.D. Short and Sons. The Lease speaks for itself and Answering Defendants deny any allegation or characterization outside the terms of said Lease. Answering Defendants further deny Paragraph 28 to the extent it calls for a conclusion of law.**

29.    In 2012, Perez and Ouverson acquired Kaeding's equity interest in Short's.

Perez and Ouverson have been 50/50 owners of Short's ever since.

**ANSWER: Admitted.**

30.     In 2012, Short's entered a Consulting Agreement with Kaeding and paid consulting fees to Kaeding.

**ANSWER: Admitted.**

31.     On or about February 2, 2017, Short's and Kaeding agreed to a mutual termination of Kaeding's consulting agreement.

**ANSWER: Admitted.**

32.     A year later, in 2018, Kaeding became a director of MWO.

**ANSWER: Admitted.**

33.     The Landlord from 2008 to 2016 was H.D. Short & Sons. During this time, Haywood B. Belle was the sole owner of H.D. Short & Sons.

**ANSWER: Answering Defendants admit that the Landlord from 2008 to 2016 was H.D. Short & Sons. Answering Defendants deny the remaining allegations in Paragraph 33 for lack of knowledge.**

34.     Upon the passing of Haywood Belle in 2016, Defendant MWO served as executor of Mr. Belle's estate. In December 2016, ownership of the Building was transferred from the estate to Defendant Haywood B. Belle Family Trust ("Trust") with MWO serving as trustee.

**ANSWER: Admitted.**

35.     Short's as tenant was never notified in writing or verbally that the Trust, with MWO as trustee, had become owner of the Building and landlord under the Lease. Until commencement of FED #1 in 2022, Short's believed that since Mr. Belle's passing in 2016

MWO had been serving as property manager for the Building owned by Mr. Belle's estate or Defendant Wallace. At no time did the Trust/MWO notify Short's that the Trust had become owner of the Building.

> **ANSWER: Denied for lack of knowledge or information.**

36.    Short's renewed the Lease for the 2014-2017, 2017-2020, and 2020-2023 three-year lease terms.

> **ANSWER: Answering Defendants admit that Short's renewed the Lease. Answering Defendants deny the remaining allegations in Paragraph 36 for lack of knowledge.**

37.    In August 2021, the Trust/MWO agreed to release Kaeding from his personal obligations under the Lease.

> **ANSWER: In answer to Paragraph 37, Answering Defendants admit that the Trust agreed to release Kaeding from his personal obligations under the Lease in August 2021. Answering Defendants deny the remaining allegations in Paragraph 37.**

38.    The Trust/MWO did not agree to release Ouverson and Perez at the same time from their obligations under the Lease.

> **ANSWER: Denied for lack of knowledge or information.**

39.    From 2008 to 2016, while Haywood Belle was alive, anytime Short's had repair or maintenance issues at the Premises, Mr. Belle responded promptly to make repairs.

> **ANSWER: Denied for lack of knowledge or information.**

40.    Ownership of the Building transferred to the Trust in December 2016.

> **ANSWER: Admitted.**

41.    At that time, MWO became property manager and trustee of the Trust.

**ANSWER: Admitted.**

**42.**    From 2018 through April 2022, Short's repeatedly notified the Trust/MWO regarding needed repairs including sewer malfunctions, water collecting in the basement through severely cracked sub-surface basement walls and roof leaks, and open leaks through the ceiling of the restaurant which interfered with customer dining.

**ANSWER: Denied for lack of knowledge or information.**

**43.**    The Trust/MWO was slow to react to Short's requests for repairs during this period, if the Trust/MWO reacted at all to these requests.

**ANSWER: Denied for lack of knowledge or information.**

**44.**    From 2011 through April 2022, Ouverson (Caucasian) was responsible for the day-to- day "front-of-the-house" operations at Short's and Perez (Hispanic) was responsible for the "back- of-the-house" operations.

**ANSWER: Denied for lack of knowledge or information.**

**45.**    Defendants Mote, Mitchell and Wallace have testified that during the time MWO has been managing the Building from 2016 to April 2022 that they had minimal or no contact with Perez regarding Short's.

**ANSWER: Denied for lack of knowledge or information.**

**46.**    Defendants MWO, Mote, Mitchell and Wallace have testified that during this 2016 to 2022 period they did not know Perez was an owner of Short's.

**ANSWER: Denied for lack of knowledge or information.**

**47.**    In early April 2022, Perez (Hispanic) and Ouverson (Caucasian) decided to change their management responsibilities and Perez became responsible for managing the front-of-the-house.

**ANSWER: Denied for lack of knowledge or information.**

**48.**    As a result of this change in managerial responsibility, Perez became Short's primary manager responsible for interactions with the landlord.

**ANSWER: Denied for lack of knowledge or information.**

**49.**    Immediately after the change of responsibility from Ouverson (Caucasian) to Perez (Hispanic), in April 2022, the Trust, MWO, and Wallace, individually as a group, began systematic and consistent mistreatment of Perez and Short's.

**ANSWER: Denied for lack of knowledge or information.**

**50.**    Perez decided on April 18, 2022 that Short's needed to temporarily suspended operations due to long-neglected structural issues including cracked basement walls, a leaking roof, 12 inches of standing water in the basement, a collapsing structural wall threatening gas piping and gas meter integrity, and smells of mold and mildew throughout the Premises.

**ANSWER: Denied for lack of knowledge or information.**

**51.**    On April 20, 2022, Defendant Wallace wrote to MWO Defendant Mitchell the following at 5:56 a.m.:

Dennis,

I will be going to the gym and will be there until 9:00 am.  This whole Short"s thing is ridiculous and these guys are acting like children   If Dan is going to drag his feet and Let Kevin walk all over him we need to move on.  I am tired of being helpless because of other people.  I think we should talk to Nate Kaeding see if he is interested, change the name but not the concept, and move ahead.  Dan needs to grow up.  Let me read the letter and why don't  you start composing a letter to send to Nate.   I will call you after the gym.

Thank you, SARAH

**ANSWER: In answer to Paragraph 51, Answering Defendants state that Defendant Wallace's message speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said message.**

**52.**    These April 20, 2022 statements by Wallace demonstrate that she will only

transact business with Ouverson (Caucasian), not Perez (Hispanic) and Wallace's demand that MWO contacting Kaeding (Caucasian) to replace Perez (Hispanic) as the operator of the Premises.

**ANSWER: In answer to Paragraph 52, Answering Defendants state that Defendant Wallace's April 20, 2022 message speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said message.**

53.    Wallace wants to have a Caucasian tenant, not a Hispanic tenant.

**ANSWER: Denied for lack of knowledge or information.**

54.    Mitchell, MWO and the Trust, prodded by and/or with the support of Wallace, took action the next day, April 21, 2022, and sent a letter to Short's declaring a possible future abandonment due to closure as the precursor to beginning the process, culminating in the filing of FED #1, to remove the Hispanic operated business from the Premises and replace that tenancy with a white-owned and operated business.

**ANSWER: Denied for lack of knowledge or information.**

55.    On April 21, 2022, the Iowa City Press Citizen reported Short's temporary closure. Statements from Short's were published by the Press Citizen describing the structural problems at the Building.

**ANSWER: In answer to Paragraph 55, Answering Defendants state that the Iowa City Press Citizen's April 21, 2022 article speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said article.**

56.    On or about April 21, 2022 inspection personnel from the City came to inspect the Premises and discovered severe structural damage. The City required that the natural gas supply to the Premises be shut-down due to collapsing walls and support structures

threatening natural gas pipe integrity. With natural gas shut-down, restaurant operations could not be conducted at the Premises.

**ANSWER: Denied for lack of knowledge or information.**

57.    On April 21, 2022, less than a week after Perez (Hispanic) assumed primary owner- managerial responsibility for Short's for the first time since 2011, MWO/Trustee/Landlord delivered a letter to Short's alleging its cessation of operations on April 18, 2022 constituted an abandonment of the Premises in breach of the Lease and demanded cure by Short's resuming restaurant operations.

**ANSWER: In answer to Paragraph 57, Answering Defendants state that the April 21, 2022 letter speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said letter and further deny the remaining allegations in Paragraph 57 for lack of knowledge.**

58.    MWO/Trust/Landlord knew that business operations by Short's was impossible due to the City-ordered gas service shut-down to the Premises.

**ANSWER: Denied for lack of knowledge or information.**

59.    During the time the Premises was unusable for operations, Short's expended time and capital to redecorate and deep clean the interior as permitted under the Lease.

**ANSWER: Denied for lack of knowledge or information.**

60.    MWO/Trustee/Landlord allegedly sent a letter dated May 5, 2022, entitled "Notice of Default under the Lease," to Short's based on the alleged abandonment by cessation of operations. The letters were delivered by email to Short's on May 10, 2022.

**ANSWER: In answer to Paragraph 60, Answering Defendants state that the May 5, 2022 letter speaks for itself. Answering Defendants deny any allegation or**

**characterization outside the terms of said letter and further deny the remaining**

**allegations in Paragraph 60 for lack of knowledge.**

61.     On May 19, 2022 Short's responded to the "Notice of Default" by letter and
stated that Short's was "in the process of remodeling and updating the space" and that it
"anticipate[d] this work to take two to four months at which time we will reopen."

> **ANSWER: In answer to Paragraph 61, Answering Defendants state that the May**
> **19, 2022 letter speaks for itself. Answering Defendants deny any allegation or**
> **characterization outside the terms of said letter.**

62.     On May 24, 2022, MWO/Trustee delivered a "Notice of Termination" stating
Short's closure was an abandonment and breach that had not been timely cured under the
Lease.

> **ANSWER: In answer to Paragraph 62, Answering Defendants state that the May**
> **24, 2022 Notice of Termination speaks for itself. Answering Defendants deny any**
> **allegation or characterization outside the terms of said notice.**

63.     The May 24, 2022 Notice of Termination also declared that the Lease would
terminate June 30, 2022 because of the "abandonment" despite a remaining term through
April 30, 2023.

> **ANSWER: In answer to Paragraph 63, Answering Defendants state that the May**
> **24, 2022 Notice of Termination speaks for itself. Answering Defendants deny any**
> **allegation or characterization outside the terms of said notice.**

64.     After receiving the Notice of Termination alleging a Lease termination date of
June 30, 2022, Perez openly, and with MWO/Trustee & Wallace's awareness and
knowledge, continued making interior redecorating changes to the Premises in anticipation

of reopening and renewal.

**ANSWER: Denied for lack of knowledge or information.**

65.    Short's operations were closed during April, May and June 2022 because of the landlord neglect, and structural damage causing a cut-off of the gas supply.

**ANSWER: In answer to Paragraph 65, Answering Defendants admit that Short's operation were closed during April – June 2022. Answering Defendants deny the remaining allegations in Paragraph 65 for lack of knowledge.**

66.    Despite being closed, Short's paid all rent and other amounts due under the Lease for April, May and June 2022.

**ANSWER: Denied for lack of knowledge or information.**

67.    During June and July 2022, MWO/Trustee contractors worked to repair the structural damage to the Building.

**ANSWER: Denied for lack of knowledge or information.**

68.    During these repairs, Short's remained closed due to lack of natural gas and the construction. Short's used the idle time to continue its interior cleaning and redecorating.

**ANSWER: In answer to Paragraph 68, Answering Defendants admit Short's was closed during June and July 2022. Answering Defendants deny the remaining allegations in Paragraph 68 for lack of knowledge or information.**

69.    Short's tendered payment of amounts due under the lease for July 2022 by check using the normal process as had been used for years.

**ANSWER: Denied for lack of knowledge or information.**

70.    MWO/Trustee rejected Short's tender of payment for July 2022 rent and returned the check, unendorsed and unprocessed, to Short's counsel asserting the Lease was

terminated on June 30, 2022.

**ANSWER: Denied for lack of knowledge or information.**

71.    On July 7, 2022, the Trustee delivered Short's a 3-Day Notice to Quit demanding the premises be vacated due to abandonment and Lease termination.

**ANSWER: In answer to Paragraph 71, Answering Defendants state that the July 7, 2022 Notice to Quit speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said notice.**

72.    On July 15, 2022, the Trust filed a forcible entry and detainer action ("FED #1") seeking to evict Short's alleging the Lease had been terminated as of June 30, 2022.

**ANSWER: Admitted.**

73.    Kaeding was not named as a defendant in FED #1 because MWO had released him from personal responsibility in August 2021, only eight months prior to the beginning of the Trust's attempts to remove Perez.

**ANSWER: In answer to Paragraph 73, Answering Defendants admit Kaeding was not named as a defendant in FED#1 and further admit that the Trust agreed to release Kaeding from his personal obligations under the Lease in August 2021. Answering Defendants deny the remaining allegations in Paragraph 73 for lack of knowledge.**

74.    On July 21, 2022, Iowa City Press Citizen reported that Perez (Hispanic) had stated to the reporter that Short's planned to reopen as soon as possible after it completed hiring new staff.

**ANSWER: In answer to Paragraph 74, Answering Defendants state that the Iowa City Press Citizen's July 21, 2022 article speaks for itself. Answering Defendants**

**deny any allegation or characterization outside the terms of said article.**

**75.**     In response to the Press Citizen article, Wallace texted Mitchell on July 21, 2022:



**ANSWER: In answer to Paragraph 75, Answering Defendants state that Defendant Wallace's July 21, 2022 text message speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said message.**

**76.**     On July 27, 2022, Short's announced on its Facebook page that it's reopening was near.

**ANSWER: In answer to Paragraph 76, Answering Defendants state that Short's July 27, 2022 Facebook post speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said post.**

**77.**     Upon seeing the Facebook post, on July 27, 2022, Wallace and Mitchell engaged in the following text message exchange in which Mitchell concludes that Perez "is not on my list of favorite people":

**ANSWER: In answer to Paragraph 77, Answering Defendants state that Defendants Wallace and Mitchell's July 27, 2022 text message exchange speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said exchange.**

78.     While FED #1 was pending, Short's restaurant operations recommenced in August 2022 consistent with the timeline in Short's reasonable offer and timeline it had provided to MWO as a reasonable proposal to reopen in cure the alleged abandonment.

**ANSWER: In answer to Paragraph 78, Answering Defendants admit Short's recommenced operations in August 2022. Answering Defendants deny the remaining allegations in Paragraph 78 for lack of knowledge or information.**

79.     During the seven month period between July 2022 and January 2023, the Trust initiated three separate lawsuits against Short's alleging breaches of the Lease. In all three

lawsuits, the plaintiff was MWO as the trustee of the Trust.

**ANSWER: In answer to Paragraph 79, Answering Defendants admit that the Trust initiated lawsuits against Plaintiff for breach of the Lease. Answering Defendants state that the public record of the lawsuits speaks for itself and deny any allegation or characterization outside the terms of said record.**

80.     All three lawsuits were pending concurrently from January 27, 2023 to March 9, 2023. All three lawsuits were voluntarily dismissed by MWO/Trust between Thursday, March 9, 2023 and Wednesday, March 15, 2023.

**ANSWER: In answer to Paragraph 80, Answering Defendants admit that the Trust dismissed the lawsuits against Plaintiff for breach of the Lease. Answering Defendants state that the public record of the lawsuits speaks for itself and deny any allegation or characterization outside the terms of said record.**

81.     The three suits brought by the MWO/Trust against Short's between January 27, 2023 and March 9, 2023 are the following:

**a.**  FED #1:  On July 15, 2022, MWO/Trust filed Forcible Entry and Detainer (*Trust v. Short's et al.,* Johnson County Case No. SCSC102261) ("FED #1") alleging breach of the Lease due to abandonment and that the Lease had terminated June 30, 2022. Evidentiary hearings in FED #1 were held on September 28, 2022 and December 20, 2022. A third-day of hearing was scheduled for 9:00 a.m. on March 9, 2023. At 8:30 a.m. on March 9, MWO *voluntarily dismissed _with_ prejudice*.

**b.**  FED #2: On January 23, 2023, MWO/Trust filed Forcible Entry and Detainer (*Trust v. Short's et al.,* Johnson County Case No. SCSC103519)

("FED #2") alleging breach of the Lease due to Short's failure to pay rent for the period July 2022 to January 2023 (being entire period during which FED #1 was pending and in which the Trust was asserting the Lease had terminated as of June 30, 2022). FED #2 was *voluntarily dismissed without prejudice* on March 9, 2023.

**c.** Trust Civil Case: On January 27, 2023, the Trust filed a civil petition at law (*Trust v. Short's et al.* Johnson County Case No. LACV084008) ("Trust Civil Case") alleging (i) breach of contract by Short's failure to pay rent for the period July 2022 to January 2023 (the same rent period as alleged in FED #2) and (ii) seeking a Writ of Attachment. The Civil Case was *voluntarily dismissed without prejudice* on March 15, 2023.

**d.** Short's Civil Case: Before MWO voluntarily dismissed the Trust Civil Case, Short's filed an Answer and Counterclaims.

**i.** Upon voluntary dismissal of the Trust Civil Case, on May 3, 2023 Short's converted its counterclaims into a Petition and commenced *Short's v. MWO et al.* (Johnson County Case No. LACV084204) ("Short's Civil Case").

**ii.** Short's alleges in the Short's Civil Case, among other claims: (i) abuse of process in filing FED #1 asserting the lease had terminated June 30, 2022 due to closure and abandonment in the light of the failure to maintain, (ii) abuse of process in bringing FED #2 claiming rent due under the Lease claimed in FED #1 to have been terminated, (iii) abuse of process in bringing the Civil Case that duplicated the claim in FED #2 for rent due

during a period in which the Lease was claimed to have been terminated in FED #1, (iv) breach of the Lease and the implied covenants of good faith and fair dealing and quiet enjoyment, and (iv) a request for a declaration that the March 10, 2023 Reaffirmation of Renewal (defined below) effectively exercised the Lease renewal option for 2023-2026.

**iii.** The Short's Civil Case asserts that FED #1, FED #2, and the Trust Civil Case were designed for the improper purpose of delay and obfuscating the status of the Lease only for the Trust to dismiss those cases voluntarily and then immediately (within two hours of dismissal) send a letter asserting non-renewal due to expiration of time to renew.

**iv.** The Short's Civil Case petition was amended to add Wallace and some of the Craft Defendants as defendants and to add claims against Wallace and the named Craft Defendants for interference with contract.

**v.** The Short's Civil Case currently is in discovery.

e. <u>FED #3</u>:

**i.** On March 9, 2023, less than an hour after dismissing FED #1 *with prejudice*, MWO sent Short's a letter declaring the Lease would terminate April 30, 2023, the end of the then existing term because Short's had failed to exercise the 2023-2026 Lease renewal option in writing prior to January 30, 2023.

**ii.** On March 10, 2023, the day after dismissal of FED #1 with prejudice, Short's delivered MWO a "Reaffirmation of Renewal" letter stating Short's had exercised the renewal option for 2023-2026.

**iii.** MWO rejected Short's claim to have validly renewed for the renewal term of May 1, 2023 to April 30, 2026.

**iv.** MWO then proceeded to send a 3-Day Notice to Quit on May 1, 2023 demanding Short's vacate because of expiration of the Lease term on April 30, 2023.

**v.** On May 8, 2023, MWO/Trust filed Forcible Entry and Detainer (*Trust v. Short's et al.,* Johnson County Case No. SCSC104238) ("FED #3") alleging the Lease term had expired on its own terms on April 30, 2023 and the option to renew/extend the Lease had not been properly exercised timely.

**vi.** Short's contends in FED #3, among other things, that:

   **a.** There was no renewal option to be exercised while FED #1 was pending in which MWO/Trust had been asserting the Lease had been terminated as of June 30, 2022 due to abandonment (declaration of termination revoked the offer to renew contained in the Lease);

   **b.** Short's timely, verbally renewed and verbal renewals, not written renewals, were accepted in 2014, 2017, and 2020 thus modifying the Lease requirement of a writing; and

   **c.** The declaration of Lease termination as of June 30, 2022 due to abandonment and commencement of FED #1 (voluntarily dismissed with prejudice on March 9, 2023):

      (i)  Was a wrongful repudiation of the Lease;

      (ii) The repudiation of the Lease excused Short's of its duty to perform conditions within the Lease while the Lease was

repudiated;

(iii)Upon retraction of the repudiation (dismissal of FED #1 with prejudice) Short's is entitled to an opportunity to cure duties unperformed while the Lease was wrongfully repudiated, and

(iv)The March 10, 2023 Reaffirmation of Renewal is a writing of renewal that relates back to January 30, 2023 as if given timely because of the wrongful repudiation of the Lease renewal option from July 1, 2022 to March 9, 2023.

**vii.** Evidentiary hearings were held in FED #3 in August and September 2023.

**viii.** On January 31, 2023, an Order to evict Short's was entered by the magistrate.

**ix.** On February 7, 2024, Short's appealed the eviction order to the Iowa District Court

**x.** Upon receiving the appeal, the District Court ordered a stay of execution of the writ of possession issued by the magistrate.

**xi.** On April 20, 2024, without oral argument or taking of additional evidence. the District Court affirmed the magistrate's eviction order and ordered writ of possession issue on or after May 14, 2024.

**xii.** On May 7, 2024, Short's appealed the FED #3 decision and filed an Application for Discretionary Review and Motion to Stay Issuance of Writ of Possession with the Iowa Supreme Court.

**xiii.** On May 9, 2024, the Iowa Supreme Court granted a stay of issuance

of the writ of possession.

**xiv.** The parties to FED #3 await a decision from the Iowa Supreme Court on the Application for Discretionary Review of FED #3, a briefing schedule, and oral argument dates.

**ANSWER: In answer to Paragraph 81 and each of its subparts, Answering Defendants admit that other related lawsuits have been filed and are pending. Answering Defendants state that the public record of the lawsuits speaks for itself and deny any allegation or characterization outside the terms of said record.**

82.    Defendant Kaeding is included in the group of Craft Defendants. Defendant Kaeding:

**a.** Was an owner of Short's from 2008 to 2012;

**b.** Was a consultant to Short's from 2012 to 2017;

**c.** Kaeding was employed by Defendant ICDD for several years beginning shortly after Kaeding sold his ownership interest in Short's;

**d.** In 2018, Kaeding was appointed to the Board of Directors of Defendant MWO and the Board of its parent company MidWestOne Financial Group ("MFG"). Kaeding remains a members of both Boards today.

**ANSWER: Admitted.**

83.    While employed by ICDD, Kaeding's responsibility was to promote downtown Iowa City and attract and recruit businesses into the Iowa City Downtown. Kaeding was employed by ICDD at the same time Kaeding was consulting for Short's. One of the first business recruited by Kaeding while at ICDD was Zombie Burger, a direct competitor with Short's.

**ANSWER: Answering Defendants admit Defendant Kaeding's responsibilities with ICDD included attracting and recruiting businesses to Iowa City's Downtown. Answering Defendants further admit Kaeding was employed by ICDD during the time he was consulting for Short's. Answering Defendants further admit that Defendant Kaeding helped facilitate Zombie Burger opening a location in Iowa City while he was working at ICDD. Answering Defendants deny the remaining allegations in Paragraph 83.**

84.    Kaeding maintains his relationship with the ICDD Defendants and has access to information regarding Iowa City Downtown business and developments.

**ANSWER: Answering Defendants admit Defendant Kaeding maintains relationships with the other ICDD Defendants. Answering Defendants deny the remaining allegations in Paragraph 83 for lack of knowledge or information.**

85.    Kaeding and other Craft Defendants opened Pullman Bar & Diner ("Pullman") in the building located at 17 S. Dubuque ("Pullman Building"). The Building is the center of the Clinton St. side (west side) of the Block and the Pullman Building is the center of the Dubuque Street side (east side) of the Block. The rear of the Pullman Building is located directly across the alley from the rear of the Building. At all times relevant, the owner of the Building has also been the owner of the Pullman Building.

**ANSWER: Answering Defendants deny all Craft Defendants were involved in opening Pullman Bar & Diner. Answering Defendants generally admit the remaining allegations in Paragraph 85.**

86.    Pullman is now owned by Craft Defendant Gold Cap.

**ANSWER: Denied.**

87.    Kaeding is an owner of Gold Cap. The owners and management of Gold Cap also includes owners/operators of Big Grove Brewery ("Big Grove"). These Gold Cap owners-operators and managers include Defendant Swift (founding partner and CEO of Big Grove), Defendant Goettsch (managing partner of Big Grove) and Defendant Smart (executive chef at Big Grove). Kaeding also holds an interest in Big Grove.

**ANSWER: Denied.**

88.    In addition to Pullman, Gold Cap also owns St. Burch Tavern located on the Iowa/Dubuque corner of the Block and Hamburg Inn located 0.4 miles (four blocks) from the Block. Big Grove Brewery is located in Iowa City on Gilbert Street approximately 1.0 mile (10 blocks) south of the Block.

**ANSWER: Denied.**

89.    Joe's Place is also a member of the Craft Concepts group and is also located in the Iowa City Downtown and on the Block.

**ANSWER: Admitted.**

90.    Pullman, St. Burch Tavern, Hamburg Inn, Joe's Place and Big Grove are competitors of Short's.

**ANSWER: Paragraph 90 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

91.    Kaeding and other Craft Defendants also have ownership interests in Defendant Craft Concepts (dba Craft Concepts Restaurant Group).

**ANSWER: Denied. Neither Kaeding nor certain other Defendants that the First Amended Petition defines as "Craft Defendants" have ownership interests in Defendant Craft Concepts.**

92.    Craft Concepts describes itself on its website as "a proud collection of award winning restaurants and breweries in Iowa" and lists the following among those restaurants and breweries in the "collection":

**a.** Big Grove;

**b.** Pullman;

**c.** St. Burch Tavern at the Iowa/Dubuque corner of the Block;

**d.** Joe's Place, located at the center of the Iowa Avenue side (north side) of the Block;

**e.** Donnelley's Pub located two blocks from Short's in the Pedestrian Mall;

**f.** Brix Cheese Shop & Wine Bar located across the street from the Hamburg Inn

**g.** Blackstone located in eastern portion of Iowa City 280 feet away from Short's Eastside location;

**h.** 30 Hop Brewery with a location in Coralville, IA;

**i.** Iowa Athletic Club located in Coralville;

**j.** Tribute Eatery & Bar located in Coralville;

**k.** Vesta located in Coralville;

**l.** Field Day Brewery located in North Liberty;

**m.** Reds Ale House located in North Liberty;

**n.** Tin Roost located in North Liberty.

**ANSWER: Admitted.**

93.    All of these restaurants compete with Short's, some more directly than others. Short's, Pullman, St. Burch, and Joe's Place are on the Block. Hamburg and Brix are four

blocks from Short's. Big Grove is a mile away from Short's.

> **ANSWER: Answering Defendants admit Hamburg, Brix and Big Grove are in close proximity to Short's location. The remainder of Paragraph 93 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

94.    Kaeding has served as a director of Defendant MWO and MFG since 2018. MWO's headquarters is on S. Clinton Street a half a block south of Short's just across the street from the Block. As a director of MWO, Kaeding is able to access information regarding the local economy, local loans made by MWO, distressed loans or business that can be solicited by the Craft Defendants, and other information that can be used by the Craft Defendants to expand.

> **ANSWER: Answering Defendants admit Defendant Kaeding has served on the Board of Director of Defendant MWO and MFG since 2018 and that MWO's headquarters is on S. Clinton Street in close proximity to Short's location. Answering Defendants deny the remaining allegations in Paragraph 94 for lack of knowledge or information.**

95.    MWO Defendants have testified in related litigation that Kaeding and his various businesses are on a "short-list" of three or four people MWO will contact if a property they manage is likely to have a vacancy.

> **ANSWER: Denied for lack of knowledge or information.**

96.    Defendant Bird, former director of the ICDD now director of Defendant Greater Iowa City, testified in related litigation that Kaeding and his group of entities is also on the ICDD short-list when ICDD is seeking potential retail business to enter the Iowa City

Downtown market.

**ANSWER: Denied for lack of knowledge or information.**

97.     On April 18, 2022, Short's temporarily closed due to structural issues at the Building.

**ANSWER: Denied for lack of knowledge or information.**

98.     Due to the number of outstanding keys to the locks, Perez changed the locks to the Premises as a security measure to prevent entry while Short's was closed.

**ANSWER: Denied for lack of knowledge or information.**

99.     On April 20, 2022, Defendant Wallace, by email to Defendants Mitchell and MWO, stated "I think we should talk to Nate Kaeding and see if he is interested. . . why don't you start composing a letter to Nate."

**ANSWER: In answer to Paragraph 99, Answering Defendants state that Defendant Wallace's April 20, 2022 text message speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said message.**

100.    Unaware of MWO and Kaeding's scheme, Perez provided MWO a key to the new locks on April 26, 2022.

**ANSWER: Admitted.**

101.    On May 2, 2022, MWO employee and trust officer Kevin Mote ("Mote") contacted Nate Kaeding by text message stating "Sarah [Wallace] wanted me to reach out and secretly show you the Shorts and Social Club spaces."

**ANSWER: In answer to Paragraph 101, Answering Defendants state that Mote's May 2, 2022 text message speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said message.**

**102.**    On May 4, 2022, Mote met Kaeding, Swift and other Craft Defendants at Short's at 8:20 a.m.

**ANSWER: In answer to Paragraph 102, Answering Defendants admit that Kaeding and Swift met Mote at Short's on the morning of May 4, 2022. Answering Defendants deny the remaining allegations in Paragraph 102 for lack of knowledge.**

**103.**    On May 4, 2022, Mote used the new key provided by Perez to enter the Short's Premises with the Craft Defendants to show the space to those Craft Defendants as possible tenants.

**ANSWER: Denied for lack of knowledge or information.**

**104.**    Short's was not open at the time the group entered the Premises.

**ANSWER: Admitted.**

**105.**    Short's was not provided notice by MWO or the Trust that this group would be entering the Premises.

**ANSWER: Denied for lack of knowledge or information.**

**106.**    No Short's employee was present at the time this group entered and trespassed on the space.

**ANSWER: In answer to Paragraph 106, Answering Defendants admit that no employees of Short's were present at the time the group entered the space. Answering Defendants deny the remaining allegations in Paragraph 106.**

**107.**    No provision of the Lease allows the landlord to enter the Premises.

**ANSWER: In answer to Paragraph 107, Answering Defendants state that the Lease speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said Lease.**

108.    No provision of the Lease allows the landlord to provide access to the Premises to third- parties.

**ANSWER: In answer to Paragraph 108, Answering Defendants state that the Lease speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said Lease.**

109.    Kaeding and the Craft Defendants knew there was an existing lease in effect between Short's and the Trust when they organized the meet and entry into Short's Premises.

**ANSWER: Denied.**

110.    Kaeding and the Craft Defendants were aware of the terms of the Lease because Kaeding was a former owner of Short's, a guarantor of the Lease up until seven-month prior to the entry, and a member of the MWO & MFG boards of directors.

**ANSWER: Denied.**

111.    On May 4, 2022, all of the Craft Defendants and Mote (acting on behalf of MWO and the Trust) knew when they entered the Premises that Short's had an existing Lease in effect pursuant to which Short's was entitled to exclusive occupancy and control of the Premises.

**ANSWER: Denied as to Answering Defendants. The remainder of Paragraph 111 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

112.    On May 4, 2022, at approximately 11:02 a.m., by email, Kaeding thanked Mote for showing the space to him, Swift, Kent and the Craft Defendants.  In that email, Kaeding stated: "We would definitely be interested in taking over the lease for both 18 S Clinton as well as (perhaps) 18 S Clinton (2nd/3rd floor)."

**ANSWER: In answer to Paragraph 112, Answering Defendants state that Kaeding's May 4, 2022, email speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said email and deny the remaining allegations in Paragraph 112.**

113.    "We" referred to Kaeding, Swift, Kent and the other Craft Defendants.

**ANSWER: Denied.**

114.    While in Short's on May 4, 2022, Mote (acting on behalf of MWO) observed Short's inventory and equipment in the Premises.

**ANSWER: Denied for lack of knowledge or information.**

115.    Despite knowing Short's was still occupying the Premises from Mote's observations during the "break-in," the day after, on May 5, 2022, the Trust/MWO sent Short's notice of default under the Lease due to "abandonment." The Trust/MWO knew that Short's had not abandoned the Premises when the May 5, 2022 notice of default was sent.

**ANSWER: Denied for lack of knowledge or information.**

116.    It was not until 2024 that Short's, Perez, and Ouverson first became aware of and learned that MWO, Trust, Wallace, Mote, Mitchell, Kaeding, Swift, Kent and the Craft Defendants planning to and then entering Short's on May 4, 2022.

**ANSWER: Denied for lack of knowledge or information.**

117.    The City requires restaurants to obtain licenses of patio seating in the public rights-of- way (e.g. sidewalks, pedestrian mall, on-street parking areas, etc.).

**ANSWER: Admitted.**

118.    Annually, Short's has obtained a renewal of its 2009 sidewalk cafe right-of-way license for the sidewalk area in-front of the Premises and in the on-street parking area in-front

of the Building.

**ANSWER: Denied for lack of knowledge or information.**

119.    Short's operated its patio attached to the façade of the Premises every spring through fall from 2009 through 2022.

**ANSWER: Denied for lack of knowledge or information.**

120.    Short's operated the patio in the on-street parking area every spring through fall from 2016 through 2022.

**ANSWER: Denied for lack of knowledge or information.**

121.    Short's 2022-2023 sidewalk license agreement extension with the City expired on January 31, 2023.

**ANSWER: Denied for lack of knowledge or information.**

122.    On March 30, 2023, Short's General Manager, an authorized Short's signatory, executed, on behalf of Short's, a document entitled "2023 Renewal of License Agreement for Temporary Use of Public Right-of-Way" between the City of Iowa City and Short's Burger and Shine, LLC D/B/A Short's Burger and Shine, for a Sidewalk Café on the Public Right-of-Way at 18 South Clinton St., Iowa City, Iowa (the "Patio License Agreement"). Short's General Manager executed the document as "Tenant" on page 1 and the "Tenant Acknowledgment" section on page 2 was the notary of the General Manager's signature on page 1.

**ANSWER: In answer to Paragraph 122, Answering Defendants state that the License Agreement speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said agreement.**

123.    On March 30, 2023 Mote, a vice president and trust officer of MWO, executed

the exact same License Agreement document ("wet signatures" of both Short's and MWO on the same piece of paper) as an authorized officer of MWO as trustee of the Landlord. Mr. Mote signed as "Landowner" on page 1 and the "Landowner Acknowledgment" section on page 2 provided the notarization of Mr. Mote's signature.

**ANSWER: In answer to Paragraph 123, Answering Defendants state that the License Agreement speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said agreement.**

124.    Under the heading "Section 10-3-3 of the City Code" at paragraph B, the Sidewalk Café Ordinance provides "No person shall operate a sidewalk café without executing an easement agreement."

**ANSWER: In answer to Paragraph 124, Answering Defendants state that the Sidewalk Café Ordinance speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said ordinance.**

125.    Short's executed an easement agreement for the period of February 1, 2023 to January 31, 2024.

**ANSWER: Denied for lack of knowledge or information.**

126.    The usual, customary, process is that the executed Patio License Agreement and fees are submitted to the City, the City signs the License Agreement, and the License Agreement is filed in the Johnson County real estate records.

**ANSWER: Denied for lack of knowledge or information.**

127.    There is no provision in the Sidewalk Café Ordinance for the revocation of landlord consent after consent is provided by notarized signature.

**ANSWER: In answer to Paragraph 127, Answering Defendants state that the**

**Sidewalk Café Ordinance speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said ordinance.**

128.    The only provision in the Sidewalk Café Ordinance providing for termination of a License Agreement is in the event the "City determines the right of way is needed."

**ANSWER: In answer to Paragraph 128, Answering Defendants state that the Sidewalk Café Ordinance speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said ordinance.**

129.    The Patio License Agreement is an agreement between the City and Short's, with the Landlord's consent. The introductory paragraph of the License Agreement provides:

> This Agreement is made between Short's Burger and Shine LLC d/b/a Short's Burger and Shine, and the City of Iowa City, Iowa, a municipal corporation, with the written consent of Landowner . . .

**ANSWER: In answer to Paragraph 129, Answering Defendants state that the License Agreement speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said agreement.**

130.    On March 30, 2023, Short's delivered the License Agreement (executed and notarized by Short's and Mote on behalf of the landlord) along with checks for payment of license and recording fees in the amounts of $1,680 and $12, respectively.

**ANSWER: Denied for lack of knowledge or information.**

131.    The City did not promptly process the License Agreement fully executed and notarized by the Landlord and Short's and payment of fees of March 30, 2023.

**ANSWER: Denied for lack of knowledge or information.**

132.    At some time after April 6, 2023 but before April 18, 2023, the Trust, MWO and or their representatives verbally contacted the City and purportedly verbally revoked Mote's

notarized signature consenting to the License Agreement.

**ANSWER: Denied for lack of knowledge or information.**

133.     Short's received a letter dated April 24, 2023 from the City returning the two checks submitted as payment of required fees and providing a blank form of the License Agreement to Short's to complete, but the City did not return the fully-executed License Agreement delivered to the City on March 30, 2023.

**ANSWER: In answer to Paragraph 133, Answering Defendants state that the April 24, 2023 letter speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said letter.**

134.     The April 24, 2023 letter from the Assistant City Attorney indicated "It is my understanding that the owner (your landlord) of 18 S. Clinton St. currently is not consenting to a sidewalk café."

**ANSWER: In answer to Paragraph 134, Answering Defendants state that the April 24, 2023 letter speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said letter.**

135.     On or about May 3, 2023, Short's received a letter from the Assistant City Attorney dated May 1, 2023 enclosing, according to the Assistant City Attorney's own words, "a copy of the 2023 Renewal of License Agreement which Kevin Mote did sign" and stating "As you can see the City never executed it because the owner (your landlord) of 18 S. Clinton St. no longer consents to a sidewalk café. A business cannot operate a sidewalk café without the consent of the property owner."

**ANSWER: In answer to Paragraph 135, Answering Defendants state that the May 3, 2023 letter speaks for itself. Answering Defendants deny any allegation or**

**characterization outside the terms of said letter.**

**136.** Short's has never received notice from the Trust that it had revoked its notarized signature to the License Agreement.

**ANSWER: Denied for lack of knowledge or information.**

**137.** The City has never provided Short's any written evidence of the Trust's revocation of consent reflected by Mote's notarized March 30, 2023 signature.

**ANSWER: Denied for lack of knowledge or information.**

**138.** During the first six months of 2023, Short's operated its small patio/ground-level-deck attached to the front façade of the building.

**ANSWER: Denied for lack of knowledge or information.**

**139.** During 2023, Short's did not construct its usual café in the on-street parking area in-front of Short's building.

**ANSWER: Denied for lack of knowledge or information.**

**140.** During the five-month period from January 31, 2023 to June 30, 2023, the City took no action to require Short's to remove its patio attached to the façade of the building.

**ANSWER: Denied for lack of knowledge or information.**

**141.** During late June 2023, MWO, the Trust, Mitchell and/or counsel for those parties contacted the City seeking and requesting that the City demand Short's remove its patio attached to the façade.

**ANSWER: Denied for lack of knowledge or information.**

**142.** On June 30, 2023, by letter, the City, in reaction to and working with MWO, the Trust, Mitchell and/or counsel for those parties to assist in harassing Perez and Short's with the goal of removing them from the Premises, demanded Short's remove its patio/deck

attached the façade of the Building or the City would remove it after July 14, 2023.

**ANSWER: In answer to Paragraph 142, Answering Defendants state that the June 30, 2023 letter speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said letter.**

143.     On July 1, 2023, by letter:

**a.**  Short's advised the City that Short's had provided, and the City was in possession of, a fully executed and notarized Patio License Agreement and all fees required had been tendered satisfying the requirements of the City's ordinance.

**b.**  Short's put the City on notice that Short's position was that the City's sudden decision to take action against Short's small deck area, after five months of inaction, was prompted by communications with MWO/Trust and that the City was knowingly aiding and abetting retaliation against Short's and, in the process, violating City ordinances regarding historic preservation and depriving Perez of his equal protection and due process rights under the Iowa Constitution.

**ANSWER: In answer to Paragraph 143, Answering Defendants state that the July 1, 2023 letter speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said letter.**

144.     By email on July 14, 2023, Short's reiterated its position to the City and gave the same warnings as contained in the July 1, 2023 letter.

**ANSWER: In answer to Paragraph 144, Answering Defendants state that the July 14, 2023 email speaks for itself. Answering Defendants deny any allegation or**

**characterization outside the terms of said email.**

**145.** The City extended the deadline for Short's to remove the small patio until July 25, 2023.

**ANSWER: Denied for lack of knowledge or information.**

**146.** On or about July 25, 2023, the City removed Short's patio and furniture and confiscated that property.

**ANSWER: Denied for lack of knowledge or information.**

**147.** From 2008 to June 2022, Short's paid all rent due under the Lease, including payment of all rent during COVID closures and rent due while closed temporarily from April to June 2022.

**ANSWER: Denied for lack of knowledge or information.**

**148.** From 2008 to May 2022, Short's had never received a notice of default under the Lease.

**ANSWER: Denied for lack of knowledge or information.**

**149.** In less than 48 hours of learning that Perez had taken over managerial control, MWO as trustee wrote a letter dated April 20, 2022 stating that Short's closure would be considered an abandonment and default under the Lease if the closure continued for longer than 15-business days.

**ANSWER: In answer to Paragraph 149, Answering Defendants state that the April 20, 2022 letter speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said letter and further deny the remaining allegations in Paragraph 149 for lack of knowledge.**

**150.** The day after the break-in by Mote and the Craft Defendants (plead above), on

May 5, 2022, MWO/Trust sent Short's a notice of default declaring a breach due to abandonment by being closed more than 15-business days. Short's was provided 10-days to open to avoid declaration of default.

> **ANSWER: In answer to Paragraph 150, Answering Defendants state that the May 5, 2022 notice speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said notice and further deny the remaining allegations in Paragraph 150.**

151.    The May 5, 2022 letter was sent days before Short's had been closed for the 15-business day minimum closure time to possibly constitute abandonment under the Lease. Abandonment cannot be considered a possible breach under the Lease until at least 15-business days have elapsed.

> **ANSWER: In answer to Paragraph 151, Answering Defendants state that the Lease and May 5, 2022 notice speaks for themselves. Answering Defendants deny any allegation or characterization outside the terms of said documents and further deny Paragraph 151 to the extent it calls for a legal conclusion and no response is required.**

152.    Short's did not receive the May 5, 2022 letter until May 10, 2022.

> **ANSWER: Denied for lack of knowledge or information.**

153.    Short's could not reopen within 10-days because the gas had been shut-off by the City due to concerns for the structural integrity of the exterior wall on which the gas meters were mounted.

> **ANSWER: Denied for lack of knowledge or information.**

154.    The Lease provides that if a cure is not possible within the 10-days, the Landlord must accept a reasonable proposal for reopening.

**ANSWER: In answer to Paragraph 154, Answering Defendants state that the Lease speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said Lease.**

155.    Short's provided MWO/Trust a letter stating that while awaiting the repairs to the wall so that gas service to the kitchen could be re-established, Short's would be conducting a deep clean and re-decorating of the Premises and that when the work on the wall was completed, Short's would re-hire employees and reopen.  Short's stated it was hoping to be in a position to re-open in two to three months (July or August 2022).

**ANSWER: In answer to Paragraph 155, Answering Defendants state that the Short's letter speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said letter.**

156.    Despite this reasonable proposal (and Short's payment of rent while closed), MWO/Trust, with the urging and support of Wallace, declared a default and declared the Lease terminated as of June 30, 2022, despite a remaining term through April 30, 2023.

**ANSWER: Denied for lack of knowledge or information.**

157.    Short's did not vacate and continued remodeling through June.

**ANSWER: Denied for lack of knowledge or information.**

158.    Short's and Perez tendered payment for July 2022 rent. The July 2022 rent tender was rejected by the Trust.

**ANSWER: Denied for lack of knowledge or information.**

159.    Given    that    payment    of    rent    was    not    an    issue, MWO/Trust/Landlord/Mitchell/Mote and Wallace were motivated to remove Short's for some reason other than economics.

**ANSWER: Denied for lack of knowledge or information.**

**160.** MWO/Trust commenced FED #1 on July 15, 2022 seeking eviction of Short's due to abandonment.

**ANSWER: In answer to Paragraph 160, Answering Defendants state that the public record of the lawsuit speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said record.**

**161.** Given (i) the temporal proximity of Perez's assumption of managerial duties around April 18, 2022 and the commencement of Defendants' actions to remove Short's beginning April 20, 2022; (ii) Short's had fully paid rent; (iii) despite repeated requests by Short's, MWO/Trust never articulated a legitimate non-discriminatory reason for its acts to seek eviction of a paying tenant and refusing Short's reasonable offer to reopen when gas was returned, the only possible reason for seeking eviction and removal of Short's can be Perez's race and MWO/Trust/Wallace's demand to deal exclusively with the Caucasian partner in Short's, Ouverson.

**ANSWER: Paragraph 161 calls for a legal conclusion and no response is required. To the extent a response is required it is denied.**

**162.** FED #1 proceeded from July 15, 2022 to March 9, 2023.

**ANSWER: In answer to Paragraph 162, Answering Defendants state that the public record of the lawsuit speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said record.**

**163.** MWO & the Trust took actions in furtherance of Wallace's demand to exclusively work with Ouverson and Kaeding (Caucasians) over Perez (Hispanic).

**ANSWER: Denied for lack of knowledge or information.**

164.    Not only was there no legitimate, good faith, non-discriminatory business reason ever articulated by MWO/Trust/Wallace for their adverse eviction action against Short's and Perez, all of the litigation commenced by the Trust/MWO (FED #1, FED #2, and MWO's Civil Case) was dismissed voluntarily (FED #1 alleging Lease abandonment being voluntarily dismissed *with prejudice*) after forcing Short's and Perez to incur the legal costs and expenses of defense.

**ANSWER: In answer to Paragraph 164, Answering Defendants state that the public record of the lawsuit speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said record and further deny Paragraph 164 to the extent it calls for a legal conclusion and no response is required.**

165.    The focus of the Defendants ire on the Hispanic Perez is evident from Defendant Bird's text to Kaeding in October 2022 in which Ms. Bird asks Kaeding "Any news on Short's? Assume Kevin [Perez] won the battle?"

   **a.**  Ms. Bird did not write I assume Perez *and* Ouverson won the battle.

   **b.**  This statement demonstrates animus against Perez, not Ouverson. The statement demonstrates cooperation and intent to remove Perez from the space.

   **c.**  Perez is the only Hispanic involved and is being directly targeted for removal from the Iowa City Downtown through conspiracy among the ICDD Defendants, Craft Defendants, the City Defendants, the MWO Defendants, and Wallace.

**ANSWER: In answer to Paragraph 165, Answering Defendants state that the October 2022 text message speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said message.**

**166.**     One hour after MWO/Trust voluntarily dismissed FED #1 with prejudice, on Thursday March 9, 2023, counsel for the Trust delivered notice to Short's that Short's had failed to timely exercise its option to renew the Lease for the May 1, 2023 to April 30, 2026 term and declared that the Lease would terminate at the expiration of its term on April 30, 2023.

**ANSWER: In answer to Paragraph 166, Answering Defendants state that the March 9, 2023 notice speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said notice.**

**167.**     On Friday, March 10, 2023, Short's mailed its Reaffirmation of Renewal letter to MWO/Trust. On Monday March 13, 2023, at approximately 9:00 a.m. Short's paid all rent for July 2022 through March 2023 that was unpaid while FED #1 was pending and the Trust refusing to accept rent payments and hand-delivered a copy of the Reaffirmation of Renewal Letter to MWO/Trust.

**ANSWER: Denied for lack of knowledge or information.**

**168.**     Short's paid April 2023 rent.

**ANSWER: Denied for lack of knowledge or information.**

**169.**     Short's tendered payment of May 2023 rent. The May 2023 rent payment was accepted by a MWO teller, processed through the federal reserve system and cleared. The Trust/MWO attempted to return that rent payment by placing funds equaling the same amount into Short's account at MWO without notice or permission. The Trust did not have authority to transact business in Short's MWO bank account.

**ANSWER: Denied for lack of knowledge or information.**

**170.**     Short's has tendered payment of rent for every month since May 2023 and those

attempted payments have been refused by the Trust/MWO.

**ANSWER: Answering Defendants deny the allegations in Paragraph 170 for lack of knowledge.**

171.    The Trust commenced FED #3 in May 2023 asserting the Lease term had expired on April 30, 2023 due to failure to timely renew by January 30, 2023 despite pendency of FED #1 from July 15, 2022 to March 9, 2023.

**ANSWER: In answer to Paragraph 171, Answering Defendants state that the public record of the lawsuit speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said record.**

172.    There is no business reason for the FED #3 action – Short's has paid all rent and its tenders of additional rent have been refused.

**ANSWER: Denied for lack of knowledge or information.**

173.    Mitchell testified in FED #3 that the Trust has not been marketing any units in the Building nor seeking a new tenant.

**ANSWER: Denied for lack of knowledge or information.**

174.    No legitimate non-discriminatory reason for seeking to evict Short's (a paying tenant of 15 years) has ever been articulated by MWO/Trust/Mitchell/Mote/Wallace or their counsel.

**ANSWER: Denied for lack of knowledge or information.**

175.    Perez's Hispanic race and assumption of managerial responsibilities in April 2022 is the reason the MWO Defendants and Wallace have continued to seek eviction of Short's.

**ANSWER: Denied.**

**176.**    Since 2008, Short's has been a perfect tenant. Rent has always been paid or tendered timely or within grace periods and no notices of default had ever been issued to Short's. From 2016 to 2022 Ouverson was responsible for interactions with the landlord. Almost immediately after the Short's owners shifted front of the house responsibility from a white man (Ouverson) to a Hispanic man (Perez), the Trust, MWO, and Wallace commenced an all-out assault in an attempt to remove a Hispanic run business from the Premises.

**ANSWER: Denied for lack of knowledge or information.**

**177.**    Perez filed a complaint of discrimination with the Iowa Civil ights Commission on June 2, 2023 ("ICRC Complaint #1") alleging MWO/Trust/Wallace had engaged in discriminatory practices based on race in violation of the Iowa Civil Rights Act. Iowa Code Ch. 216.

**ANSWER: Answering Defendants admit Perez filed a civil right complaint. Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

**178.**    ICRC assigned ICRC Complaint #1 Complaint No. 06-23-80113.

**ANSWER: In answer to Paragraph 178, Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

**179.**    ICRC Complaint #1 alleges that the Trust, MWO, Mitchell, Mote, and Wallace violated Iowa Code § 216.7 by discriminating against Perez on the basis of his Hispanic race in the furnishing of accommodations, advantages, facilities, services or privileges.

**ANSWER: In answer to Paragraph 179, Answering Defendants state that the civil**

**rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

180.    The ICRC also investigated Complaint #1 under Iowa Code §216.8 (discrimination in real estate transactions).

**ANSWER: Denied for lack of knowledge or information.**

181.    ICRC Complaint #1 cited to the lack of landlord-tenant conflicts from 2008 to April 2022 while Ouverson (Caucasian) was managing the business and then the sudden spate of litigation and attempts to evict (despite Short's paying rent) only days after Perez (Hispanic) assumed managerial responsibility.

**ANSWER: In answer to Paragraph 181, Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

182.    ICRC Complaint #1 asserted that this temporal proximity and the lack of a legitimate non-discriminatory business reason demonstrated Perez's race was a motivating factor in the aggressiveness seeking eviction.

**ANSWER: In answer to Paragraph 182, Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

183.    ICRC Complaint #1 also asserted that the filing and prosecution of FED #1, FED #2, and MWO's Civil Case from July 2022 to March 2023, only for all three to be voluntarily dismissed, demonstrates harassment and animus towards Perez.

**ANSWER: In answer to Paragraph 183, Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside**

**the terms of said complaint.**

184.    Counsel for Perez provided counsel for MWO a courtesy copy of the ICRC Complaint #1 documents filed with the ICRC on or about June 2, 2023.

**ANSWER: Denied for lack of knowledge or information.**

185.    On June 19, 2023, before the ICRC had even processed ICRC Complaint #1 or delivered it to the respondents named therein, MWO filed an Answer and Counterclaims in Short's Civil case. The ICRC did not distribute ICRC Complaint #1 to the named respondents until after June 22, 2023. However, on June 19, 2023, MWO's Answer and Counterclaims in Short's Civil Case MWO alleged as follows:

a.    MWO specifically named Perez as a Third-Party Counterclaim Defendant and joined Perez personally in the litigation.

b.    MWO asserted a Counterclaim solely against Perez alleging that "the Civil Rights Complaint" [ICRC Complaint #1] was filed for the sole purpose of harassing the Trust, increasing litigation expenses, and/or pressuring the Trust into agreeing to dismiss the forcible entry and detainer action. [FED #3]".

c.    MWO alleged in the counterclaim against Perez that the filing of ICRC Complaint #1 with the Iowa Civil Rights Commission constituted abuse of process and Perez was personally liable for monetary damages related to responding to ICRC Complaint #1.

**ANSWER: In answer to Paragraph 185 and each of its subparts, Answering Defendants state that the public record of the lawsuit speaks for itself and deny any allegation or characterization outside the terms of said record.**

**186.**    Perez's filed an amendment to ICRC Complaint #1 with the ICRC on June 20, 2023 ("ICRC Complaint #1 Amendment") alleging unlawful retaliation.

> **ANSWER: Answering Defendants admit Perez filed an amendment to his civil right complaint. Answering Defendants state that the amendment speaks for itself and deny any allegation or characterization outside the terms of amendment.**

**187.**    The ICRC Complaint #1 Amendment alleges, in summary (quotes are from Perez's Complaint #1 Amendment):

> **a.**    "Respondent MWO's counterclaims assert Complainant Perez personally is liable for money damages to MWO based solely upon his filing of the Initial Complaint with the ICRC."

> **b.**    "MWO has sued Mr. Perez for monetary damages solely because he filed a complaint with the ICRC. There is no doubt such action constitutes unlawful retaliation under the ICRA."

> **c.**    Iowa Code § 216.11(2) provides:

>> It shall be an *unfair and discriminatory practice* for: . . . (2) any person *to discriminate or retaliate* against another person in any of the rights protected against discrimination by this chapter *because such person has lawfully opposed any practice forbidden under this chapter . . . or has filed a complaint . . .* under this chapter."

> **d.**    "Respondent MWO has directly sued Mr. Perez because he opposed its unlawful practices and filed a complaint under the ICRA. Respondent MWO's act of suing Mr. Perez for damages because he filed the Initial Complaint is as direct a violation of the ICRA retaliation prohibition as could possibly exist. Suing anyone for damages solely because that party filed a complaint with the ICRC is a blatant and direct violation of the ICRA."

**e.**    It can be put no more simply than it is illegal to sue someone who files a complaint with the ICRC based solely upon the complaint being filed. The filing of a complaint of discrimination with the ICRC is a statutorily protected act. Suing a complainant because they filed a complaint is prohibited. The case for retaliation against Respondent MWO is as clear-cut a violation of the ICRA as there can be.

**f.**    On July 1, 2024 the Trust doubled down on its retaliation described above and filed the same prohibited counterclaim in the litigation commenced by Perez upon receipt of his ICRC right-to-sue letters.

**g.**    The Trust failed to articulate a legitimate, non-discriminatory reason for filing another personal claim against Perez on July 1, 2024.

**ANSWER: In answer to Paragraph 187 and each of its subparts, Answering Defendants state that the amendment speaks for itself and deny any allegation or characterization outside the terms of amendment.**

Further Retaliation and Aiding and Abetting by the City – Short's Patio

**188.**    As plead above, from 2008 through 2022, Short's annually renewed its Sidewalk Café License Agreement.

**ANSWER: Denied for lack of knowledge or information.**

**189.**    Short's Sidewalk Café License Agreement renewal term ended on January 31, 2023.

**ANSWER: Denied for lack of knowledge or information.**

**190.**    On March 30, 2023, Short's delivered a renewal document (executed by Mote and notarized) to the City and tendered payment of required fees by check.

**ANSWER: Denied for lack of knowledge or information.**

**191.** A week after MWO consented by notarized signature, Wallace, the beneficiary of the Trust, texted Mitchell and MWO with specific instructions to retaliate against Short's and Perez contrary to the history of the landlord consenting to Short's sidewalk café over the prior 15 years of annual renewals. Defendant Wallace wrote to Mitchell:

> Thursday, Apr 6 • 4:54 PM
>
> Please make sure Kevin Mote DOES NOT sign anything for SHORT'S. NO PATIO DINING
>
> Thursday, Apr 6 • 6:03 PM
>
> Left him a voice mail

**ANSWER: In answer to Paragraph 191, Answering Defendants state that the April 6, 2023 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

**192.** Wallace's text to Mitchell states that Wallace and Mitchell were both aware on April 6, 2023 that landlord consent to Short's 2023 patio agreement was customary and that Mote either had consented or would consent to that agreement.

**ANSWER: In answer to Paragraph 192, Answering Defendants state that the April 6, 2023 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

**193.** Wallace demanded that Mitchell deprive Short's use of the patio solely based on her bias against the Hispanic Perez as the newly public face of the business.

**ANSWER: In answer to Paragraph 193, Answering Defendants state that the April 6, 2023 text message speaks for itself and deny any allegation or characterization**

**outside the terms of said message.**

194.     Mitchell responded he left a voicemail with Mote.

**ANSWER: In answer to Paragraph 194, Answering Defendants state that the April 6, 2023 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

195.     Mote had authority to execute the renewal on March 30, 2023 and did so with a notarized signature.

**ANSWER: Denied for lack of knowledge or information.**

196.     At some point after April 6, 2023, MWO, through Mitchell and Mote, at the direction of and urging of Wallace, contacted one or more of the City Defendants or other City employees seeking to revoke Mote's notarized March 30, 2023 signature consenting to the renewal.

**ANSWER: Denied for lack of knowledge or information.**

197.     No writing exists whereby MWO states to the City that the notarized consent granted by Mote on March 30, 2023 was revoked.

**ANSWER: Denied for lack of knowledge or information.**

198.     The City refused to sign the February 1, 2023 to January 31, 2024 Sidewalk Café License Renewal for Short's despite Short's compliance with all prerequisites for such signature.

**ANSWER: Denied for lack of knowledge or information.**

199.     The actions of Wallace/ Mitchell/Mote in seeking to revoke consent were in furtherance of the discrimination and retaliation against Perez.

**ANSWER: Denied.**

200.    Despite no renewal, Short's operated its patio attached to the façade of the Building during March, April, May, and June 2023. This operation was consistent with Iowa City Code § 10-3-3B. During this time, the City took no action against Short's for conducting such operations without a renewal executed by the City.

**ANSWER: Answering Defendants deny the allegations in Paragraph 200 for lack of knowledge and to the extent it calls for a legal conclusion and no response is required.**

201.    On June 2, 2023 ICRC Complaint #1 was filed and a courtesy copy provided to MWO's counsel.

**ANSWER: Answering Defendants admit a civil rights complaint was filed. Answering Defendants deny the remaining allegations in Paragraph 201 for lack of knowledge.**

202.    On June 19, 2023, MWO filed its Counterclaim against Perez described above.

**ANSWER: In answer to Paragraph 202, Answering Defendants state that the public record of the lawsuit speaks for itself and deny any allegation or characterization outside the terms of said record.**

203.    On June 30, 2023, Short's received a letter from the City demanding that Short's remove its patio attached to the façade or the City would remove it.

**ANSWER: In answer to Paragraph 203, Answering Defendants state that the June 30, 2023 letter speaks for itself and deny any allegation or characterization outside the terms of said letter.**

204.    The letter was written by Assistant City Attorney Dulek.

**ANSWER: Denied for lack of knowledge or information.**

**205.**    Open Records Act requests obtained by Short's reveal that the June 30, 2023 letter was the *only* instance where a demand for compliance with the City patio ordinance was made directly by the City Attorney's Office. All other compliance communications with patio owners were initiated by City staff and managerial employees.

**ANSWER: Denied for lack of knowledge or information.**

**206.**    Open Records Act requests obtained by Short's reveal that the June 30, 2023 letter was the *only* instance where a demand for compliance with the City patio ordinance did not include notice of a right to appeal.

**ANSWER: Denied for lack of knowledge or information.**

**207.**    This disparate treatment of Mr. Perez is indicative of the following:

> **a.**    Former Assistant City Attorney Mitchell communicating with Dulek, his successor in the City Attorney's Office, to assist in MWO's retaliation by confiscating the patio.

> **b.**    The decision to eschew traditional City protocol and instead enlist direct involvement by City law enforcement was an effort to escalate retaliation against Perez.

**ANSWER: Answering Defendants deny the allegations in Paragraph 207 and each of its subparts for lack of knowledge.**

**208.**    The June 30, 2023 City letter to Short's included a "cc:" to MWO's counsel.

**ANSWER: In answer to Paragraph 208, Answering Defendants state that the June 30, 2023 letter speaks for itself and deny any allegation or characterization outside the terms of said letter.**

**209.**    Prior to issuance of the City's June 30, 2023 letter, MWO communicated with

the City requesting that the City enforce its sidewalk café ordinance against Short's despite full knowledge by all relevant parties that a notarized consent agreement for that café had been provided the City.

**ANSWER: Denied for lack of knowledge or information.**

210.    Prompting the City to take adverse action against Short's was retaliation for Perez filing ICRC Complaint #1 only two weeks earlier.

**ANSWER: Denied for lack of knowledge or information.**

211.    Counsel for Short's, in writing, advised the City's Assistant City Attorney (Defendant Dulek) that (i) the City had taken no action against Short's patio from February 1 – June 30, 2023, (ii) the City was now taking action at the bidding of MWO, and (iii) MWO was retaliating against Short's and Perez for filing ICRC Complaint #1 and ICRC Complaint #1 Amendment by seeking the City assist in confiscating Short's property and damaging Short's business during the summer months.

**ANSWER: Denied for lack of knowledge or information.**

212.    Short's counsel advised the City in writing that the City was on notice that action to take Short's patio would be knowing and intentional aiding and abetting MWO's retaliation in violation of the Iowa Civil Rights Act.

**ANSWER: Denied for lack of knowledge or information.**

213.    Despite this knowledge, on or about July 25, 2023, the City ignored the warnings and intentionally dismantled Short's and Perez's small patio/deck, protruding into the public sidewalk right-of-way, including removing the iron fencing and its bolts attaching the fencing to the facade of the building, together with Short's furniture and floor of the patio and confiscated that property.

**ANSWER: Denied for lack of knowledge or information.**

214.    The removal left damage to the façade of the Building and open holes in the façade.

**ANSWER: Denied for lack of knowledge or information.**

215.    Perez filed a second complaint with the ICRC on August 3, 2023 ("ICRC Complaint #2")

**ANSWER: Answering Defendants admit Perez filed a civil right complaint. Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

216.    ICRC Complaint #2 was assigned ICRC Complaint No. 06-23-80434.

**ANSWER: In answer to Paragraph 216, Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

217.    ICRC Complaint #2 alleged that MWO as Trustee retaliated against Short's for filing ICRC Complaint #1 by (i) filing counterclaims in Short's Civil Action based solely upon Perez's exercise of his rights under the ICRA and (ii) seeking the City's enforcement of the Sidewalk Café Ordinance (which had not been enforced for five months).

**ANSWER: In answer to Paragraph 217, Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

218.    The temporal proximity between the June 2, 2023 ICRC Complaint #1 filing, the June 19, 2023 Counterclaim against Perez, and the June 30, 2023 letter from the City seeking removal of the patio (with a copy of such letter being provided to the same MWO

counsel who signed and filed the Counterclaim 11-days earlier) demonstrates causation and retaliatory motive.

**ANSWER: Paragraph 218 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

219.    ICRC Complaint #2 alleges (quotes are from Perez's ICRC Complaint #2):

**a.**    "The outdoor dining, ambiance and visuals are important to attracting business. MWO's alleged revocation of consent to the sidewalk café license (consent having been provided each of the prior 15 years) was an adverse action based on the same discriminatory motive as the filing of Fed #1, FED #2, Trust Civil Case and FED #3. ICRC Complaint #1 alleged that the supposed verbal "revocation" of consent, if it occurred, was racially and ethnically motivated."

**b.**    "Because the City would not sign the sidewalk café agreement due to an alleged verbal revocation of a written, notarized consent, Short's did not construct its usual dining area located outside in the street parking area. However, depending on weather, from February 1, 2023 to July 25, 2023 Short's continued to operate its two tables outside on a small deck attached to the front of the building and extending into the sidewalk."

**c.**    "Despite no sidewalk café license being in effect from February 1, 2023 to July 2023, and Short's operating its attached deck during this period, the City took no action asserting that Short's was operating in violation of the City's sidewalk café ordinance."

**d.**    On June 19, 2023, MWO filed its counterclaim in Short's Civil Case against Mr. Perez unjustifiably alleging abuse of process against Mr. Perez –

these allegations are subject of the ICRC Complaint #2 alleging retaliation. A mere 11 days after retaliating by filing such counterclaim, Mr. Perez and Short's received a letter, dated June 30, 2023 from City Defendant Dulek acting as Assistant City Attorney stating that the "chairs, tables, and fencing" comprising the attached deck "must be removed from the public sidewalk."

**e.**    Disturbingly, the June 30, 2023 letter includes the "copy w/ enc. to:" (i.e. "cc") included "Siobhan Briley," counsel for MWO.  There was no discernable basis for Defendant Briley to be cc'd on this letter, as its content is not relevant to Briley or her client (MWO/Trust). Briley was included on that communication in furtherance of Dulek's demonstration of her compliance with requests made of her by Defendant Briley and/or other MWO Defendants (e.g. Defendant Mitchell, former Assistant City Attorney) to aid and abet retaliation against Perez.

**f.**    When questioned in writing by Short's counsel about why Dulek included Briley on a communication that was only relevant to Perez, Dulek responded on July 10, 2023 that she had "never spoken to Siobhan Briley regarding this matter" and "I don't believe I have ever spoken to her.

**g.**    When questioned further in writing by Short's counsel regarding Dulek's parsing of language through use of the word "spoken" Dulek responded on July 17, 2023 "Siobhan Briley is listed as the attorney of record representing the owner in the pending eviction action against Short's, which is why I copied her in. My only communication with her **in this matter** was to provide her a copy of the letter."

**i.**    Open Record Act Requests obtained by Short's reveal that Dulek and Briley had communicated prior to 2023. Dulek's deliberate choice to use the word "spoken" was done to obfuscate the truth that the two lawyers know each other and have provably communicated in writing. Dulek then backpedaled on July 17 when she changed her answer to limit the scope of her July 10 claim from not ever communicating with Briley at all to only communicating with Briley once "in this matter."

**ii.**    Dulek had no legitimate reason to be aware of or follow the litigation and eviction pattern between MWO and Short's. The City is not a party to that litigation. Dulek was aware of the FED action because Briley and/or her client (MWO/Trust) enlisted Dulek in its scheme to retaliate against Perez using the eviction process unlawfully.

**iii.**    Dulek was by her own admission aware that MWO/Trust and Short's had counsel at the time she sent Perez the June 30, 2023 letter. Dulek contacted Perez directly despite knowing he was represented, yet did not contact the Trust/MWO directly. Multiple communications between Dulek and Defendant Mitchell exist demonstrating that Dulek routinely did favors for Mitchell and the Trust, yet Dulek chose to exclusively copy Briley on her June 30, 2023 communication.

**iv.**    Dulek copied Briley because Briley and/or Briley's client (MWO/Trust) requested Dulek's aid in their retaliation against Perez.

**h.**    By letter dated July 1, 2023, counsel for Short's "advised the Assistant City Attorney [Defendant Dulek] of MWO's retaliation against Mr. Perez" and

"advised the City of the existence of the discrimination allegation in [ICRC Complaint #1] and the retaliation allegations in the [ICRC Complaint #1 Amendment]. In that letter to the City Short's counsel emphasized and advised the City that 'the City is now on notice that Perez and Short's view the April/May 2023 alleged revocation of consent . . . to have been an act of discrimination based on race/national origin' [ICRC Complaint #1] and that communications by MWO/Briley to the City seeking to "nudge the City down the path reflected in the [June 30, 2023] letter" to remove Short's patio was an act by MWO/Briley in retaliation for the filing of [ICRC Complaint #1]."

**i.**      On July 1, 2023, Plaintiff's counsel further advised the City "of Iowa Code § 216.11(1) prohibiting any person from intentionally aiding and abetting another person to engage in prohibited unfair or discriminatory conduct." The City thereby was put on notice that its sudden interest in taking Short's and Mr. Perez's property was aiding and abetting retaliation by MWO/Briley against Mr. Perez for his filing of the Initial Complaint.

**ANSWER: In answer to Paragraph 219 and each of its subparts, Answering Defendants state that the civil rights complaint speaks for itself and deny any allegation or characterization outside the terms of said complaint.**

**220.**   After a series of letters and emails between Short's counsel and the City between July 1 and July 13, Short's/Perez's position was synthesized to 19 points and delivered to the City. These include:

**(i)**    The City's admission that at no time since adoption of the Sidewalk Café Ordinances has the City rejected or denied a notarized, signed sidewalk

café agreement for which fees were tendered – thus indicating that the City's rejection of Short's 2023 application was targeted at Mr. Perez,

**(ii)**    The City's knowledge of the ICRA claims pending before the ICRC, and (iii) the temporal proximity between the filing of ICRC Complaint #1 and the retaliation subject of [ICRC Complaint #2] and the City's June 30, 2023 letter.

**ANSWER: In answer to Paragraph 220 and each of its subparts, Answering Defendants state that the referenced communications speaks for themselves and deny any allegation or characterization outside the terms of said communications.**

221.    These 19 points concluded with Short's/Perez's counsel advising the City that any action taken to dismantle the deck and take Short's and Mr. Perez's property would be knowingly aiding and abetting Defendants' retaliation in violation of the Iowa Civil Rights Act.

**ANSWER: In answer to Paragraph 221, Answering Defendants state that the referenced communications speaks for themselves and deny any allegation or characterization outside the terms of said communications.**

222.    Perez requested that the ICRC issue "right-to-sue" letters as ICRC Complaint #1, ICRC Complaint #1 Amendment and ICRC Complaint #2.

**ANSWER: Denied for lack of knowledge or information.**

223.    The ICRC issued right-to-sue letters for ICRC Case No. 06-23-80113 and Case No. 06- 23-80434 on December 7, 2023.

**ANSWER: Denied for lack of knowledge or information.**

224.    On February 21, 2024, Perez and Short's filed a Petition in the Iowa District Court alleging (i) violations of the Iowa Civil Rights Act (discrimination, retaliation, aiding

& abetting) against the Trust, MWO, Mitchell, Mote, Wallace and the City and (ii) violations of the due process, takings, and equal protection clauses of the Iowa Constitution by the City's confiscation of Short's patio. *Perez et al v. MWO et al.* (Johnson County Case No. CVCV085088) ("ICRA Case").

**ANSWER: In answer to Paragraph 224, Answering Defendants state that the public record of the lawsuit speaks for itself and deny any allegation or characterization outside the terms of said record.**

225.    The ICRA Case is pending. All motions to dismiss were denied and the defendants filed answers in late June 2024.

**ANSWER: In answer to Paragraph 225, Answering Defendants state that the public record of the lawsuit speaks for itself and deny any allegation or characterization outside the terms of said record.**

226.    H.D. Short was born in the 1870s as the son of recently freed slaves in Missouri who had remained on their former master's land as sharecroppers.

**ANSWER: Denied for lack of knowledge or information.**

227.    In the mid-1890's H.D. Short moved to Iowa City and began work with a shoeshine box.

**ANSWER: Denied for lack of knowledge or information.**

228.    In approximately 1925, H.D. Short, the son of former slaves, purchased the Building.

**ANSWER: Denied for lack of knowledge or information.**

229.    The University of Iowa admitted African-American student beginning in the 1870s. The University of Iowa constructed its dormitories in the 1910s. Until 1946, African-

American students were not allowed to occupy the dorms.

**ANSWER: Denied for lack of knowledge or information.**

230.    During the time at which the University of Iowa admitted African-American students, but prohibited those students from living in the newly constructed dorms, H.D. Short provided housing to African-American students in the upper floors of the Building and provided those students, and other African-American student living elsewhere in the City, jobs in his shop.

**ANSWER: Denied for lack of knowledge or information.**

231.    During World War II, H.D. Short was contracted by the United States to repair and refurbish combat boots for the war effort.

**ANSWER: Denied for lack of knowledge or information.**

232.    Professor Phillip Hubbard was a distinguished University of Iowa professor, Dean and Vice President, and in 1971 became the first African-American Vice President at a Big Ten University. In his 1996 book "New Dawn: A 150-year look at Human Rights at The University of Iowa," Professor Hubbard recognized and lauded H.D. Short as a role model for the African- American community in Iowa City before, during and after segregation.

**ANSWER: Denied for lack of knowledge or information.**

233.    Haywood Belle was the grandson of H.D. Short and died in 2016.

**ANSWER: Admitted.**

234.    From 1925 to 2016, the Building was owned by the son of freed slaves, his sons, and his grandson.

**ANSWER: Denied for lack of knowledge or information.**

235.    The Building became the foundation for H.D. Short, his sons and grandson to

expand their real estate holdings in Iowa City, including acquisition of the Pullman Building.

**ANSWER: Denied for lack of knowledge or information.**

236.    With the passing of Haywood Belle in 2016, ownership of the Building was transferred to MWO as trustee of the Trust.

**ANSWER: Admitted.**

237.    The Building and the story of H.D. Short is of historic importance to the City of Iowa City and the State of Iowa.

**ANSWER: Denied for lack of knowledge or information.**

238.    The State of Iowa certified the City of Iowa City as a "certified local government" ("CLG") satisfying the qualifications and criteria set forth by the State and the US Department of the Interior ("DOI") under the 1966 National Historic Preservation Act (54 U.S.C. §300101 *et seq*.)("NHPA") in 1987.

**ANSWER: In answer to Paragraph 238, Answering Defendants state that the the City of Iowa City's certifications speak for themselves and deny any allegation or characterization outside the terms of said certifications.**

239.    In 1987, the City entered a Certified Local Government Agreement with the State of Iowa attached hereto as Exhibit D ("CLG Agreement") and incorporated herein by this reference.

**ANSWER: In answer to Paragraph 239, Answering Defendants state that the CLG Agreement speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

240.    The CLG Agreement requires the City to "enforce all appropriate state and local ordinances for designating and protecting historic properties."

**ANSWER: In answer to Paragraph 240, Answering Defendants state that the CLG Agreement speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

241.     The CLG Agreement requires that the City "not unlawfully discriminate on the basis of sex, race, color, and/or national origin *in any of its activities* in implementing its programs."

**ANSWER: In answer to Paragraph 241, Answering Defendants state that the CLG Agreement speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

242.     The CLG Agreement requires that the City "provide for adequate public participation in the local historic preservation programs, including the process for recommending properties for nomination to the National Register of Historic Places." This obligation is to be "accomplished in a format issued by the State in its program guidelines."

**ANSWER: In answer to Paragraph 242, Answering Defendants state that the CLG Agreement speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

243.     The NHPA, DOI regulations, State of Iowa, and the CLG Agreement require that the  City maintain a system for the survey and inventory of historic properties.

**ANSWER: Paragraph 243 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

The City's Inconsistent Description of the Building in Representations to the State and DOI

244.     The "Tate Arms Building" and the Iowa Federation Home for Colored Girls ("Iowa Federation Home") provided housing for African-American students at the University

at the time African-Americans were prohibited from living in the dorms. At the time of these buildings' historic importance, the buildings were owned by African-Americans.

**ANSWER: Denied for lack of knowledge or information.**

245.    In 2018, the City, as CLG, recommended the Tate Arms and the Iowa Federation Home for listing on the National Register of Historic Places ("NRHP"). The nominations were accepted and the two buildings were listed in 2020.

**ANSWER: Denied for lack of knowledge or information.**

246.    At the time of the nominations, the buildings were owned by Caucasians.

**ANSWER: Denied for lack of knowledge or information.**

247.    Because of the listings on the NRHP, federal and state grants and loans became available to the owners.

**ANSWER: Denied for lack of knowledge or information.**

248.    In the 2018 application for the Tate Arms and Iowa Federation Home, the City's application noted its consideration of the Building once owned by H.D. Short for nomination for its contribution to African-American history in Iowa City, but the City did not include the Building ostensibly due to modifications made to the façade in the 1970s-1980s. The City overlooked comparable modifications made to the exterior Tate Arms Building in its nomination.

**ANSWER: Denied for lack of knowledge or information.**

249.    The 2018 Tate Arms and Federation Home nomination materials prepared by the City applied different standards to the Caucasian owned buildings than the African-American owned and Hispanic operated H.D. Short Building.

**ANSWER: Denied for lack of knowledge or information.**

**250.**    In the 2021 City application for the listing of the "Iowa City Downtown District" on the National Register, the City did not downgrade the Building as done in 2018 but rather the City identified the Building as a "key contributing resource" by local historic standards.

**ANSWER: Denied for lack of knowledge or information.**

**251.**    Both the 2018 and 2021 applications relied upon the same survey data.

**ANSWER: Denied for lack of knowledge or information.**

**252.**    In 2018, the City identified the Tate Arms and Iowa Federation Home as the only viable options for African-American historic buildings in Iowa City and excluded the Building ostensibly because of its exterior modifications.

**ANSWER: Denied for lack of knowledge or information.**

**253.**    Exterior design is not a requirement for listing on the NRHP when a building otherwise has historic local or national importance.

**ANSWER: Denied for lack of knowledge or information.**

**254.**    The City supported the successful application for the listing of MWO's headquarters on the NRHP despite significant modifications to building over time, including the relatively recent addition of floors.

**ANSWER: Denied for lack of knowledge or information.**

**255.**    City Defendant Boyd, then chair of the Iowa City Historic Preservation Commission ("ICHPC"), knew the 2018 application denigrating the importance of the Building was a false representation yet approved the application.

**ANSWER: Denied for lack of knowledge or information.**

**256.**    City Defendant Boyd was in charge in the 2021 application for NRHP listing

of the Iowa City Downtown Historic District that included the Building as a key contributing resource.

**ANSWER: Denied for lack of knowledge or information.**

257.    The City's historic preservation plan, adopted in 2008, states that the City will pursue local land-marking status for all properties listed on the NRHP.

**ANSWER: Denied for lack of knowledge or information.**

258.    In 2021, The City sought, and received NRHP designation for the Iowa City Downtown Historic District including classification of the Building as a "key contributing resource" in that district.

**ANSWER: Denied for lack of knowledge or information.**

259.    The City has not pursued local land-marking status for the Building.

**ANSWER: Denied for lack of knowledge or information.**

260.    Defendant Boyd was directly involved with and responsible for the 2018 and 2021 applications plead above.

**ANSWER: Denied for lack of knowledge or information.**

261.    Defendant Boyd was responsible for the implementation of the historic preservation plan while he was serving as the chair of the ICHPC.

**ANSWER: Denied for lack of knowledge or information.**

262.    Defendant Boyd failed to seek local landmarking of the buildings within the Iowa City Downtown Historic District.

**ANSWER: Denied for lack of knowledge or information.**

263.    Defendant Boyd described the NRHP listing of the Iowa City Downtown District to the press as "honorific" and stated to the press that it is his opinion that local

landmarking is required to prevent demolition of the historic buildings in the district.

> **ANSWER: In answer to Paragraph 263, Answering Defendants state that Defendant Boyd's statements to the press speak for themselves and deny any allegation or characterization outside the terms of said statements.**

264.    Defendant Boyd designed the historic district application process, including its boundaries, for purposes of feigning interest in historic preservation, quelling local demands for preservation, while at the same time working with the other Defendants to redevelop the Iowa City Downtown and redistribute the Iowa City Downtown assets to members of the enterprise, their affiliates and confederates to the exclusion of others as plead below.

> **ANSWER: Denied for lack of knowledge or information.**

265.    Because the Trust advised Short's and others that it lacked cash for funding repairs to the Building, Short's, Perez and counsel, looked for sources of funding availability.

> **ANSWER: Denied for lack of knowledge or information.**

266.    In 2023, Short's counsel advised the City, MWO, the Trust, and Wallace of the availability of federal and state funds to refurbish and repair buildings of historic importance to African-Americans.

> **ANSWER: Denied for lack of knowledge or information.**

267.    The City, MWO, the Trust, and Wallace never responded to Short's, Perez, or counsel about the funding.

> **ANSWER: Denied for lack of knowledge or information.**

268.    The City, MWO, the Trust and Wallace failed to apply for those available funds.

> **ANSWER: Denied for lack of knowledge or information.**

**269.** On a monthly basis beginning in August 2023 to present, Short's and Perez, through counsel, have requested to be placed on the agenda of the Iowa City Historic Preservation Commission ("ICHPC") to provide a presentation on the Building and its historic importance.

**ANSWER: Denied for lack of knowledge or information.**

**270.** Perez and Short's have requested that the ICHPC and the City's Historic Preservation Planner assist in preparing the necessary applications for listing the Building on the NRHP and for local land-marking of the Building.

**ANSWER: Denied for lack of knowledge or information.**

**271.** The City has refused to allow Perez and Short's to present at the ICHPC meetings because Short's and Perez had filed Writs of Certiorari against the City in State Court demanding (i) the City apply its "demolition-by-neglect" ordinance to force the owners of the Building to make required repairs and (ii) the City proceed through the historic review process for modifications to a historic building prior to the City physically removing Short's patio and damaging the façade of the building.

**ANSWER: Denied for lack of knowledge or information.**

**272.** The "Slezak Building" is located on the corner of Bloomington and Linn Streets in Iowa City and is in the Iowa City Downtown. The Slezak Building has housed Pagliai's Pizza for decades. The Slezak Building has "Bohemian roots" from 1870s immigration from what is now the Czech Republic.

**ANSWER: In answer to Paragraph 272, Answering Defendants admit the Slezak Building is located on the corner of Bloomington and Linn Streets in downtown Iowa City and houses Pagliai's Pizza. Answering Defendants deny the remaining**

**allegations in Paragraph 272 for lack of knowledge.**

273.    The current Slezak Building owner (a decedent of the original owners) placed the building for sale in 2023. Some parties interested in the purchase allegedly intended to raze the land and begin new commercial or residential development.

**ANSWER: Denied for lack of knowledge or information.**

274.    Against the owner's wishes, the ICHPC declared the Slezak Building a local historic landmark in 2024. The City prepared all the necessary documents, held hearings, heard the owners objections, but proceeded with the designation.

**ANSWER: Denied for lack of knowledge or information.**

275.    Defendant Bristow publicly stated that the Slezak Building and its Caucasian owners would be entitled to multiple significant financial benefits once the Slezak Building received local landmark status.

**ANSWER: Denied for lack of knowledge or information.**

276.    Defendant Bristow will not communicate with Perez, will not consider landmarking the African-American owned Building and will not offer the above referenced benefits to the minority- owned Building. This has directly deprived Perez participation in a program, historic preservation, directly funded by the federal government. Further, Bristow's refusal is in direct contravention of the Iowa City Historic Preservation Plan (which is incorporated in the City's Comprehensive Plan). Compliance with the Plan, and its equal participation and citizen participation requirements, is necessary to maintain certified local government status.

**ANSWER: Denied for lack of knowledge or information.**

277.    Short's and Perez requested that the City follow similar procedures for

declaring the Building a local historic landmark and assistance in seeking listing of the Building on the NRHP.

**ANSWER: Denied for lack of knowledge or information.**

278.    The City refused Short's and Perez's requests.

**ANSWER: Denied for lack of knowledge or information.**

279.    Perez's requests remain unheard after nearly twelve months yet the City declared landmarking of the Slezak Building an emergency.

**ANSWER: Denied for lack of knowledge or information.**

280.    At all times relevant, the City and Bristow have been aware that the Building is being demolished by neglect and is in disrepair.

**ANSWER: Denied for lack of knowledge or information.**

281.    The City and Bristow will not seek to protect an African-American owned historic commercial building nor offer it the same benefits afforded to Caucasian-owned commercial historic buildings.

**ANSWER: Denied for lack of knowledge or information.**

282.    The Slezak Building is not on the NRHP. The Iowa City historic preservation plan makes it clear that buildings on the NRHP are to receive priority attention in matters of local landmarking. The only reason the City will not adhere to its own plan and its CLG contract with the State of Iowa is due to racial bias against the African-American legacy and ownership of the Building and its current Hispanic tenant.

**ANSWER: Denied for lack of knowledge or information.**

<u>Failure to Enforce Ordinances Against the Building Owners</u>

283.    Short's has repeatedly advised the Landlord of water leaking into the Premises

from a source above the Premises (e.g. second floor plumbing or leaks in the roof).

**ANSWER: Denied for lack of knowledge or information.**

284.    Despite this notice, water has continued to enter the Premises from above.

**ANSWER: Denied for lack of knowledge or information.**

285.    In June and July 2023, Short's requested that the City inspect the Building (18-20 S. Clinton) for compliance with Iowa City Code (ICC) 14-3B-7 – Demolition by Neglect.

**ANSWER: Denied for lack of knowledge or information.**

286.    On August 2, 2023, three City inspectors examined the building and found 12-18 inches of standing water in the basement.

**ANSWER: Denied for lack of knowledge or information.**

287.    The City has taken no action to force the Landlord/Trust to repair the leaking building.

**ANSWER: Denied for lack of knowledge or information.**

288.    The City inspectors' August 2023 report stated that the Trust, represented by Defendant Mitchell at the inspection, indicated repairs would commence within a month. As of December 15, 2023, no repairs to the roof had been commenced.

**ANSWER: Denied for lack of knowledge or information.**

289.    Despite repeated requests for the City to enforce its demolition-by-neglect ordinance, no action has been taken by the City against the Trust as owner of the Building for failure to make the required repairs to comply with the standards of ICC 14-3B-7 and its incorporation of residential standards requiring historic buildings to be maintained in a weathertight and watertight condition.

**ANSWER: Denied for lack of knowledge or information.**

290. The City is required to submit an annual application for re-certification as a CLG under the NHPA to the State Historic Preservation Office ("SHPO").

**ANSWER: Denied for lack of knowledge or information.**

291. By letter of May 6, 2024 the SHPO found the City to be inadequately performing as an CLG and suspended the City's eligibility for a portion of the State's annual Historic Preservation Fund Award (CLG Pass-Through Grant).

**ANSWER: In answer to Paragraph 291, Answering Defendants state that the May 6, 2024 letter speaks for itself and deny any allegation or characterization outside the terms of said letter.**

292. A true and correct copy of the State's letter suspending the City's CLG status is attached hereto as Exhibit E.

**ANSWER: In answer to Paragraph 292, Answering Defendants admit the May 6, 2024 letter was attached to the Complaint as Exhibit E. Answering Defendants state that the May 6, 2024 letter speaks for itself and deny any allegation or characterization outside the terms of said letter.**

293. Following the murder of George Floyd, the City of Iowa City, with the urging and effort of Defendant Bergus as City Council member, created the Iowa City Ad Hoc Truth and Reconciliation Commission ("ICTRC") and funded the organization with more than $1 million.

**ANSWER: Denied for lack of knowledge or information.**

294. The purpose of the ICTRC, the brain-child of Defendant Bergus, was "to bear witness to the truth of racial injustice in Iowa City and to carry out restorative justice, through

the collection of testimony and public hearings."

**ANSWER: Answering Defendants admit that quoted language in Paragraph 294 is taken from the ICTRC website. Answering Defendants deny the remaining allegations in Paragraph 294 for lack of knowledge.**

295.    Perez and Short's, on a monthly basis beginning in October 2023, requested time on the ICTRC agenda to (i) inform the ICTRC of the importance of the Building to African-American history in Iowa City, (ii) inform the ICTRC of the City's failure to seek available federal and state grants to preserve the Building, and (iii) inform the ICTRC of the City's participation, aiding and abetting of MWO's discrimination against Perez as claimed below.

**ANSWER: Denied for lack of knowledge or information.**

296.    The City refused to allow Perez and Short's to present to the ICTRC other than in public comment (3 minute presentation limit and no discussion with the commission members allowed).

**ANSWER: Denied for lack of knowledge or information.**

297.    The Iowa City Downtown District is a "Self-Supported Municipal Improvement District" encompassing the Iowa City Downtown area.

**ANSWER: Denied for lack of knowledge or information.**

298.    East Washington Defendant Hayek was a member of the Iowa City City Council from 2008 through 2015 and served as mayor of Iowa City from 2010 through 2015.

**ANSWER: Admitted.**

299.    Defendant Hayek was instrumental in the re-establishment of the SSMID in 2012.

**ANSWER: Denied for lack of knowledge or information.**

**300.**    Defendant Hayek, as mayor and City Councilman, was directly involved in recruiting and hiring ICDD Defendant Bird as the director of the ICDD in 2012.

**ANSWER: Denied for lack of knowledge or information.**

**301.**    Both Hayek and Bird served in the Peace Corps contemporaneously in 1993-1994.

**ANSWER: Denied for lack of knowledge or information.**

**302.**    The ICDD claims that its purpose is to provide "a leadership directive that advocates for the Districts mission and serves as a mechanism to more efficiently implement District-wide marketing, programs, events, and projects that support vitality for the benefit of the businesses within it, the University of Iowa, community members and the region at large."

**ANSWER: Answering Defendant admit Paragraph 302 quotes language relating to mission of the ICDD. Answering Defendants deny the remaining allegations in Paragraph 302.**

**303.**    The ICDD acts as a private arm of the City.

**ANSWER: Denied.**

**304.**    The ICDD recruits businesses to the Iowa City Downtown.

**ANSWER: Denied.**

**305.**    The ICDD serves as a gatekeeper for entry into the Iowa City Downtown market.

**ANSWER: Denied.**

**306.**    The ICDD is advised of potential retail space openings prior to that availability being publically advertised or announced.

**ANSWER: Denied for lack of knowledge or information.**

307.    When Short's temporarily closed on April 18, 2022, Perez placed a sign on the window advising of its closure.

**ANSWER: Denied for lack of knowledge or information.**

308.    Defendant Bird saw the sign and contacted Perez by email inquiring as to Short's needs or problems.

**ANSWER: Denied for lack of knowledge or information.**

309.    At the same time, Defendant Bird was in contact with Defendant Kaeding, former employee of the ICDD, regarding the Craft Defendants' interest in the Premises.

**ANSWER: In answer to Paragraph 309, Answering Defendants state that Defendant Bird's email to Defendant Kaeding speaks for itself and deny any allegation or characterization outside the terms of said email.**

310.    Despite Short's having a current and valid Lease in April 2022, Defendant Bird emailed Defendant Kaeding indicating that the ICDD had been contacted by a business that would be interested in replacing Short's as a tenant but that Bird and ICDD would direct that contact to look elsewhere for space if Kaeding and the Craft Defendants were interested in pursuing the space.

**ANSWER: In answer to Paragraph 310, Answering Defendants state that Defendant Bird's email to Defendant Kaeding speaks for itself and deny any allegation or characterization outside the terms of said email.**

311.    The ICDD Defendants were directly involved in preparing and submitting the application for the listing of the Iowa City Downtown Historic District on the NRHP.

**ANSWER: Denied for lack of knowledge or information.**

312. The purpose of the City's promotion and execution of listing of the Iowa City Downtown District on the NRHP was to expose residential properties within the district to an additional tax under Iowa Code Ch. 368.

**ANSWER: Denied for lack of knowledge or information.**

313. The Iowa Code Ch. 368 taxes are directed by the City to the ICDD as a SSMID.

**ANSWER: Denied for lack of knowledge or information.**

314. Increases in taxes under Iowa Code Ch. 368 were not disclosed to the citizens of Iowa City when support for the SSMID was being solicited by the City, City Defendants, or ICDD Defendants.

**ANSWER: Denied for lack of knowledge or information.**

315. The listing of the Iowa City Downtown Historic District on the NRHP did little to provide historic preservation and protection and served only to increase SSMID tax revenue for the ICCD Defendants.

**ANSWER: Denied for lack of knowledge or information.**

316. The anti-trust and RICO claims plead below are based upon a number of enterprises organized into a larger enterprise designed to control commercial leases and real property ownership in the Iowa City Downtown.

**ANSWER: Paragraph 316 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

317. This larger enterprise comprised of the Defendants and others operates through a series of interlocking relationships, including the following:

     a. East Washington Defendant Hayek served as councilman and mayor of the City from 2008 through 2016.

**b.** East Washington Defendant Bergus has served on the City Council since 2020.

**c.** East Washington Defendant Hayek and ICDD Defendant Bird served in the Peace Corp during the same time.

**d.** East Washington Defendant Hayek as mayor oversaw the creation of the ICDD  SSMID and recruited ICDD Defendant Bird as the first director.

**e.** East Washington Defendant Hayek promoted City Defendant Fruin and urged Fruin's hiring as City Manager.

**f.** City Defendant Fruin served on the ICDD Board when ICDD Defendant Bird was director of the ICDD.

**g.** The ICDD is funded with SSMID tax revenue and operates as a private arm of the City.

**h.** The East Washington Defendants serve as a clearinghouse of information among the enterprise as owner of the building at the center of the Washington Street side of the Block and as counsel to MWO and other members of the enterprise.

**i.** MWO's General Counsel departed in 2024 and MWO relied upon East Washington Defendant Moreland as temporary general counsel. Defendant Moreland appeared for MWO for less than 60 days in the Short's Civil Case.  During that time, Moreland solicited a global settlement offer from Short's as to all claims against MWO, the Trust, and the City. A settlement offer was provided to Moreland which included a complete description of all of the Plaintiffs' claims plead herein as well as the claims pending in

related litigation.  Plaintiffs supplied a long memorandum (similar to a pre-mediation brief) with a global proposal.

**j.**  After receiving the information, Moreland never responded to the offer and promptly withdrew from representation.  Moreland acted on behalf of the enterprise to gain information from Plaintiffs under false pretenses of interest in a settlement.

**k.**  East Washington Defendant Hayek is a member of Defendant MWO's Board of Directors.

**l.**  Craft Defendant Kaeding is a member of Defendant MWO's Board of Directors.

**m.**  MWO Defendant Mitchell is a former Assistant City Attorney.

**n.**  While a City attorney, Mitchell provided legal support to the City department responsible for building inspections.  As counsel for that department, Mitchell had a working relationship with the current head of inspection, Hennes.

**o.**  Hennes rarely does inspections, but was assigned to and conducted the inspections of the Building in August 2023 and April 2024.

**p.**  Despite observing 12-18 inches of standing-water in the basement and signs of water stains and infiltration on the walls of the Premises provided a "pass" for the Building owned by the Trust, with Mitchell acting as trust officer.

**q.**  Upon Defendant Mitchell's departure from the City, Mitchell was replaced by City Defendant Dulek.

**r.** City Defendant Dulek and MWO Defendant Winkleblack served as directors and senior officers of the Iowa City Foreign Relations Council (ICFRC) and met and communicated regularly for over a decade.

**s.** The ICFRC was founded by Dick Summerwill, former MWO CEO, and Defendant Winkleblack is Summerwill's self-declared professional and civic protégé.

**t.** The Craft Defendants, in different ownership iterations, own and control all of the Craft affiliated and confederated entities plead above as well as other enterprises.

**u.** The individual establishments within the Craft Concepts "collection of restaurants and breweries" coordinate and communicate in an effort to obtain dominance, monopoly and control of the Iowa City Downtown through their affiliation with Craft Concepts.

**v.** The PHP Defendants serve as a clearinghouse of information among the enterprise through their representation and service as registered agent. This representation and agency includes services provided to MWO, the Trust, Wallace and Kaeding owned businesses.

**w.** Wallace, sole beneficiary of the Trust, is consulted and provides advice to MWO as Trustee in the administration of the Trust.

**x.** Wallace communicates regularly with Craft Defendant Kaeding and MWO Defendant Mitchell.

**y.** Boyd (City Defendant) and Mr. Kevin Monson (MWO Board Chair) were direct and active participants and influenced the listing of the Iowa City

Historic District on the NRHP.

**z.** Boyd (City Defendant) and Kaeding (MWO Defendant and Craft Defendant) were direct and active participants and influenced the listing of the Iowa City Historic District on the NRHP.

**aa.** Boyd (City Defendant) and Bird (ICDD Defendant) were direct and active participants and influenced the listing of the Iowa City Historic District on the NRHP.

**bb.** Hayek (East Washington Defendant and MWO Defendant) is a member of the MWO "Trust Committee" responsible for supervision of MWO's Trust Department.

**cc.** Bristow (City Defendant), Bird (ICDD Defendant), Boyd (City Defendant), Monson (MWO Board Chair), and Kaeding (MWO Defendant and Craft Defendant) worked in concert to obtain the listing of the Iowa City Downtown Historic District on the NRHP.

**dd.** The listing on the NRHP provided no benefit other than to increase the SSMID's revenue from taxation of residential properties within the listed district. These revenues are used by the ICDD to advance the interests of the enterprise.

**ee.** Bristow (City Defendant) is a former employee of Neuman Monson (formerly owned by Monson (MWO Board Chair) and worked closely with Monson on the NRHP listing project.

**ff.** Monson's business interests, including business in which he owns a 50% interest, include several buildings within the Iowa City Downtown.

gg. In 2023, Short's and Perez began requesting public records regarding the decade long relationship between Bird and the City Defendants. The City stated for months that there were no such records.

hh. After multiple requests and a complaint to the Iowa Public Information Board, the City subsequently stated the cost of reproducing all of the Bird-City communications would be more than $100,000 and require a full-time employee over a year to review all the documents.

ii. Defendant Bird, aware of the problem of voluminous responsive documents as to her interactions and relationship with the City Defendants, publicly requested on the record of a City Council meeting in late 2023 to place Assistant City Manager Rachel Kilburg-Varley (Defendant Fruin's direct subordinate) directly into GIC's offices for a minimum of one-day a week. The purpose of seeking a City employee to be in-person in GIC's offices was to obscure the enterprise relationship between Bird and the City and allow communications to be conducted personally and without need of documentation or the creation of records subject to the Iowa Open Records Act.

**ANSWER: Answering Defendants deny the individuals and relationships alleged in Paragraph 317 and its subparts comprise an enterprise.**

318.    The City Attorney's Office, and the named individual City Defendants within that office, act as "consiglieri" to the enterprise for purposes of (i) providing legitimacy and City backing to the enterprises activities and (ii) to hide evidence and communications behind the veil of an over-expansive and legally unjustifiable view of the attorney-client privilege

espoused by the City Defendants within the City Attorney's Office.

**ANSWER: Denied.**

319.   Approval of the listing of the Iowa City Historic Downtown District was fraudulently obtained from the citizens of Iowa City.

  a.  No disclosure of the increase in SSMID tax on residential properties occurred in soliciting citizen support.

  b.  The solicitation emphasized the "honorific" nature of the listing. MWO Chair Monson testified in deposition that he thought the listing would provide protection of the downtown buildings from demolition. The City Defendants have testified that the listing provides no protection from demolition. The listing was sold to the citizens of Iowa City as being good for historic preservation, without disclosure of the increase in taxes and knowing the City would take the legal position that the NRHP listing provided no actual protection for the historic buildings in the district.

  c.  The increased SSMID revenue from the listing the downtown district on the NRHP was used to promote the goals of the enterprise.

**ANSWER: Paragraph 319 and its subparts calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

## CLAIMS 1-10

**ANSWER: Paragraph 320-659 contain claims dismissed pursuant to the Court's Order RE: Motions to Dismiss (Doc. 139) to which no response is required. To the extent a response is required, the claims are denied.**

## CLAIM 11

**UNLAWFUL INTERCEPTION OF ELECTRONIC COMMUNICATIONS –
IOWA CODE CH. 808B
(Short's & Perez v. Craft Defendants)**

**660.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**ANSWER: Answering Defendants incorporate their responses to all allegations in this Complaint by this reference as if fully set forth herein.**

**661.** Iowa Code § 808B.2(a), (c), & (d) declares to be unlawful the following: (i) willfully intercepting, endeavoring to intercept, or procuring another person to intercept or endeavor to intercept a wire, oral, or electronic communication the interception; (ii) willfully disclosing, or endeavoring to disclose, to any other person the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication; and (iii) willfully using, or endeavoring to use, the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication.

**ANSWER: Paragraph 661 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

**662.** Iowa Code § 808B.8(1)(a) provides that "a person whose wire, oral or electronic communication is intercepted, disclosed or used in violation of Chapter 808B has a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use such communications."

**ANSWER: Paragraph 662 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

**663.** Iowa Code § 808B.8(1)(b) provides for recovery of "(1) actual damages, but not

less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation, or one thousand dollars, whichever is higher; (2) punitive damages upon a finding of a willful malicious, or reckless violation of Chapter 808B; and (3) a reasonable attorney fee and other litigation costs reasonably incurred."

**ANSWER: Paragraph 663 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

664. Kaeding held an ownership interest in Short's from 2008 to 2012. Kaeding had a consulting agreement with Short's from 2012-2016.

**ANSWER: Admitted.**

665. During Kaeding's ownership or consulting periods, Short's created a "Google Business" account.

**ANSWER: Admitted that Short's maintained a Google Business account, but denied for lack of information as to its date of creation.**

666. During Kaeding's ownership or consulting periods, Short's created a "Facebook" business account.

**ANSWER: Admitted that Short's maintained a Facebook page, but denied for lack of information as to its date of creation.**

667. Short's Google Business and Facebook accounts provide means for customers use electronic communications to comment and voice customer service concerns with these concerns and comments forwarded to the account owner by email.

**ANSWER: Denied for lack of knowledge or information.**

668. Short's Google Business and Facebook accounts also provide means for solicitation of Short's business or offers for new locations or business opportunities to be

transmitted by electronic communication to the account owner by email.

**ANSWER: Denied for lack of knowledge or information.**

**669.**    During Kaeding's period of ownership of Short's or consulting for Short's Kaeding set Short's Google Business and Facebook accounts to send notification emails to a personal email address controlled by Kaeding.

**ANSWER: Admitted that Short's set its account notification settings to ssend automated notices to Kaeding, but the balance of allegations are denied.**

**670.**    When Kaeding's consulting for Short's ended, Kaeding did not change the Google Business and Facebook notification email address.

**ANSWER: Admitted that Kaeding did not alter Short's Google Business and Facebook settings after Kaeding's consulting for Short's ended.**

**671.**    From 2016 to 2023, Kaeding received all of the email communications from Google Business and Facebook intended for Short's.

**ANSWER: Denied.**

**672.**    Kaeding's interception of these emails damaged Short's including by denying Short's potential business opportunities including information about potential locations or expansion opportunities and by harming Short's customer relations with customer complaints going unanswered.

**ANSWER: Denied.**

**673.**    Kaeding on behalf of, and working with, the other Craft Defendants used the information, intended for Short's, to their business advantage and to Short's detriment.

**ANSWER: Denied.**

**674.**    The other Craft Defendants knew or should have known that the information

obtained by Kaeding were intercepted electronic communications intended for Short's.

**ANSWER: Denied.**

675.    More than seven years of receiving email intended for Short's without changing the email address was willful, malicious and/or reckless violation of Iowa Code Ch. 808B.

**ANSWER: Denied.**

676.    The Craft Defendants interception, disclosure and use of intercepted electronic communications intended for Short's violated Iowa Code Ch. 808B and Short's is entitled to recover (i) actual damages in the minimum liquidated amount of $1,000 plus such additional liquidated damages that may be proven at trial; (ii) punitive damages for the willful, malicious and/or reckless failure to cease interception; and (iii) attorney's fees and costs.

**ANSWER: Denied.**

### CLAIM 12
### ELECTRONIC COMMUNICATIONS PRIVACY ACT 18 U.S.C. § 2520
### (Short's & Perez v. Craft Defendants)

677.    Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**ANSWER: Answering Defendants incorporate their responses to all allegations in this Complaint by this reference as if fully set forth herein.**

678.    Plaintiffs specifically reallege and incorporate by reference the allegations contained in Claim 11.

**ANSWER: Answering Defendants incorporate their responses and denials to Plaintiffs' allegations in Claim 11 of the Complaint by this reference as if fully set forth herein.**

679.    The Craft Defendants interception and use of emails intended for Short's as plead above violated 18 U.S.C. § 2511 (Electronic Communications Privacy Act)("ECPA").

**ANSWER: Denied.**

680.    18 U.S.C. §2520(a) provides that "any person whose wire, oral or electronic communication is intercepted, disclosed or intentionally used in violation of this chapter may in a civil action recover . . . such relief as may be appropriate."

**ANSWER: Paragraph 680 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

681.    Relief available includes damages, punitive damages and fees and costs. 18 U.S.C. §2520(b). Damages are calculated as the greater of (i) actual damages or (ii) statutory damages of $100 per day or $10,000. 18 U.S.C. § 2520(c).

**ANSWER: Paragraph 681 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

682.    Defendant Kaeding intercepted email communications intended for Short's for multiple years. Kaeding knew these communications were intended for Short's. Kaeding knew he no longer was associated with Short's from 2017 to 2024 yet continued to receive and read these messages for more than five years.

**ANSWER: Denied.**

683.    Plaintiffs first learned of and discovered Kaeding's interception of these emails in 2024 and this claim is timely under 18 U.S.C. §2520(e).

**ANSWER: Denied.**

684.    Plaintiffs are entitled to recover at least $10,000, fees and costs from the Craft Defendants for violations of the ECPA.

**ANSWER: Denied.**

685.    Plaintiffs are entitled to recover actual damages to be proven at trial, punitive

damages for the intentional use of intercepted communications by the Craft Defendants, fees and costs.

**ANSWER: Denied.**

## CLAIM 13

**ANSWER: Paragraph 686-702 contain a claim dismissed pursuant to the Court's Order RE: Motions to Dismiss (Doc. 139) to which no response is required. To the extent a response is required, the claim is denied.**

## CLAIM 14 DEFAMATION

**(Short's & Perez v. MWO Defendants, Kaeding, Swift, Bird and Wallace)**

**703.** Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

**ANSWER: Answering Defendants incorporate their responses to all allegations in this Complaint by this reference as if fully set forth herein.**

**704.** Charlie Funk, former CEO of MWO, testified under oath in July 2024 that his understanding was that Short's was being evicted by the Trust for non-payment for rent. This belief is false, FED #1 asserted Short's abandoned (dismissed with prejudice voluntarily) and FED #3 asserted that Short's failed to timely exercise an option to renew. Non-payment of rent was never the basis of either eviction action.

**ANSWER: Denied for lack of knowledge or information.**

**705.** Mr. Funk learned his information from the MWO Defendants.

**ANSWER: Denied for lack of knowledge or information.**

**706.** From May 2022 to present, whether by written or verbal statements, the MWO Defendants falsely stated, internally within MWO in a manner that resulted in the information being received by MWO's CEO, that the MWO/Trust eviction actions against

Perez and Short's were based failure to pay rent when in reality no monetary default occurred under the Lease prior to the initiation of any of the eviction action.

**ANSWER: Denied.**

**707.**     The MWO Defendants statements that the Short's evictions were based upon failure to pay rent were knowingly false when made and designed to impugn Perez and Short's and damage their business reputation.

**ANSWER: Denied.**

**708.**     Such defamation is defamation *per se* (statements asserting an individual is unable to their job or lacks integrity and statements that harm the plaintiff's profession or employment). and goes to the heart of Perez and Short's credibility and ability to compete in the market.

**ANSWER: Denied.**

**709.**     Kaeding sent emails to Swift, Smart, Kent, Maske, and Breitbach on February 5, 2024 asserting Perez was blaming the "man" for Perez's "business failing." This statement was knowingly false.

**ANSWER: In answer to Paragraph 709, Answering Defendants state that Defendant Kaeding's February 5, 2024 emails speak for themselves and deny any allegation or characterization outside the terms of said emails. Answering Defendants specifically deny the statements in Defendant Kaeding's February 5, 2024 emails were knowingly false.**

**710.**     Swift texted Kaeding in 2021 urging Kaeding to take Short's "just to stick it [to] those guys".

**ANSWER: In answer to Paragraph 710, Answering Defendants state that**

**Defendant Swift's 2021 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

711.    By text in April 2022 Kaeding denigrated Perez as bad business partner to Peter Matthes, an important figure for Perez's business. Kaeding testified under oath in related litigation that he did not and does not believe that Perez is a bad business man.

**ANSWER: In answer to Paragraph 711, Answering Defendants state that Defendant Kaeding's April 2022 text message and testimony speak for themselves and deny any allegation or characterization outside the terms of said message and testimony.**

712.    On April 28, 2022 Bird wrote Kaeding a text message in which she indicated that she had communicated with Wallace and that Wallace was "done with [Perez]."

**ANSWER: In answer to Paragraph 712, Answering Defendants state that Defendant Bird's text messages speaks for itself and deny any allegation or characterization outside the terms of said message.**

713.    The conversation between Wallace and Bird was defamatory.

**ANSWER: Paragraph 713 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

714.    The conversation between Wallace and Bird led Bird to text to Kaeding that "it was a pretty shitty thing to do to blame his [Perez's] business failures on the building."

**ANSWER: In answer to Paragraph 714, Answering Defendants state that Defendant Bird's text messages speaks for itself and deny any allegation or characterization outside the terms of said message.**

715.    No examples of Short's having "business failures" or "blaming" the building

are  provided by Defendant Bird.

> **ANSWER: In answer to Paragraph 715, Answering Defendants state that Defendant Bird's text messages speaks for itself and deny any allegation or characterization outside the terms of said message.**

716.    Defendant Bird made these statements in furtherance of the enterprise and to defame Perez.

> **ANSWER: Paragraph 716 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

717.    These statements, whether made by Bird or made by Wallace and repeated by Bird, or both, were knowingly false.

> **a.** Short's business was not failing and Perez had never indicated such.

> **b.** The collapse of the Building's back wall caused the City to cut-off the gas supply. A restaurant kitchen cannot operate without a gas supply. The Building's physical  deterioration was reason for Short's closure.

> **ANSWER: Paragraph 717 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

718.    Bird's and Wallace's false statement as to Perez's business failure constitute defamation *per se*.

> **ANSWER: Paragraph 729 is not directed to the Answering Defendants and no response is required on their behalf. To the extent a response is required, it is denied.**

719.    In response to Bird's text on April 28, 2022, Kaeding responded to Bird "Of course I have dealt with him [Perez]. Bad dude."

> **ANSWER: In answer to Paragraph 719, Answering Defendants state that**

**Defendant Kaeding's April 2022 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

**720.** No examples of Perez being a "bad dude" are provided.

**ANSWER: In answer to Paragraph 720, Answering Defendants state that Defendant Kaeding's April 2022 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

**721.** Kaeding's statements are knowingly false and made in furtherance of the enterprise and to defame Perez.

**ANSWER: Denied.**

**722.** By this statement, Kaeding was confirming Bird's false premise of a failing business being blamed on the building. By this statement, Kaeding was impugning Perez and Short's business ethics.

**ANSWER: Denied.**

**723.** Kaeding's statements constitute defamation *per se*.

**ANSWER: Denied.**

**724.** In 2024, Kaeding testified in a related litigation deposition that he thought Perez was a good business man.

> **a.** Kaeding's text of April 28, 2022 re-enforcing and confirming Wallace's and Bird's false statements that Perez was wrongfully blaming the building for a business failure was a knowingly false statement by Kaeding when made. Kaeding's subsequent sworn testimony as to his real beliefs about Perez's business acumen denies the truth of Kaeding's earlier statements.

b. Kaeding's text of April 28, 2022 re-enforcing and confirming Wallace's and Bird's false statements that Perez was wrongfully blaming the building for a business failure constituted defamation *per se* impugning Perez and Short's business reputation.

c. As a direct result of these false statements, Bird and Kaeding reinforced Wallace's animus towards Perez, and that reinforced racial animus was directed by Wallace to the MWO Defendants to fulfill Wallace's demand that Perez and Short's be evicted in favor of Kaeding or Craft Concepts affiliated or confederated enterprise becoming the replacement tenant.

d. The Mote/Craft Concepts "break-in" at Short's occurred less than a week after the Bird-Kaeding texts of April 28, 2022.

e. The existence of the Bird-Kaeding text messages referencing Bird's communications with Wallace prior to April 28, 2022 prove that Defendant Bird is aware as to how she learned information about Short's during April 2022.

f. Nonetheless, Bird has refused to retract her April 24, 2024 false sworn statement given in furtherance of the enterprise, and constitutes perjury, as plead above.

**ANSWER: In answer to Paragraph 724, Answering Defendants state that Defendant Kaeding's testimony speaks for itself and deny any allegation or characterization inconsistent with said testimony.**

725. On or about June 9, 2022, Wallace texted Kaeding regarding giving the

Premises to Kaeding's affiliates and in doing so Wallace stated Ouverson was understanding but that "Kevin is an idiot."

**ANSWER: In answer to Paragraph 725, Answering Defendants state that Defendant Wallace's June 9, 2022 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

726.    No actual examples of Perez's idiocy are provided.

**ANSWER: In answer to Paragraph 726, Answering Defendants state that Defendant Wallace's June 9, 2022 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

727.    On April 18, 2023, Kaeding texted Swift, Kent, Smart that Short's was "a shit show" and that "Perez is a complete douche."

**ANSWER: In answer to Paragraph 727, Answering Defendants state that Defendant Kaeding's April 18, 2023 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

728.    No actual examples of why Short's is a "shit show" or why Perez is a "complete douche" are provided.

**ANSWER: In answer to Paragraph 728, Answering Defendants state that Defendant Kaeding's April 18, 2023 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

729.    Kaeding stated under oath in 2024 that he did not hold these opinions.

**ANSWER: In answer to Paragraph 724, Answering Defendants state that Defendant Kaeding's testimony speaks for itself and deny any allegation or characterization inconsistent with said testimony.**

**730.** Wallace and Kaeding wrote those statements knowing they are baseless, in furtherance of the enterprise and to defame Perez.

**ANSWER: Denied.**

**731.** Kaeding by February 5, 2024 text message to the group of Defendants Swift, Maske, Kent, Smart and Breitbach that Perez and Short's release of information regarding the coordinated May 4, 2022 "break-in" was a "completely baseless accusation designed to make him look like the victim and blame the 'man' for his business failing."

    **a.** Kaeding's use of the term "the man" belies his belief that he (Kaeding) is "the man" a superior white male and Perez is a jealous, inferior Hispanic minority. This statement proves Kaeding's racial animus against Perez.

    **b.** If there was no racial motivation involved, Kaeding would simply have said the accusation was completely baseless and not have made reference to Perez's racial "inferiority" in his statement.

    **c.** Kaeding knew this statement was false when made. The accusation that the Craft Concepts break-in and interest in taking Short's business location is based in facts known to Kaeding.

    **d.** Short's business was not failing and Kaeding knew as much from his time as an owner, consultant, member of the MWO Board, employment at the ICDD, and his connections.

    **e.** Kaeding's post-Short's tenure in Iowa City has included ongoing attempts to steal concepts originated in Iowa City by Perez, including Kaeding's multiple failed efforts to place burger restaurants in close

proximity to Short's while simultaneously receiving consulting fees from Short's.

    **f.**    Such attempts by Kaeding demonstrate that Kaeding has never believed that Perez is a failed business man.

    **g.**    Kaeding's statement was designed to intentionally impugn Perez and Short's business practices and damage Perez and Short's business reputation.

    **h.**    Kaeding's knowing lies about his own actions were written in furtherance of the enterprise and to defame Perez.

**ANSWER: In answer to Paragraph 731 and each of its subparts, Answering Defendants state that Defendant Kaeding's February 5, 2024 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

**732.**    Kaeding, by text message to Peter Matthes on February 6, 2024, stated that Perez was "crazy."

**ANSWER: In answer to Paragraph 732, Answering Defendants state that Defendant Kaeding's February 6, 2024 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

**733.**    No actual example of Perez being "crazy" is provided.

**ANSWER: In answer to Paragraph 733, Answering Defendants state that Defendant Kaeding's February 6, 2024 text message speaks for itself and deny any allegation or characterization outside the terms of said message.**

**734.**    Kaeding stated under oath at deposition in 2024 that he does not hold that

opinion of Perez.

**ANSWER: In answer to Paragraph 734, Answering Defendants state that Defendant Kaeding's deposition testimony speaks for itself and deny any allegation or characterization outside the terms of said testimony.**

735.    Kaeding made that knowingly false statement to Matthes in furtherance of the enterprise and to defame Perez.

**ANSWER: Denied.**

736.    Kaeding, by text message on or about February 6, 2024 texted to Swift that "Dan Ouverson brought this clown [referring to Perez] into Short's after we started. I didn't know any better."

    **a.**    This statement was knowingly false. Perez *was not brought in **after*** Kaeding and Ouverson started Short's.

    **b.**    This statement and reference to Perez as a "clown" was designed and intended to impugn Perez and Short's business practices and reputation.

    **c.**    This statement constitutes defamation *per se*.

**ANSWER: In answer to Paragraph 736, Answering Defendants state that Kaeding's February 6, 2024 text message speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said message and further deny the allegations in each subpart of Paragraph 736.**

737.    In response to Kaeding's text message described in the preceding paragraph, Defendant Swift wrote to Defendant Kaeding (emphasis added):

> I told [my wife] when we went for a run in Palm Beach *by a homeless camp*, they don't play by the same rules.  When you have *nothing to lose*, you don't conform to anything that is 'normal'. So be fucking careful....

a.    Swift drops in his location in the well-to-do community of Palm Beach.

b.    Swift chose to use an example of his experience in a Miami suburb, as opposed to the location where he actually resides, Johnson County, Iowa.

c.    The Hispanic/Latino population in Miami is 70%.

d.    It stands to reason that a city with a 70% Hispanic population would have a large Hispanic unhoused population.

e.    Swift is not unhoused, and has no first-hand knowledge of whether or not an unhoused population has "nothing to lose."

f.    Swift chose to highlight this location in his statement solely due to the heavy Hispanic population of Miami so that he could use untrue stereotypes to disparage Perez despite knowing that Perez is neither unhoused (homeless) nor a resident of Palm Beach.

g.    Swift's statement then characterizes Perez as being the equivalent of residing in a homeless encampment.

h.    Swift knew this statement was not true as he and Kaeding both know where in Iowa City Perez has lived and owned his home for more than 25 years.

i.    Defendant Swift's statement belies his racial animus towards Hispanics and Perez.

j.    Swift's statement then states Perez has "nothing to lose." This statement was knowingly false. Perez had something valuable and the Craft Defendants are trying to take it – occupancy and operation of a

restaurant in the Premises.

**k.**     Swift then states that there is danger because Perez won't conform to anything normal.  There is no basis for a conclusion of "danger" necessitating a "fucking" qualifier.

**l.**     Swift provides no definition of his understanding of what the word "normal" means.

**m.**     Swift provides no examples of how Perez refuses to comply with Swift's, or any definition of "normal."

**n.**     Defendant Swift, a white male, believes that by virtue of Perez's race, Perez can never be "normal" and therefore, like the homeless Hispanic encampment near Palm Beach, Perez is a "danger." The danger Swift sees is to the enterprises' goal of white male dominance in the Iowa City Downtown and all other markets in which the Craft Defendants compete.

**o.**     Swift's false statements regarding Perez's person, business and danger were designed to impugn Perez and Short's personally and their business acumen, practices, and finances.

**p.**     Swift's false statements constituted defamation *per se*.

**ANSWER: In answer to Paragraph 737, Answering Defendants state that Swift's text message speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said message and further deny the allegations in each subpart of Paragraph 737.**

**738.**     On or about February 15, 2024, Kaeding and Swift engaged in a text message

exchange discussing the status of Short's eviction. In that message Kaeding accused Perez and Short's of "taking texts illegally . . . then using them out of context to try and play the victim. Its all about dragging down the winners in society." In response, Swift wrote "Agree."

    **a.**    Kaeding's statement was knowingly false. Short's did not take texts illegally. The text messages between Kaeding and Mote regarding the break-in planning and execution were produced by MWO in related litigation and no protective order was in place at the time of production. Perez came into possession and control of the Kaeding-Mote texts lawfully and pursuant to judicial process. Kaeding knew that to be the case.

    **b.**    The statement alleging Perez and Short's committed a crime by obtaining relevant communications during discovery was defamation *per se* as it alleges criminal conduct.

    **c.**    Referring to the Craft Defendants as the "winners in society" Kaeding makes the statement that Perez and Short's are the "losers in society" was designed to impugn the business practices and reputation of Perez and Short's. Kaeding's statements and Swift's agreement are defamation *per se* as to Perez and Short's business reputation.

**ANSWER: In answer to Paragraph 738, Answering Defendants state that the February 15, 2024 text message exchange speaks for itself. Answering Defendants deny any allegation or characterization outside the terms of said exchange and further deny the allegations in each subpart of Paragraph 738.**

    **739.**    The City Defendants, the MWO Defendants, the Craft Defendants, Wallace

and Bird engaged in a systematic and coordinated effort to defame Short's and Perez. These coordinated acts constitute a civil conspiracy for purposes of assignment of liability.

**ANSWER: Denied.**

**740.**    MWO and the Trust's serial attempts to evict have generated the false belief in the community that Short's is economically stressed and that Perez and Short's are unable to pay their bills.

**ANSWER: Denied.**

**741.**    These false statements have damaged ***

**ANSWER: Denied.**

**742.**    All of plead false statements (whether written or verbal) plead herein constitute both defamation *per se* and/or defamation *per quod*.

**ANSWER: Denied.**

**743.**    The above plead false statements were made maliciously.

**ANSWER: Denied.**

**744.**    The above plead false statements have damaged Plaintiffs' personal and business reputations in the community.

**ANSWER: Denied.**

**745.**    This defamation has restricted Perez and Short's access to the banking, leasing, and financing markets by placing a taint on Perez and Short's names.

**ANSWER: Denied.**

**746.**    The Plaintiffs have been damaged, including emotional damages, from this defamation.

**ANSWER: Denied.**

**747.**    The Plaintiffs are entitled to compensation and awards of damages, of all types legally available, in an amount to be proven at trial.

**ANSWER: Denied.**

## CONCLUSION

**748.**    The enterprises plead above concertedly and with coordination towards a common goal acted and attempted to monopolize the Iowa City Downtown and remove minority participation of the economic development and re-development of the Iowa City Downtown. In doing so, the enterprises have discriminated, intimidate, extorted and engaged in racketeering activity towards those ends.

**ANSWER: Denied.**

**749.**    Economic opportunities in Iowa City are being allocated and distributed to the same group of individuals, all Caucasian males, to the exclusion of Perez and other racial minorities.

**ANSWER: Denied.**

**750.**    Plaintiffs have been damaged directly by these unlawful and discriminatory acts.

**ANSWER: Denied.**

**The remainder of Plaintiffs' Complaint constitutes their prayer for relief and no response is required. To the extent a response is required, it is denied.**

## AFFIRMATIVE DEFENSES

1.    Plaintiffs' First Amended Complaint fails to state a claim upon which relief can be granted.

2.      Plaintiffs' claim of defamation is barred in whole or in part because the statements Defendants are alleged to have made, even if made, were protected opinions, true, and/or justified.

3.      Plaintiffs' claim of defamation is barred in whole or in part because Defendants are entitled to a qualified privilege for the alleged statements.

4.      The conduct, acts and/or omissions of the Plaintiffs caused all or part of the damages it purports and now seeks.

5.      If Plaintiffs have been damaged, other causes have contributed to the same.

6.      Plaintiffs' claims are barred by the doctrines of laches, estoppel, unclean hands, waiver, and/or ratification.

7.      To the extent Plaintiffs have failed to mitigate the damages it now seeks, they are barred, in whole or in part, from recovery in this action.

8.      Plaintiffs' claims are barred by applicable statutes of limitation.

9.      Answering Defendants reserve the right to assert additional affirmative defenses as necessary.

WHEREFORE, having answered the allegations of the First Amended Complaint and asserted their affirmative defenses, Defendants IC Burg, LLC, MH Legacy, LLC, NS Holdings, LLC, Nathaniel Kaeding, Matthew Swift, Cory Kent, Benjamin Smart, John Maske, Stephanie Breitbach and Doug Goettsch hereby pray that the Complaint be dismissed at Plaintiffs' cost and that said Defendants recover their costs, attorneys' fees and expenses incurred herein.

### DEMAND FOR JURY TRIAL

Defendants IC Burg, LLC, MH Legacy, LLC, NS Holdings, LLC, Nathaniel Kaeding,

Matthew Swift, Cory Kent, Benjamin Smart, John Maske, Stephanie Breitbach and Doug Goettsch hereby demand a trial by jury.

SIMMONS PERRINE PLC

By: /s/ Paul D. Gamez
Paul D. Gamez, AT0002806
Nicholas Petersen, AT0012570
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
Telephone: (319) 366-7641
Facsimile: (319) 366-1917
E-mail: pgamez@sp.law
npetersen@sp.law

ATTORNEYS FOR DEFENDANTS
IC BURG, LLC, MH LEGACY, LLC,
NS HOLDINGS, LLC, NATHANIEL
KAEDING, MATTHEW SWIFT,
CORY KENT, BENJAMIN SMART,
JOHN MASKE, STEPHANIE
BREITBACH AND DOUG
GOETTSCH

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2025, I filed the foregoing using the court's CM/ECF system which will send notification of said filing to all attorneys and parties of record.

/s/ Paul D. Gamez